oct 4 17(2).txt

1

1

2   UNITED STATES DISTRICT COURT

3   EASTERN DISTRICT OF NEW YORK

4   - - - - - - - - - - - - - - - - - - - -x

5   In re
                            Case No.
6                           16-45646 (CEC)
    BOYSIN RALPH LORICK,
7   CYNTHIA THERESA LORICK,

8                  Debtors.
    - - - - - - - - - - - - - - - - - - - -x
9
                       90 Merrick Avenue
10                      East Meadow, New York

11                      October 4, 2017
                        1:53 p.m.
12

13

14      DEPOSITION of MOHAMMAD CHOUDHARY, a

15   Witness in the above-entitled action, held

16   at the above time and place, taken before

17   Susan Adams, a Shorthand Reporter and

18   Notary Public of the State of New York,

19   pursuant to the Federal Rules of Civil

20   Procedure and stipulations between

21   Counsel.

22

23              *       *       *

24

25

2

oct 4 17(2).txt

1
2  APPEARANCES:
3
4     CERTILMAN BALIN ADLER & HYMAN, LLP
5           Attorneys for Soleyman Ghalchi
6           90 Merrick Avenue
7           East Meadow, New York 11554
8     BY:   RICHARD J. McCORD, ESQ.
9
10
11    KILPATRICK TOWNSEND & STOCKTON, LLP
12          Attorneys for Defendant
13          Wells Fargo Bank
14          1114 Avenue of the Americas
15          New York, New York 10036
16    BY:   MAXIMILIANO RINALDI, ESQ.
17
18    JANE NADELSON, ESQ.
19          Attorney for Mohammad Choudhary
20          3024 Coney Island Avenue
21          Brooklyn, New York 11235
22
23
24
25
                                          3

1
2                  STIPULATIONS
3       IT IS HEREBY STIPULATED AND AGREED, by
4   and among counsel for the respective
                 Page 2

oct 4 17(2).txt

```
 5   parties hereto, that the filing, sealing
 6   and certification of the within deposition
 7   shall be and the same are hereby waived;
 8      IT IS FURTHER STIPULATED AND AGREED
 9   that all objections, except as to form of
10   the question, shall be reserved to the
11   time of the trial;
12      IT IS FURTHER STIPULATED AND AGREED
13   that the within deposition may be signed
14   before any Notary Public with the same
15   force and effect as if signed and sworn to
16   before the Court.
17                *      *      *
18
19
20
21
22
23
24
25
```

♀

                                                    4


```
 1              M. Choudhary
 2   M O H A M M A D   C H O U D H A R Y,
 3           a Witness herein, having first
 4           been duly sworn by the Notary
 5           Public, was examined and
 6           testified as follows:
 7   EXAMINATION BY
```
                        Page 3

oct 4 17(2).txt

8   MR. MCCORD:

9       Q.      Would you please state your name

10  for the record.

11      A.      Mohammad Choudhary.

12      Q.      Where do you reside?

13      A.      4200 Atlantic Avenue, Brooklyn,

14  New York 11224.

15      Q.      Hi, Mr. Choudhary.  My name is

16  Richard McCord.  I am Mr. Soleyman

17  Ghalchi's attorney in this matter

18  pertaining to Boysin Ralph Lorick and

19  Cynthia Theresa Lorick, Chapter 11 Case

20  Number 16-45645-NLH.

21              I don't know why I do that.  You

22  already have it, don't you.  Anyway, I

23  will be asking you some questions today.

24              Have you ever been deposed

25  before in a deposition like this?

                                             5


1               M. Choudhary

2       A.      I don't remember.  A long, long

3   time I think in one case.

4       Q.      So anyway, you're under oath and

5   under penalties of perjury.  And sitting

6   here today testifying in that matter is

7   the same thing as you if you were sitting

8   in a court of law.

9               Do you understand?

10      A.      Yes, sir.

11              MR. MCCORD:  Off the record.

Page 4

oct 4 17(2).txt

```
12              [Discussion held off the

13      record.]

14              MR. MCCORD:   Back on the record.

15      Q.     Do you understand that, that

16  you're under penalties of perjury, and

17  that it's the same thing as if you're

18  sitting in a court of law?

19      A.     Yeah.

20      Q.     I will be asking you some

21  questions.  If I ask you something you

22  don't understand, please tell me and I'll

23  try to clarify it.  If I ask you a

24  question where you don't know the answer,

25  please tell me.  I prefer you don't guess.
```

                                                6

```
 1              M. Choudhary

 2  And then we'll just move on.

 3              Do you understand?

 4      A.     Yes, sir.

 5      Q.     Okay.  And you see this young

 6  lady here is the court reporter and she

 7  can only take one person's statements down

 8  at a time, so let's try not to talk at the

 9  same time.

10              Okay?

11      A.     Okay.

12      Q.     Are you under any kind of

13  medication or anything like that that

14  would interfere with your ability to
```

                    Page 5

oct 4 17(2).txt

15    openly and honestly answer my questions

16    today?

17        A.    No.

18        Q.    Okay.  All right.  I show you --

19            MR. MCCORD:  Let's mark this in,

20        please.

21            (Whereupon, Choudhary Exhibit 1,

22        subpoena to testify at a deposition in

23        a bankruptcy case was hereby marked

24        for identification, as of this date.)

25            MS. NADELSON:  September 28 is

7

1            M. Choudhary

2    the prior one.

3            MR. MCCORD:  Right.

4        Q.    I show you what's been marked as

5    Choudhary Exhibit 1.  It says "Subpoena to

6    testify at a deposition in a bankruptcy

7    case"; do you see that?

8        A.    Yeah.

9        Q.    And is that why you're here

10    today although it's dated September 28,

11    that was adjourned until today, the actual

12    date, but other than that, is that why

13    you're here today?

14        A.    Yes.

15        Q.    Okay.  Could you just put the

16    exhibits over behind the reporter's

17    laptop.

18            MR. MCCORD:  Mark this in.

oct 4 17(2).txt

19            (Whereupon, Choudhary Exhibit 2,
20        check from the Brownstone Agency, Inc
21        on behalf of Aspen American Insurance
22        Company was hereby marked for
23        identification, as of this date.)
24        Q.    I show you what's been marked as
25    Choudhary Exhibit 2, it's a check from the

8

1               M. Choudhary
2    Brownstone Agency, Inc on behalf of Aspen
3    American Insurance Company.
4            Do you see it?
5        A.    Yeah.
6        Q.    And it's in the amount of
7    $153,356.03 --
8        A.    Yeah.
9        Q.    -- do you see it?
10        A.    Yeah.
11        Q.    "Made payable to Boysin Lorick
12    Wells Fargo Bank as trustee, Douglas
13    Rosenberg," etcetera; do you see that?
14        A.    Yeah.
15        Q.    And it's dated November 19,
16    2014; do you see that?
17        A.    Uh-huh.
18        Q.    Do you know what that's for?
19        A.    No.
20        Q.    Have you ever seen that before?
21        A.    Never.

Page 7

oct 4 17(2).txt

22    Q.    Have you ever heard of the

23    company Brownstone Agency or Aspen

24    American Insurance Company?

25    A.    Never.

9

1              M. Choudhary

2    Q.    Have you ever heard of any of

3    the people that it's payable to?

4    A.    Boysin Lorick.

5    Q.    Anyone else?

6    A.    Only Lorick.

7    Q.    No one else?

8    A.    No one else.

9    Q.    Okay.  This is a check from the

10   insurance company.  This says check from

11   the insurance company payable to those

12   people because of the fire damage at Mr.

13   Lorick's building in 2013 at 3126 Coney

14   Island Avenue, Brooklyn, New York; are you

15   aware of that?

16   A.    No.

17   Q.    Okay.  Did you have anything to

18   do with that building at that time on

19   behalf of Mr. Lorick?

20   A.    I just remember -- what I

21   remember, you know, after the fire I

22   pulled a permit on something, that's the

23   only thing I did, I pulled the permit.

24   Q.    Okay.

25         MS. NADELSON:  Do you have a

⚲

```
 1              M. Choudhary
 2       copy of the permit, right?
 3              MR. MCCORD:   Mark this in,
 4       please.
 5              (Whereupon, Choudhary Exhibit 3,
 6       copy of the permit issued to Mohammad
 7       Choudhary on July 29, 2013 was hereby
 8       marked for identification, as of this
 9       date.)
10       Q.    I show you what's been marked as
11   Choudhary Exhibit 3, is that the permit
12   that you're talking about that was issued
13   to you Mohammad Choudhary on July 29,
14   2013; do you see that?
15       A.    Yeah.
16       Q.    And the work to be performed is
17   alteration type 2 general construction --
18       A.    Yeah.
19       Q.    -- and interior renovation of
20   apartments; do you see that?
21       A.    Yeah.
22       Q.    Okay.  Are you the Mohammad
23   Choudhary that's on this permit?
24       A.    Yes, sir.
25       Q.    Okay.  And did you perform the
```

⚲

11

oct 4 17(2).txt
1              M. Choudhary
2    work?
3        A.    No, sir.
4        Q.    Who did, if you know?
5        A.    I have no idea it was his people
6    I don't know.  No, I didn't.
7        Q.    Do you know over here the
8    company called 786 Contracting, Inc.?
9        A.    That is mine.
10        Q.    That is your company?
11        A.    Yes, sir.
12        Q.    If you look at the exhibit
13    that's the business that's listed on the
14    permit; do you see that?
15        A.    Yes, sir.
16        Q.    Was the building destroyed by
17    the fire?
18              MS. NADELSON:  It's a leading
19        question, he doesn't know.
20        Q.    Mr. Lorick's building, was it
21    destroyed; if you know?
22        A.    It was not destroyed.
23              MS. NADELSON:  The building,
24        it's a huge building.
25        Q.    According to this permit there
                                    12


1              M. Choudhary
2    seems to be a lot of renovation work that
3    needed to be done; is that correct?
4        A.    I don't think it was a lot of
                 Page 10

oct 4 17(2).txt

```
 5    work to be done.  It was smoke and this
 6    and that.
 7            We pulled the permit because of
 8    the violation.  I don't remember.  It was
 9    a long time ago, but I know I pulled the
10    permit but I never did the work there.
11    Q.     Who did the work?
12    A.     I have no idea who did the work
13    there.
14    Q.     Was it done?
15    A.     I don't know if it was done or
16    not.  And I even don't remember if I
17    closed the permit on this one.
18            MS. NADELSON:  Obviously not
19        if --
20            MR. MCCORD:  Ms. Nadelson,
21        please.
22    Q.     Why did you apply for the
23    permit, if you weren't planning on doing
24    the work?
25            MS. NADELSON:  If you don't
```

                                                13


```
 1            M. Choudhary
 2        remember or you don't know the answer,
 3        just say so.
 4    Q.     Why did you apply for the
 5    permit, if you didn't do the work?
 6    A.     Well, we know each other.  Once
 7    in a while if I have a plumbing problem he
```

Page 11

oct 4 17(2).txt

 8    helps me and I help him.  That was just --

 9        Q.    A plumbing problem, did you say?

10        A.    No, I mean in my building he's a

11    very handy man also.

12              MS. NADELSON:  He asked you a

13        question, I'm sorry, if you did any

14        work on this building.

15              THE WITNESS:  No.

16        Q.    I asked you another question

17    after that question which was, why did you

18    apply for the permit, as you were

19    answering before your attorney interrupted

20    you.

21              MS. NADELSON:  Yes, sorry.

22        Q.    Is it because you work together

23    and you help each other out; is that what

24    you're saying; is that your testimony?

25        A.    Yes, sir.  Sometimes you know on

                                        14


 1              M. Choudhary

 2    the construction problems, yes.

 3        Q.    Do you know why he didn't apply

 4    for the permit?

 5        A.    I don't think he has.  I don't

 6    know why he didn't apply.

 7        Q.    Does he have a license to do

 8    general contracting, if you know?

 9        A.    I don't know.  I don't think so.

10        Q.    Do you?

11        A.    I do.

                    Page 12

oct 4 17(2).txt

12       Q.       Do you now?

13       A.       Yes, I do.

14       Q.       Did you have in 2013 when you

15   applied for this permit?

16       A.       Yes, I do.

17       Q.       So you would apply for the

18   permit to do the work because you're

19   licensed to do this kind of work at that

20   time in 2013 and Mr. Lorick is not; is

21   that correct?

22       A.       Yes.

23       Q.       Okay.  And then you got the

24   permit, correct?

25       A.       Yeah, yeah.

                                                 15


 1               M. Choudhary

 2       Q.      It was issued, correct?

 3       A.      Yeah, yeah.

 4       Q.      And is it your testimony that

 5   you never did the work?

 6       A.      Never did the work.  I even

 7   don't remember when did he do the work.

 8       Q.      But --

 9       A.      Yes, I pulled the permit.

10       Q.      Did he do the work under this

11   permit --

12               MS. NADELSON:  You already asked

13       him this question.

14       Q.      -- if you know?

                       Page 13

oct 4 17(2).txt

15      A.      I don't know if he did with this
16  permit or what.  I don't know.  I don't
17  know who did it.
18      Q.      It's your testimony you don't
19  know if the work was ever done; is that
20  correct?
21      A.      I don't know.  Yes, I don't
22  know.
23      Q.      Do you know if it was done or
24  not done?
25      A.      I don't remember that, if it was

                                        16


1               M. Choudhary
2   done or not done.  I don't remember that.
3       Q.      Well, when was the last time you
4   were in the building at 3126 Coney Island
5   Avenue, Brooklyn, New York?
6       A.      I don't remember.  I don't go
7   there.  We mostly meet -- no, I don't
8   remember.
9       Q.      Mostly where?
10      A.      On the street.
11      Q.      Do you meet at your office?
12      A.      At my office and on the street.
13      Q.      Where is your office?
14      A.      Just one block.
15      Q.      What's the address?
16      A.      3072 Coney Island Avenue.
17      Q.      What's the purpose of meeting in
18  your office, is it for business purposes?

oct 4 17(2).txt

19    What is the purpose of meeting in your
20    office?
21        A.    We have no business.   Just as I
22    told you we help each other.   If there is
23    any problem, the way I pull the permit if
24    I have any problem, he's a very good
25    plumber, he will help me a little bit.

                                        17


1                M. Choudhary
2    It's nothing more than that.
3        Q.    So how often do you meet with
4    him in your office?
5        A.    It's not in the office that he
6    has to come to my office.   Whenever he
7    wants he comes but not so often.   Mostly
8    on the street, hi, hello.
9        Q.    How long have you known Mr.
10    Lorick?
11        A.    Long time.
12        Q.    Can you be a little bit more
13    specific?
14        A.    More than ten years, a long
15    time.
16        Q.    Do you own any businesses with
17    him?
18        A.    No.
19        Q.    Are you in any type of business
20    venture with him, if you know what that
21    means?

                    Page 15

oct 4 17(2).txt

22      A.      No.

23      Q.      Have you ever been?

24      A.      No.

25      Q.      And do you know Cynthia Theresa

                                            18

1              M. Choudhary

2       Lorick?

3       A.      I met her only once in the

4       court.  I don't know her so close.

5       Q.      And you know about the Chapter

6       11 bankruptcy filing of Mr. Lorick?

7       A.      I don't know anything what the

8       bankruptcy is, but I know he filed and

9       that is how I know but I don't know what

10      is it.

11      Q.      Do you know he filed on December

12      15, 2016?

13      A.      Yeah.  He filed the bankruptcy,

14      yes.

15      Q.      That he filed it in December 15,

16      2016?

17      A.      Yes.

18      Q.      How do you know he filed that?

19      A.      He told me.

20      Q.      He told you?

21      A.      Yeah.  He discussed with me,

22      yeah.

23      Q.      Did you know he filed bankruptcy

24      in July of 2016 Chapter 13, another type

25      of bankruptcy, did he tell you that?

oct 4 17(2).txt

19

1              M. Choudhary
2      A.    No, I think this is the one I
3  know.  I don't know the before one.
4      Q.    He never told you about the
5  before one?
6      A.    No, no.  The latest one is the
7  one I know only.
8      Q.    Do you know an attorney by the
9  name of Frank Wharton?
10      A.    No.
11          MS. NADELSON:  I'm sorry, Mr.
12      McCord.
13          I think he's missing in the --
14      it's because it was so close to each
15      other, can you rephrase your question
16      regarding --
17          MR. MCCORD:  Let me make a
18      statement for the record.
19          Ms. Nadelson, hopefully, you
20      have a pen and piece of paper and I
21      will permit you when I'm done to ask
22      questions that you feel is
23      appropriate, either for purposes of
24      clarifying what I asked or expanding
25      upon it, but interrupting me in this

20

oct 4 17(2).txt

```
 1              M. Choudhary
 2     fashion is not appropriate.
 3              MS. NADELSON:  I'm sorry.
 4              MR. MCCORD:   Take notes, and I
 5     will give you an opportunity to ask
 6     questions to clarify.
 7              Okay.   Thank you.
 8              MS. NADELSON:   Sorry.
 9     Q.      Do you know an attorney by the
10     name of Frank Wharton?
11     A.      No.
12     Q.      As you sit here today, you don't
13     recall Mr. Lorick ever telling you about
14     the first bankruptcy that he filed?
15     A.      Yes -- no, he never told me.
16     Q.      When did he tell you about this
17     one, the one that he's in now and the
18     reason why we are here today?
19     A.      No.   This is -- last year, you
20     know.
21     Q.      Before or after he filed
22     bankruptcy?
23     A.      No, no, before.  He told me
24     before he needed -- he told me before.
25     Q.      He told you before, what did he
```
                                   21

```
 1              M. Choudhary
 2     tell you before?
 3     A.      I don't remember, but he told me
 4     he talks --
```
                    Page 18

oct 4 17(2).txt

 5      Q.      Did he ask you for any kind of

 6   help?

 7      A.      Yeah, you're talking about

 8   bankruptcy?

 9      Q.      Yeah.

10      A.      Yes.

11      Q.      What did he ask you?

12      A.      He said that -- he said

13   something like that his building is going

14   to auction, and what you call that guy who

15   takes care of the building, what is it?

16           MS. NADELSON:   Trustee.

17      A.      -- the trustee told him that

18   still you could save it if you file

19   bankruptcy; so do you know anybody any

20   lawyer or anything.  I said I don't

21   know -- first time I'm hearing from you

22   that there is a bankruptcy.  So this is

23   how we spoke.

24      Q.      That was it?

25      A.      No, no.  Then he ask me whatever

                                              22



 1              M. Choudhary

 2   the question he ask me about the attorney.

 3   I said I don't know, but I know Jane

 4   Nadelson and we could ask her.

 5      Q.      Okay.

 6      A.      Then we ask.

 7      Q.      What happened next?

                 Page 19

oct 4 17(2).txt

```
 8        A.      Then we ask her and then she
 9   recommended Norma.
10        Q.      Norma Ortiz?
11        A.      Yeah.
12        Q.      Okay.  And then what happened
13   after she recommended Norma?
14        A.      I don't know.  We went there and
15   we spoke to her.
16        Q.      You went to Ms. --
17        A.      Not me I didn't speak or
18   anything.  There was one more guy Vito, I
19   think.  We were sitting out and they were
20   talking?
21        Q.      Who is "they"?
22        A.      Norma, Boysin and Jane.
23        Q.      They were talking about the
24   bankruptcy?
25        A.      I don't know what they were
```

                                        23


```
 1             M. Choudhary
 2   talking about, it was not in front of me.
 3        Q.      Where were you that you saw them
 4   talking?
 5        A.      No, I was in the waiting room.
 6   She had a little waiting room.
 7        Q.      They were not in the waiting
 8   room?
 9        A.      No, I think they went inside.
10        Q.      It was like a conference room?
11        A.      Conference room, yeah.
```

oct 4 17(2).txt

12    Q.    Jane Nadelson, Norma Ortiz and

13  Boysin Lorick went into a conference room?

14    A.    Yes.

15    Q.    Is it your testimony that you

16  and Vito this person Vito stayed in

17  another room?

18    A.    Yeah.

19    Q.    And do you remember when that

20  was?

21    A.    I don't remember.

22    Q.    Was that before or after he

23  filed bankruptcy?

24    A.    No, it was before.

25    Q.    Was it in December of 2016?

                                        24

1              M. Choudhary

2    A.    I don't remember the date.

3    Q.    What happened next after they

4  had that meeting?

5    A.    Then I think he hired Norma and

6  then they -- the case started whatever,

7  then it was between them.

8    Q.    Did you have anymore involvement

9  with the preparation or the bankruptcy

10  filing at all, you personally?

11    A.    No.

12    Q.    Did Mr. Lorick talk to you about

13  it at all?

14    A.    Yes, he did.

oct 4 17(2).txt

15     Q.     What did he tell you?

16     A.     He talks different things, I

17 mean that the paperwork.  And sometimes

18 not all the times.

19     Q.     At that time what did he tell

20 you?

21     A.     At that time when we were there?

22     Q.     Right after he met with Ms.

23 Ortiz and Ms. Nadelson.

24     A.     He's hiring her.

25     Q.     Did he say for how much?

25

1          M. Choudhary

2     A.     No.  He did not mention anything

3 to me.

4     Q.     Did he say anything about hiring

5 Ms. Nadelson also or just Ms. Ortiz?

6     A.     Just Ms. Ortiz, just Ms. Ortiz.

7     Q.     And did you ask Ms. Nadelson to

8 assist him with his bankruptcy process --

9     A.     Yes.

10     Q.     -- and explain what that means.

11     A.     Well, he ask her that he's a

12 very good person.  He in trouble, can you

13 help him, can you get somebody good for

14 him, can you help him.  And he really --

15 she also was doing a lot.

16     Q.     Like what?

17     A.     I mean many questions he was

18 asking, and she answered.

oct 4 17(2).txt

19     Q.     Ms. Nadelson?

20     A.     Yeah.

21     Q.     She was answering --

22     A.     Yeah.

23     Q.     -- to him or to him and Ms.

24 Ortiz?

25     A.     To him, to Boysin.

26

1              M. Choudhary

2     Q.     Did he pay her for any of that?

3     A.     I don't think so.

4     Q.     Did you?

5     A.     No.

6     Q.     Okay.  Is Ms. Nadelson your

7 attorney?

8     A.     Yes.

9     Q.     And is she on a general

10 retainer, do you pay her like one fee

11 every month or --

12     A.     No.  Whenever she do, she do for

13 me, landlord-tenant she do for me the

14 closing I mean mortgage closing, all these

15 so I pay her per job.

16     Q.     And why was she, do you know, in

17 this meeting with Ms. Ortiz and Mr.

18 Lorick?

19     A.     I begged her to help him because

20 he's a very nice man.

21     Q.     She said okay?

Page 23

                        oct 4 17(2).txt
22      A.      Yeah.

23      Q.      She helped him?

24      A.      Yeah.

25              MS. NADELSON:   How did I help
                                                27



 1              M. Choudhary

 2      him?

 3              MR. MCCORD:   Ms. Nadelson.

 4              MS. NADELSON:   I'm sorry.

 5      Q.      So she helped him?

 6      A.      She helped him to take there,

 7   she went there with us.

 8              MR. MCCORD:   What was that?

 9      A.      To take to the office.

10      Q.      So you went in the same car to

11   Ms. Ortiz' office?

12      A.      Yes.

13      Q.      Did you pick up Ms. Nadelson,

14   and bring her there or did she meet you

15   there?

16      A.      No, no we went together.

17      Q.      Was Vito driving the car?

18      A.      I think so.

19      Q.      And he --

20              MS. NADELSON:   Vito?

21              MR. MCCORD:   Ms. Nadelson,

22      please.

23      Q.      It was Mr. Lorick's car?

24      A.      I don't remember that.  I think

25   it was Vito -- I think it was Ms.
                        Page 24

oct 4 17(2).txt

28

```
 1              M. Choudhary
 2    Nadelson's car.  I don't remember exactly.
 3         Q.    You said he's a very good man
 4    Mr. Lorick?
 5         A.    Yes.
 6         Q.    You wanted Ms. Nadelson to help
 7    him?
 8         A.    Yes.  Help him to find the
 9    attorney.
10         Q.    Did you ask Ms. Nadelson to help
11    him beyond that finding the attorney to do
12    anything more for him than finding the
13    attorney?
14         A.    What else can she do for him, I
15    don't know.  No, no.
16         Q.    Did you ask her?
17         A.    No, she find the attorney.  Then
18    they were talking to each other, both.
19         Q.    Do you know if she provided
20    information to Ms. Ortiz and Ms. DeJesus,
21    regarding Mr. Lorick's information; did
22    you know that?
23         A.    Who is Mr. --
24         Q.    Did you know Ms. Nadelson
25    provided information to Ms. Ortiz and Ms.
```

29

oct 4 17(2).txt
```
 1            M. Choudhary
 2   DeJesus regarding --
 3            MS. NADELSON:   Martha.
 4      Q.    Martha DeJesus, do you know who
 5   that is?
 6      A.    Yeah.  I know Martha, yeah.
 7      Q.    Do you know Ms. Nadelson gave
 8   them some information about Mr. Lorick?
 9      A.    I don't know.  They were
10   talking, and whatever information she gave
11   I don't know.  Ask Ms. Nadelson that.
12      Q.    This is your deposition so?
13      A.    I'm sorry.
14      Q.    That's why I'm asking you.
15      A.    I'm sorry, sir.
16      Q.    So after he filed do you
17   remember when he told you he filed; was it
18   December, was it January, was it the same
19   day he filed?
20      A.    No, the same time when we saw
21   Ortiz, Norma, I think he hired her that
22   time.  And I don't know when it was filed,
23   but right after, soon after.
24      Q.    Did you have any contact with
25   him after that about the property right
```
                                              30



```
 1              M. Choudhary
 2   after he filed; did you have any
 3   discussions with him about the property
 4   located at 3126 Coney Island Avenue,
```

oct 4 17(2).txt

      5   Brooklyn?

      6        A.    Yeah.

      7        Q.    Was it right after he filed that

      8   you had discussions with him?

      9        A.    We had a discussion.  I don't

     10   know.  It was right after filing, but yes,

     11   many times we had discussions.

     12        Q.    Before he filed within the year

     13   or six months before he filed, did you

     14   ever talk to him about buying the building

     15   from him before he filed?

     16        A.    Yeah.  Before he filed, yes.

     17   Well like five or six years ago you know

     18   he wanted to sell the building he wrote on

     19   a piece of paper, but then he changed his

     20   mind.

     21              I said that's okay.  You don't

     22   want to sell, it's okay, but he wanted to

     23   sell.  Yes, we did discuss.

     24        Q.    And last year did you discuss it

     25   last year, too, about him selling the

                                                        31


      1              M. Choudhary

      2   building when he was going through these

      3   difficulties with the foreclosure action?

      4        A.    He's the one who wanted, I don't

      5   know when -- yes, we discussed.  He's the

      6   one who wanted to, not to sell he wanted

      7   to keep the building all the time, and he

oct 4 17(2).txt

8    wanted to sell some share out of it.

9        Q.    Okay.

10       A.    He never wanted to sell the

11   whole thing.

12       Q.    After the bankruptcy filing, did

13   you continue to discuss the status of the

14   building, his ownership, to sell or for

15   the refinance of the building?

16       A.    Yeah.

17       Q.    Okay.   What were your

18   discussions?

19       A.    He said if he could get a

20   mortgage on my building and, you know, pay

21   for that, then he will sell me 10 percent

22   of the building.   That is the discussion

23   we had.

24       Q.    And did you agree to that?

25       A.    Yes.

                                            32

1              M. Choudhary

2        Q.    Okay.   Any other proposals other

3    than that?

4        A.    Then the building was going to

5    auction.   There was bidders.   They put

6    like 5.2.   That's what Norma told him, and

7    I told him listen --

8              MS. NADELSON:   That's what Norma

9         told him.

10       A.    I will say I will buy it for 6

11   million.

                    Page 28

oct 4 17(2).txt

12        Q.     And this was during the
13    bankruptcy?
14        A.      After they file the bankruptcy,
15    yeah, this is recent like three, four
16    months all this is within three, four
17    months.
18        Q.     You said you would buy it for 6
19    million?
20        A.     Yeah.
21        Q.     What did he say?
22        A.     Boysin?  Then Norma said it's a
23    capital gains issue.  It's this issue.
24    And besides that really he was crying he
25    never wanted to sell the building.   He

                                              33


1                M. Choudhary
2    never wanted to.  Then I don't want to buy
3    it.
4         Q.     Did you ask Ms. Nadelson to
5    assist Norma with researching the law
6    about capital gains tax liability that you
7    just said about the capital gains, did you
8    ask Ms. Nadelson to help Ms. Ortiz?
9         A.     We all looking for that.  If
10    there's a capital gains.
11        Q.     Who is "we all"?
12        A.      Me, Nadelson, Ms. Nadelson and
13    Boysin talking to -- he was talking to his
14    accountant, I was talking to mine,

oct 4 17(2).txt

15    actually to help him, that how much is and

16    should he sell or not.  That was his

17    concern and Norma's concern.

18        Q.    And you also spoke to Ms.

19    Nadelson about it, the capital gains?

20        A.    I think, yeah, we discussed.

21        Q.    Do you know --

22        A.    But I spoke to my accountant.

23        Q.    What's your accountant's name?

24        A.    Eric.

25        Q.    Eric what?

                                        34


1              M. Choudhary

2        A.    Krupnik.

3        Q.    Did you pay Ms. Nadelson any

4    money in the past 11 months to work on

5    this case for you, the bankruptcy case?

6    Or --

7        A.    No.

8        Q.    Or the deal with Lorick?

9        A.    No.

10        Q.    Did you pay any kind of mortgage

11    broker to assist you in this arrangement

12    with Lorick?

13        A.    Two or three brokers I paid.

14        Q.    How much did you pay them?

15        A.    One I paid 15,000.  I don't

16    remember exactly, but it was close to

17    15,000.

18        Q.    That was a real estate broker?

oct 4 17(2).txt

19      A.      Mortgage broker.

20      Q.      Mortgage broker?

21      A.      Yeah.

22      Q.      You paid 15,000?

23      A.      Yeah.

24      Q.      Do you know when that was?

25      A.      Within these four or five

1              M. Choudhary

2      months.

3      Q.      Okay.  Do you know the name of

4      the broker?

5      A.      I have -- I don't remember it

6      now.

7              MR. MCCORD:  I will leave a

8          space in the transcript, and you can

9          fill that in.

10    (Insert)_____

11    _____

12      A.      Yeah.

13      Q.      That's one for 15,000.  Who else

14    did you pay?

15      A.      She charge different.  She

16    charge for appraising all of my different

17    properties and for starting the

18    application?  --

19      Q.      Did she get the appraisal done?

20      A.      Yeah.  On all of my other

21    properties.

oct 4 17(2).txt

```
22      Q.      Who else did you pay?

23      A.      The last one I paid $30,000 to

24      this guy.  The last one he had did

25      something.
```

⚥

36

```
 1              M. Choudhary

 2      Q.      That was a good faith deposit?

 3      A.      Yeah.

 4      Q.      So that's $45,000; have you paid

 5      any other money?

 6      A.      I spent a lot of money on the

 7      mortgage that was only for him.  I

 8      refinance my building.  I paid a 15,000

 9      prepayment penalty when I was not supposed

10      to.  And I spent a lot of money on my

11      mortgage, but that he said that is his

12      expense I mean.

13      Q.      How did he propose to pay you

14      back?

15      A.      If you know if either 10 percent

16      share he will adjust there or he will,

17      whenever he sells the building, he will

18      pay me back that money.

19      Q.      Do you know how much Wells Fargo

20      is owed at this time, the creditor, Wells

21      Fargo [indicating]?

22      A.      I don't know exactly.

23      Q.      Is it about $5 million?

24      A.      Yeah.

25      Q.      And you know that your highest
```

```
 1              M. Choudhary
 2   bid at the auction was 7.4 million?
 3        A.    Yeah.
 4        Q.    And Mr. Ghalchi, my client's,
 5   was 7.350, correct?
 6        A.    Yeah.
 7        Q.    So that means there's probably
 8   gonna be $2 million equity; is that right?
 9        A.    Yeah.
10        Q.    So are you expecting Mr. Lorick
11   to pay you back for these expenses that
12   you laid out to help him?
13        A.    Of course, I need all those
14   back.
15        Q.    And that's the 45,000 that you
16   just identified plus --
17        A.    No.   30,000 didn't go through
18   because the next day the scene was
19   against.  This was on the -- this August,
20   I don't know, 17, 18 and on the 21st it
21   was gone against so that didn't go
22   through.
23        Q.    So how much money when he sells
24   this property, do you expect him to pay
25   you back, not to the penny but
```

38

oct 4 17(2).txt
```
 1              M. Choudhary
 2  approximately how much money have you laid
 3  out that you expect him to pay back to
 4  you?
 5       A.    Well, all the mortgage but we
 6  have to sit down.
 7       Q.    How much?
 8       A.    We have to sit down.
 9       Q.    Approximately how much?
10       A.    It's more than 100,000.
11       Q.    And he, I think you testified he
12  said it was his expense --
13       A.    Yes.
14       Q.    -- that's what you said --
15       A.    Yes.
16       Q.    -- he agreed to pay you back?
17       A.    Yes.
18       Q.    Okay.  Other than the 100,000
19  that you just talked about, and the
20  mortgage and the good faith deposit and
21  the brokers, you said several brokers,
22  correct?
23       A.    Yeah.  Three, four, brokers.
24       Q.    Did you pay each three or four
25  brokers money or just that one broker the
```
                                                    39


```
 1              M. Choudhary
 2  15,000?
 3       A.    The other one -- see one of the
 4  brokers I paid him $24,000 out of the
```

oct 4 17(2).txt

```
 5   closing.
 6        Q.    That's different than the woman?
 7        A.    Different than the woman.
 8        Q.    So --
 9        A.    24,000, I paid him at the
10   refinance when we refinance the building,
11   but that was understanding with him that
12   you will get us the balance of the money
13   to pay for 5 million, whatever that was.
14   So he was doing most of the work.
15        Q.    That broker?
16        A.    That broker.
17        Q.    Do you remember his name?
18        A.    David Steinmetz.
19        Q.    So you paid the one woman
20   15,000, the broker, to get your appraisal
21   and to do things like that she did it?
22        A.    She did, yes.
23        Q.    Then you paid another broker for
24   the refinancing to help get other
25   financing together, the 24,000, correct?
```

                                        40


```
 1              M. Choudhary
 2        A.    Yes.
 3        Q.    So that's two brokers.  Are
 4   there any other brokers that you paid?
 5        A.    I don't remember if I paid any.
 6        Q.    Because you said three or four?
 7        A.    I went to three or four, but I
```

                        Page 35

oct 4 17(2).txt

8    don't think I paid them.  I mean they

9    were --

10       Q.    And all along this time which

11   was this year --

12       A.    Yeah.

13       Q.    -- after he filed bankruptcy,

14   right?

15       A.    Yes.

16       Q.    Were you trying to work out this

17   arrangement with him and for him to

18   refinance the building, correct?

19       A.    Not for him.  10 percent I was

20   buying.

21       Q.    Well, other than the 10 percent?

22       A.    Yeah.

23       Q.    So you went to these brokers,

24   did he go with you to these brokers?

25       A.    Most of, yes.

                                          41

1            M. Choudhary

2        Q.    Three or four brokers.  There

3    were some of them you paid money and some

4    of whom you didn't.  So what help did you

5    get to refi or was it help for you to sell

6    or both?

7        A.    No, we were just over there just

8    to pay to the bank never to --

9        Q.    What were you asking these

10   brokers to do for you?  The two of you

11   told me about.  What about the other two,

oct 4 17(2).txt

12      what were you asking them to do for you?

13          A.      To refinance this building.

14          Q.      To help you get a refinance?

15          A.      Yes.

16          Q.      They were real estate brokers or

17      mortgage brokers?

18          A.      Mortgage.

19          Q.      They were all mortgage brokers?

20          A.      Yes.

21          Q.      No, real estate brokers?

22          A.      Yes.

23              MR. RINALDI:   Clarification,

24          when you say this building, which

25          building are you talking about?

                                                    42

1              M. Choudhary

2              THE WITNESS:   3126 -- no, that's

3          my building.

4              MR. RINALDI:   You were trying to

5          refinance your building or Mr.

6          Lorick's?

7              THE WITNESS:   No, I refinanced

8          my building and that money was

9          supposed to be paid for 10 percent and

10         the balance was going to him but.

11         Q.      On 3126?

12         A.      That is on my building 3076.

13         Q.      But it was for the purpose of

14      enabling Lorick to take out Wells Fargo,

oct 4 17(2).txt

15    basically?

16        A.    Yeah.

17        Q.    To pay Wells Fargo for his

18    property, correct?

19        A.    Yes.

20        Q.    Okay.  This has been going on

21    for months, up until the auction?

22        A.    Yes.

23        Q.    And you and Mr. Lorick would go

24    to the mortgage brokers to obtain what you

25    just described to myself and Mr. Rinaldi?

                                        43

1                M. Choudhary

2        A.    Yes.

3        Q.    Are you aware that Mr. Lorick

4    hired a mortgage broker in July of this

5    year and paid them $25,000?

6        A.    No.

7        Q.    Well, the monthly operating

8    report that is required of debtors to file

9    reflects for July and for August, a

10    $25,000 payment to a mortgage broker?

11        A.    I don't know.

12        Q.    You don't know anything about

13    that?

14        A.    No, that he paid.  I don't know.

15        Q.    So in addition to you meeting

16    with these brokers and trying to get the

17    refinance over these past months, it must

18    of taken a lot of your time?

oct 4 17(2).txt

19      A.      Yes.

20      Q.      How much time did you spend on

21  this over the last few months?

22      A.      I never noted the hours, but I

23  spend a good time.

24      Q.      Every day, every week?

25      A.      Not every day.  But yes, every

                                        44


 1              M. Choudhary

 2  week.

 3      Q.      With Mr. Lorick?

 4      A.      Excuse me?

 5      Q.      With Mr. Lorick?

 6      A.      With Mr. Lorick.

 7      Q.      How would you describe your

 8  relationship with Mr. Lorick?  Are you

 9  friends, are you business associates?  Do

10  you do business together?  How would you

11  describe your relationship, now and in the

12  past?

13      A.      Not a business relationship, not

14  any close business but you could say a

15  friend helping each other.

16      Q.      But you did do business together

17  on occasion, correct?

18      A.      What is the business.

19      Q.      Well, one, you just said he did

20  plumbing work for you, correct?

21      A.      But that is not business.

oct 4 17(2).txt

22    Business is when you get paid from each

23    other.

24        Q.    So you never paid him?

25        A.    No, no, if I'm even overseas I

                                              45

 1              M. Choudhary

 2    have problem in my building I will get

 3    Boysin, can you go see, can you snake the

 4    sewer line is clogged and different things

 5    like that he needs permit I will pull, but

 6    no business.

 7        Q.    When you went to these

 8    brokers --

 9        A.    Yeah.

10        Q.    -- what did you say, you were

11    friends or that you were trying to enter

12    into a financial arrangement together to

13    pay off Wells Fargo?

14        A.    Yeah.

15        Q.    And was that business?

16        A.    Well, from here I don't know how

17    you want to describe it.

18        Q.    I'm asking how would you

19    describe it, not me.

20        A.    Not business, it's a straight

21    deal.

22        Q.    But is that business or social?

23        A.    It's --

24              MS. NADELSON:  If you don't

25        know, just don't answer it.

                        Page 40

⚲

```
 1              M. Choudhary
 2      Q.      How would you describe it,
 3  business or social?
 4      A.      You can describe whatever you
 5  want.
 6      Q.      I'm asking what you would say.
 7  If I came up to you as a mortgage broker,
 8  and said I'm interested in obtaining the
 9  financing for you on this deal that you
10  will get 10 percent of the building,
11  there's loans, things like that, what
12  would you say to me?  I want to hire you
13  and pay you to put this business deal
14  together, or this --
15      A.      Yeah.  You could call it
16  business, yeah.
17      Q.      And did there come an occasion
18  where it failed, and you weren't able to
19  do it between you and Mr. Lorick and for
20  this property?
21      A.      Yeah, it was -- yes.
22      Q.      When did that happen?
23      A.      It is one night before the
24  auction, 21st, 6:00, 7:00 when Norma
25  called that whatever she filed the motion
```

⚲

oct 4 17(2).txt

```
 1              M. Choudhary
 2   was denied.  It was like a bomb fell.
 3              We never knew before that the
 4   building is going for -- we were very
 5   happy that we were getting the bank and
 6   everything is fine.
 7        Q.    Who is "we"?
 8        A.    Me and Lorick.
 9        Q.    When you say you never knew?
10        A.    The building is going for
11   auction.
12        Q.    You never knew that?
13        A.    Never.
14        Q.    Neither did he?
15        A.    I don't think.  I don't think
16   he -- it was week before Vito comes to the
17   office, and he say that somebody is there,
18   he's saying the building is going for
19   auction.
20              He picks up the phone and he
21   calls Norma is the building going for
22   auction.  She said are you kidding.  So we
23   never knew the building.  If he knew that
24   he hide it from me.  I never knew the
25   building is going for auction.  21st at
```

                                             48


```
 1              M. Choudhary
 2   6:00, 7 o'clock.  The first time I was
 3   shocked that the building is going for
 4   auction.  How is it going to auction, it
```

oct 4 17(2).txt

```
 5    still big shock for me.  Why is it going
 6    to the auction when I refinanced the
 7    building.
 8              Norma knows about that
 9    refinancing.  And we going to the broker.
10    We telling her the moment you tell us to
11    come up with the money, we will come up
12    with the money.  She's telling me, oh
13    there is a process, oh there is a process,
14    oh there is process and that process took
15    to the auction.  I never knew that.
16              She always said, wait, there is
17    a process, there is a process.  Norma took
18    it to the auction.
19       Q.    So is it your testimony that you
20    have refinancing in place to take --
21       A.    Oh, yeah.  When we started --
22    hen the last 30,000, a hundred percent was
23    done.
24       Q.    Is it still done, could you
25    still do it?
```

49

```
 1              M. Choudhary
 2       A.    Well, he's very mad at me now.
 3       Q.    Who?
 4       A.    The broker.  Well, he's now I
 5    can't answer now if I'm able to.  I cannot
 6    answer that question at this time until I
 7    have the building in my hands.
```

Page 43

oct 4 17(2).txt

8      Q.      Your attorney and Ms. Ortiz and

9   Ms. Macron -- do you know who Ms. Marilyn

10   Macron is?

11      A.      No.

12      Q.      You have said to me, to this

13   gentleman [indicating] and to the court

14   that you can buy the building for $7.4

15   million; is that true?

16      A.      Yes.

17      Q.      Do you have $7.4 million in the

18   bank?

19      A.      No.

20      Q.      So if you can, you want to do

21   that?

22           MS. NADELSON:   Not at this

23      moment.

24      Q.      You have 7.4 or you want to buy

25   the building for 7.4 million that's what

                                        50

1           M. Choudhary

2   you bid on on August 22, and you're still

3   willing to do that today?

4      A.      Yes.

5      Q.      What the bank is concerned about

6   then and now is that you don't have the

7   ability to do it.

8      A.      The bank accountant can do

9   anything he wants.  The guy, I don't know

10   why he's so -- I don't know why he so

11   angry at me.

                Page 44

oct 4 17(2).txt

12      Q.      He not angry at you.

13      A.      No, he is.  He doesn't want --

14              MS. NADELSON:   Just answer the

15      question.

16              MR. MCCORD:   He's trying to

17      answer the question, don't interfere.

18      A.      I don't know why he thinks that

19  we always have the ability to pay.

20      Q.      Mr. Choudhary?

21      A.      Yes, sir.

22      Q.      I can't tell you -- when you say

23  "he," I assume you mean the attorney for

24  the bank, and this is one of them by the

25  way, he's one the attorneys for the bank

                                              51


 1              M. Choudhary

 2  [indicating], but he's probably not the

 3  one who is at court.  I can only imagine

 4  who he's talking about.

 5              MS. NADELSON:   Colin, I believe

 6      it is.

 7      A.      I'm talking about Colin.

 8      Q.      But in any case, this thing

 9  could possibly, very possibly, I don't

10  know if Ms. Nadelson or anyone else told

11  you -- please you're under oath -- that

12  there's an assignment that's been

13  circulated that my client Ghalchi assigns

14  his contractor all rights to buy this

                    Page 45

oct 4 17(2).txt

15    property to you, and then you can buy it?

16    A.    Yes.

17    Q.    Do you know that?

18    A.    Yes.

19    Q.    Okay.   Pursuant to the bidding

20    terms that were approved by the court,

21    which means you have to close from 30 days

22    from September 11 which is October 11 and

23    if you want another 30-day extension you

24    have to put another 10 percent deposit and

25    then you can close no later than November

52

1              M. Choudhary

2    11; did you know that?

3              MS. NADELSON:   Can you slow down

4        and repeat that, please.

5    Q.    If you get this assignment?

6    A.    Uh-huh.

7    Q.    The first period of time in

8    which you're supposed to close based on

9    the orders of the court is October 11,

10    which is next Wednesday.  I don't think

11    anybody can close that fast unless you

12    have the money in the bank.

13              Do you know that or did you know

14    that that was one of the terms?

15    A.    I don't know that is the term.

16    Q.    Well, now you know.

17              MS. NADELSON:   Assignment.

18    Q.    What is the assignment --

oct 4 17(2).txt

19          MR. MCCORD:  Ms. Nadelson,

20     please, did your pen run out of ink;

21     would you please stop.

22     A.     The assignment I know.

23     Q.     The assignment is for my client,

24 who the court deemed to be the highest

25 bidder and knocked you out, disqualified

♀                                                  53

1               M. Choudhary

2 you out?

3     A.     Yes, sir.

4     Q.     My client is for no money

5 assign, well, for the return of his

6 deposit but from you no money, give you

7 his rights to buy this building?

8     A.     Yes, sir.

9     Q.     You know that --

10    A.     Yes, sir.

11    Q.     -- for $7.4 million; you know

12 that?

13    A.     Yes, sir.

14    Q.     And you agree?

15    A.     Yes, sir.

16    Q.     So you know that?

17    A.     Yes, sir.

18    Q.     Okay.  There are terms, there

19 are provisions that the judge, an order

20 from the judge, Judge Craig saying that

21 the people at the auction are buying this

oct 4 17(2).txt

22    property on August 22, you, pursuant to

23    certain terms and conditions --

24        A.    Uh-huh.

25        Q.    -- one of them is that you have

                                              54


 1                M. Choudhary

 2    to put down a 10 percent deposit, which

 3    you did?

 4        A.    I did.

 5        Q.    Another one is you have to prove

 6    through documents that you have the

 7    ability to get the rest of the money to

 8    close?

 9        A.    Yeah.

10        Q.    Did you do that?

11        A.    If you give me the assignment,

12    then I will answer you that question I

13    need the assignment to go to anybody.

14        Q.    Okay.  All right.

15        A.    Then yeah.

16        Q.    All right.  The judge did not

17    approve you on August 24, the judge

18    disqualified you and approved my client as

19    the successful bidder --

20        A.    Yes, sir.

21        Q.    -- Ghalchi?

22              MS. NADELSON:    The judge --

23        Q.    Now, we are agreeing to give you

24    the right to buy the property that you bid

25    on?

```
 1              M. Choudhary
 2     A.     Yes, sir.
 3     Q.     But it's gotta be subject to the
 4  same terms and conditions that you agreed
 5  to on August 22, meaning you're supposed
 6  to close within 30 days of when the judge
 7  signed the order which was September 11th.
 8  So the initial closing period, it expires
 9  next week on October 11.
10            Can you close by October 11,
11  $7.4 million?
12     A.     Until I have assignment, I have
13  to --
14     Q.     Yes or no?
15            MS. NADELSON:  Yes or no.
16     Q.     Do you think if I give you the
17  assignment today you can close --
18     A.     7.4 million.
19     Q.     -- next week?
20     A.     No.
21     Q.     So then there's another
22  condition that says if you put another 10
23  percent down, that you can have another 30
24  days to close November 11?
25     A.     Yeah.
```

56

oct 4 17(2).txt
```
 1              M. Choudhary
 2     Q.    Can you if you get the
 3   assignment?
 4     A.    I think I could, yeah.
 5     Q.    Can you close?
 6     A.    (Witness nods head.)
 7     Q.    Are you willing to take the
 8   chance to get this assignment that if you
 9   don't close by November 11 then you lose
10   your million and a half deposit that you
11   put down, that is called liquidated
12   damages, that's what the debtor Lorick
13   would get if you don't close by November
14   11, and then Giella (phonetic), the third
15   highest bidder, would buy the property.
16   So you have to be able to get the money to
17   close by November 11.
18          MS. NADELSON:   November.
19     A.    I think I can do it if I get --
20   but the bank definitely I could pay the
21   bank, it's not a problem, the five,
22   whatever.
23     Q.    By when?
24     A.    That I could pay it within three
25   weeks.
                                    57


 1              M. Choudhary
 2     Q.    And how can you do that within
 3   three weeks?
 4     A.    Going back to, if I have the
```
Page 50

oct 4 17(2).txt

5   assignment then I could tell you exactly,

6   but I have a whole BS.  I can do that one,

7   I can do that bank.  I could pay.

8        Q.    Are you confident enough that

9   you could do that let's say in a month,

10   instead of three weeks let's say a month?

11        A.    Yes.

12        Q.    Are you willing to designate

13   your deposit the 1 million 5, basically,

14   as nonrefundable?

15        A.    Yes, sir.

16              MR. RINALDI:  Which bank did you

17        apply for a loan with?

18              THE WITNESS:  The loan I have

19        for everything is the bank in

20        California, they give me 5 million

21        that time.

22              MR. RINALDI:  What's the name of

23        the bank?

24              THE WITNESS:  I could send

25        you --

                                    58


1              M. Choudhary

2              MS. NADELSON:  Hold on.

3              Off the record.

4              MR. MCCORD:  We are not off the

5        record.

6              MS. NADELSON:  It's not a bank

7        like Wells Fargo.

Page 51

oct 4 17(2).txt

8          MR. MCCORD:   Like a hedge fund?

9          MS. NADELSON:   Yes.

10     Q.     We will leave a space in the

11   transcript and you can fill it in.

12   (Insert)_____

13   _____

14     Q.     Let me tell you something about

15   banks.  They don't care who pays them the

16   money, they just want their money.   And

17   Wells Fargo has gone through a difficult

18   time here because they've been in state

19   court in a foreclosure action.

20          Then they were in the Bankruptcy

21   Court last year with the Chapter 13, this

22   gentleman, Wharton, filed for Mr. Lorick,

23   which they had to expend expenses.

24          Now they're in the Chapter 11

25   for a year.  Now they weren't comfortable

                                         59


1             M. Choudhary

2   on August 24 with you being designated as

3   the successful bidder because they did not

4   have confidence that you could close;

5   otherwise they don't care if you buy the

6   building, they don't care about any of

7   that.

8     A.     I assure your bank will -- I

9   assure your bank will be paid within 30

10   days.

11     Q.     Are you willing to say that that

oct 4 17(2).txt

12  1 million 5 is nonrefundable?

13      A.      Yes.    The bank will be paid.   I

14  need the assignment.

15      Q.      You could very well get it.

16  It's up to the judge.   We have to tell the

17  judge that, but do you have any kind of

18  documents to raise the confidence level of

19  the bank now that if you got the

20  assignment you got this 5 million, or

21  whatever it is?

22          MR. MCCORD:   Ms. Nadelson, you

23      know what, you know what --

24          MS. NADELSON:   I will not talk

25      anymore, I'm sorry.

                                        60


1              M. Choudhary

2      Q.      The question is do you have any

3  kind of documents to convince the bank

4  that what you're saying is true;  they

5  don't believe you?

6      A.      Yeah.

7      Q.      They don't believe you.

8      A.      I saw that.

9      Q.      They don't believe you.

10      A.      The only person they don't

11  believe is me.

12      Q.      Now, the judge even said -- were

13  you in court on Monday?

14          MR. MCCORD:   Was he in court on

                    Page 53

oct 4 17(2).txt

15      Monday?  Were you there?

16              MS. NADELSON:   No.

17      Q.      Were you there?

18              MS. NADELSON:    Not this Monday.

19      Q.      Not two weeks ago, two days ago.

20      A.      No.

21      Q.      The judge seemed to think that

22      the fact that you were willing to lose 1

23      million 5 went a long way to letting you

24      take the assignment from Ghalchi, but the

25      bank still didn't agree to it because the

                                            61


 1              M. Choudhary

 2      bank doesn't care about the 1 million 5,

 3      they're owed 5 million.  They want 5

 4      million not 1 million 5, they want 5

 5      million.

 6      A.      I assure you, 5 million.

 7      Q.      And I believe you but remember

 8      this is business.  Business means that

 9      these attorneys [indicating] have to go to

10      a publicly-traded lending institution

11      international that has layers of people in

12      charge and say he can do it.

13              You can't, you can't ask them to

14      go to these people and say, well, he gave

15      us his word because guess what, you know

16      business, it doesn't work that way.  It

17      doesn't work that way.  You have to have

18      some kind of proof.

                         Page 54

oct 4 17(2).txt

19          Even from a bank, if you can get
20    it by tomorrow that would be great because
21    when we show it to them in court from a
22    bank saying it's a condition, "If you get
23    the assignment, we will give you whatever
24    you need."
25          You have 2 million in the bank

62

1          M. Choudhary
2    already, so all you need is like another
3    half a million dollars, 500 -- $5 million
4    so --
5      A.    I don't need another 5, I need 3
6    and-a-half.
7      Q.    Whatever you need to close, you
8    have to give them something that says
9    that.
10     A.    I will.
11     Q.    And if they get it, then maybe
12    they will change their mind.
13     A.    I will.
14          MR. RINALDI:  Are you saying you
15      have enough to pay the bank or you
16      have enough to close, because the bank
17      is owed 5 million and change, but the
18      closing price is 7.4 million?
19          THE WITNESS:  The bank I could
20      arrange right away, to pay to the
21      bank.

Page 55

oct 4 17(2).txt

22      Q.      What about the closing, buying

23   the building?

24      A.      Buying the building, that bank

25   in California bank, I have to go back to

♀

                                        63


 1              M. Choudhary

 2   them.  I have to refinance my property

 3   now.  I own a lot of property.

 4              MS. NADELSON:  It's gonna take

 5      time.

 6      A.      It will take time.

 7      Q.      Can you have that refinanced

 8   done by November 11?

 9      A.      That I cannot guarantee.  The

10   bank yes, the bank I have.

11      Q.      The sales price isn't $5

12   million; the sales price is 7.4 million?

13      A.      The other one I have to go back

14   to after assignment.

15      Q.      You should have already have

16   gone back to them.

17      A.      How?

18      Q.      Tell them you have this

19   assignment.

20      A.      I lost a lot of money going back

21   and forth.  If there's litigation, I'm not

22   interested.  If I don't have assignment, I

23   can't go back to anybody.  I need the

24   assignment.

25      Q.      How much money --

oct 4 17(2).txt

♀

64

```
 1              M. Choudhary
 2       A.      I will guarantee you it will be
 3   paid then.
 4       Q.      How much money does it cost you
 5   to go to this California lender to ask
 6   them to give you the money for the refi on
 7   your own building?
 8       A.      He was really very upset on the
 9   24th and I was --
10       Q.      Why was he so upset, you paid
11   him money?
12       A.      Back and forth, he spoke to us
13   many times.  He send us his bank
14   statements, $23 million bank statements.
15       Q.      He wanted to do the deal?
16       A.      Oh yeah.  And then when they
17   disqualified me -- I don't want to go into
18   that.
19              MS. NADELSON:  Can you go off
20         the record?
21              MR. MCCORD:  No, no, no.
22              MS. NADELSON:  It's not
23         pertaining to this.
24              MR. MCCORD:  Off the record.
25              [Discussion held off the
```

♀

65

oct 4 17(2).txt

1          M. Choudhary

2     record.]

3   BY MR. MCCORD:

4      Q.     Mr. Choudhary, in order for you

5   to get this assignment according to the

6   terms and conditions as it is now, we can

7   always change it or ask the court to

8   change it, but as the terms are now

9   already approved you have to close by

10   November 11 for the full amount 7.4

11   million not 5 million, that's what the

12   bank is owed, but you have to close for

13   the full amount you can't do it in two

14   parts it has to be in one part, so

15   otherwise you lose your deposit?

16      A.     Well, I will try to get the

17   money you know.

18      Q.     So when you found out that the

19   auction was taking place, according to

20   your testimony, it was the day before the

21   auction?

22      A.     The 21st.

23      Q.     What did you do?

24      A.     Then we were, first of all, we

25   were very upset.

                                        66

1           M. Choudhary

2      Q.     Who is "we"?

3      A.     Me, I was sitting there, and

4   Boysin was there also, and Jane was there
                    Page 58

oct 4 17(2).txt

```
 5    then.
 6              MS. NADELSON:  When was that,
 7         I'm sorry I missed that, when was
 8         that?
 9              MR. MCCORD:  You can read the
10         transcript.
11              THE WITNESS:  The 21st.
12         Q.    You, Jane and Boysin was there,
13    and what about Norma?
14         A.    Norma was not there.
15         Q.    Where were you, Jane and
16    Boysin --
17         A.    In my office.
18         Q.    -- in your office?
19         A.    Yes.
20         Q.    On the 21st?
21         A.    On the 21st.
22         Q.    Why were you in the office on
23    the 21st, were you expecting Norma to call
24    or you happened to be there?
25         A.    We were just there deciding what
```

                                        67


```
 1              M. Choudhary
 2    the judge was gonna decide, sitting and
 3    waiting there.
 4         Q.    You didn't know the auction was
 5    the next day?
 6         A.    No, no.  We thought that we'll
 7    raise the money and everybody was happy.
```
                        Page 59

oct 4 17(2).txt

 8  If they knew -- I didn't know there was

 9  auction.  From Norma's words, "Are you

10  kidding."

11      Q.      What does that mean?

12      A.      To me it means, no, there is no

13  auction when Boysin is asking her.

14          MS. NADELSON:  On the 21st, I'm

15      sorry.

16      A.      A few days before the 21th that

17  somebody is telling there is auction going

18  on and she said "Are you kidding."

19      Q.      Like there's no auction?

20      A.      There's no auction.  I don't

21  know how this --

22      Q.      So when you found out that there

23  was one on the 21st, what did you do?

24      A.      I ask Jane, can I bid it.  And I

25  think she called Norma, can he bid it?

                                        68


 1          M. Choudhary

 2  Can he be qualified to bid it?  No.  I ask

 3  Jane, I said Jane I want to bid it.  She

 4  said how you gonna qualify there is a

 5  procedure.  I said what procedure you

 6  talking about.  We were too busy arranging

 7  the money.  We didn't know if there was an

 8  auction.  Now even I don't have a right to

 9  bid it.

10      Q.      So when you say we didn't know,

11  you mean?

                    Page 60

oct 4 17(2).txt

12      A.      Me, Boysin.

13      Q.      You mean you didn't know?

14      A.      I didn't know about Boysin I

15  cannot say.  But I think he didn't know it

16  either, but I cannot answer for him.

17      Q.      Okay.

18      A.      I didn't.

19      Q.      Okay.

20      A.      Then Norma said if you have the

21  money, you bring the money.  Then I the

22  next day made the check and I went there

23  and I bid -- oh, then she refuse me to

24  bid.

25              Then she said show me some

                                        69


                    M. Choudhary

1

2  proof.  Then I showed her proof from the

3  broker.  I contacted the broker the same

4  night, the broker very close to me.

5      Q.      What is his name?

6      A.      David Steinmetz.  And I sent

7  something to Norma on the 22nd by 10:00,

8  10:30, maybe it was 11:30, 10:30 something

9  like that and then she qualified me and I

10  bid the building.

11      Q.      Do you know Mr. Ghalchi, my

12  client, Mr. Ghalchi?

13      A.      Now I know but not before.  I

14  saw him over.

                    Page 61

oct 4 17(2).txt

```
15        Q.        Do you know Mr. Goldenberg?

16        A.        No.

17        Q.        The other bidder, do you know

18   Mr. Giella?

19        A.        I heard his name but not

20   personal knowledge.  I saw him only in the

21   court one time and that day.

22        Q.        He was at the auction?

23        A.        Yeah.

24        Q.        Did anybody talk to you during

25   the auction, approach you in any way
```

                                                    70


```
 1                 M. Choudhary

 2   anyone from the bank, Norma?

 3                 After the auction started, did

 4   anyone talk to you while the bidding was

 5   going on or when there were breaks, did

 6   Mr. Lorick talk to you, did Mr.  --

 7        A.        No.

 8        Q.        Did Mr. Rinaldi talk to you?

 9   Mr. Bernardino, Colin Bernardino, did he

10   talk to you?

11        A.        No.

12        Q.        Did anybody talk to you at the

13   auction?

14        A.        You mean before the auction?

15        Q.        Did anybody talk to you before

16   the auction?

17        A.        They started, Mr. Ghalchi and

18   what is the bank attorney's name.
```

                          Page 62

oct 4 17(2).txt

19     Q.     Colin Bernardino?

20     A.     Yeah, he said something like

21     he's objecting that I'm not qualified and

22     how -- yeah, he started something.   Then

23     the Ghalchi attorney also said something,

24     I don't remember exactly the words.

25     Q.     After the bidding started, did

                                                    71

1               M. Choudhary

2     anybody talk to you?

3               MS. NADELSON:   After the bidding

4        started?

5               MR. MCCORD:   Ms. Nadelson.

6     A.     I don't think.

7     Q.     How did you get to the auction

8     that day, did you go with Mr. Lorick?

9     A.     No, I think I was with Jane.

10     Q.     Who?

11     A.     With my attorney.

12     Q.     Did you meet Mr. Lorick outside

13     the courthouse before the auction took

14     place?

15     A.     He was there, yes.

16     Q.     Did you meet him outside?

17     A.     I don't remember if it was

18     inside I met him or outside.

19     Q.     Did you talk to him about the

20     auction?

21     A.     I spoke a lot, yeah, about the

                    Page 63

oct 4 17(2).txt

22    auction.

23        Q.    What did you say to Norma about

24    the auction?  He was there, too, Mr.

25    Lorick was there when you --

                                            72


1                M. Choudhary

2        A.    I never thought he had

3    authority.  Now I know he is the one that

4    approves.  I thought only Norma is the one

5    who approves.

6        Q.    So when you spoke to them it was

7    before the auction, what did you talk

8    about?

9        A.    Norma was not letting me bid

10    again, before the auction I'm talking.

11        Q.    Did you talk to Mr. Lorick the

12    night before, after you found out the

13    auction was proceeding?

14        A.    The night before?

15        Q.    The 21st.

16        A.    He was sitting there, that is

17    the only way you know that the judge

18    refused, and we have to bid it.

19        Q.    Only you and Mr. Lorick have to

20    bid it?

21        A.    No, I have to bid it.  Lorick

22    has nothing to do with it.

23        Q.    We already know that if the

24    property sold of the $2 million in equity

25    that's gonna come back, that's gonna come

oct 4 17(2).txt

73

1                M. Choudhary

2    back to Mr. Lorick --

3        A.    Yeah.

4        Q.    -- that he's gotta pay you

5    100,000 dollars or approximately 100,000

6    dollars for your out-of-pocket expenses?

7        A.    I don't care whoever buys now.

8    He supposed to pay me that.

9        Q.    I understand.  Well, whoever

10   buys it?

11       A.    Yeah.

12       Q.    He's gonna net out probably

13   close to $2 million maybe a little less,

14   but around $2 million --

15       A.    Yeah.

16       Q.    -- after the bank is paid?

17       A.    Yeah.

18       Q.    And you're expecting to be paid

19   that 100,000 dollars, if you put this

20   deposit up for the 735 and the 1.5 --

21            MS. NADELSON:  Two deposits.

22       Q.    -- two deposits.

23            Do you also expect him if you

24   lost it to pay you that money back, too,

25   in addition to the 100,000 dollars?

74

Page 65

oct 4 17(2).txt
1              M. Choudhary

2      A.    No.   Why he's gonna pay me back,

3    that is my deal; he has nothing to do with

4    this.

5      Q.    So he's not gonna get a piece of

6    the building.  You will not give him

7    partial ownership in the building, if he

8    gives you money or anything like that?

9      A.    Well, that is a future.  I don't

10   know what will -- no, why should I.  If

11   I'm gonna buy it, I will buy it.

12     Q.    Have you talked to him about it,

13   because I know he's very desirous about

14   not losing the building?

15     A.    Yes.

16           MS. NADELSON:  But also --

17           MR. MCCORD:   Ms. Nadelson.

18           Let the record reflect at least

19       ten times she interrupted these

20       proceedings, and I asked her numerous

21       times to stop and she won't.

22     Q.    Have you talked to him about it?

23     A.    No.

24     Q.    So the only money you expect him

25   to pay you back from whatever source is

                                        75


1              M. Choudhary

2    the approximate 100,000 dollars you laid

3    out over the last several months?

4      A.    Yeah.  There was no need me for

oct 4 17(2).txt

5    to refinance it because of him I refinance

6    it I pay a repayment penalty, I pay

7    broker, I pay this and that.  And as he

8    promised me that if you --

9       Q.    Now if at the auction.  Hold on

10   a minute?

11           MR. MCCORD:  Mark this in,

12       please.

13           (Whereupon, Choudhary Exhibit 4,

14       transcript from the auction was hereby

15       marked for identification, as of this

16       date.)

17      Q.    I am showing you Exhibit 4 which

18   is the transcript from the auction.  I'm

19   asking you to turn to page 9.

20      A.    Yeah.

21      Q.    All right.  In the middle of the

22   page Ms. Ortiz asks:

23           "So does anyone have any

24       questions before we proceed?"

25           Mr. Aryeh, do you know who that

                                            76


1            M. Choudhary

2    is, that's Mr. Ghalchi's attorney?

3       A.    Yeah.

4       Q.    So he says:

5           "I do.  Eli Aryeh representing

6       Mr. Solomon Ghalchi.

7           "I just wanted to know regarding

oct 4 17(2).txt

8      Mr. Choudhary, does he have any

9      relationship to the debtor at all?"

10     And Ms. Ortiz goes, "Familial

11     relationship."

12          Mr. Aryeh goes, "Familial

13     relationship whether or not, yeah, any

14     type of relationship, is there any?"

15          Do you understand what that

16     question means?

17     A.     Yeah.

18     Q.     Ms. Ortiz says "I'll ask the

19     debtor," that's Mr. Lorick, "so that I am

20     not speaking on his behalf."

21          Mr. Aryeh says, "Please."

22          Ms. Ortiz goes on to say:

23          "I just asked Boysin Lorick if

24     he had a familial interest with Mohammad

25     Choudhary, and he said no."

                                        77


1            M. Choudhary

2            Is that true, Mr. Choudhary?

3      A.     Yes, I have no.

4      Q.     "I asked him if he shared any

5      interest in real estate, shared any

6      interest in partnership or LLC or other

7      business venture with him, and he said

8      no"; is that true?

9      A.     Yeah.

10     Q.     So how would you describe your

11     relationship?

                    Page 68

oct 4 17(2).txt

12      A.      Just helping each other.

13      Q.      Friends?

14      A.      Yeah.   You could -- yeah.

15      Q.      And he would do some work for

16   you if you needed it at your building, and

17   you took out the permit for him to do work

18   on his building --

19      A.      Yeah.

20      Q.      -- even though you know that's

21   illegal, right?  Do you know that's

22   illegal to take the permit out in your

23   name, so that somebody else can do the

24   work under your name?

25      A.      I don't know that when that

78

1               M. Choudhary

2   was --

3      Q.      Do you think it's proper that

4   you have a license to be a general

5   contractor, and he doesn't.

6               So you took the permit out, you

7   applied for it before New York City, and

8   you never intended on doing the work, you

9   let him do the work; is that correct?

10      A.      But there was, I don't think it

11   wasn't much, it was just smoke to clean

12   that I know that --

13      Q.      It doesn't matter what it was?

14      A.      The thing is how dangerous the

oct 4 17(2).txt

15   job is.  When you know there is no danger,

16   there is nothing to lose.  Then I don't --

17        Q.    Then it's okay to misrepresent?

18        A.    Yeah.

19        Q.    Did you work together in any way

20   at this auction to help Mr. Lorick protect

21   his interest in the property?

22             MS. NADELSON:  That's leading,

23        come on.

24             MR. MCCORD:  Ms. Nadelson, do

25        not interfere again.  I swear, I will

                                        79


1                 M. Choudhary

2        call the court in a minute.

3        A.    The only way he refinance it, he

4   knew if he was with me.

5        Q.    So is the answer to my question

6   yes or no?

7        A.    What is the question.

8        Q.    Did you in any way help Mr.

9   Lorick to save his building whether it's

10   at the auction or before, you said you

11   helped refinance and you laid out 100,000

12   dollars?

13        A.    Yes, yes.

14        Q.    At the auction when you found

15   out there was gonna be an auction, did you

16   two talk about working together so that

17   you could be the highest bidder and help

18   him save his building somehow in some way?

oct 4 17(2).txt

19      A.      No.

20      Q.      You just decided to go in --

21  now --

22      A.      He --

23      Q.      Two days before the auction --

24      A.      Yeah, yeah.

25      Q.      You were going to give him

⚥                                              80

1              M. Choudhary

2  $600,000 and then 1 million 2 --

3      A.      Yeah.

4      Q.      -- $1,800,000?

5      A.      Yeah.

6      Q.      Two days before August 22?

7      A.      Yeah.

8      Q.      On August 22 you upped, you

9  increased your offer for this to $7.4

10  million?

11      A.      Yeah, yeah.

12      Q.      $5.2 million higher than what

13  you were gonna invest two days before,

14  why?

15      A.      I'm buying the building.   He

16  never wanted to sell the building.   Now

17  the building is gone to auction, he's out

18  of the picture now.

19      Q.      Is he, though?  You're not gonna

20  have any relationship with him going

21  forward, he's out of the picture?

oct 4 17(2).txt

22    A.    Yeah, just I mean whatever the

23    friendly, we talked to each other.  If I

24    buy the building, it's gonna be my

25    building.

                                        81

1                M. Choudhary

2     Q.    Does he know that?

3     A.    He knows that.

4     Q.    Do you think in the transcript

5     Mr. Aryeh asked if you had any kind of

6     relationship with Mr. Lorick, correct?

7     A.    Yeah.

8     Q.    And Ms. Ortiz then broke that

9     down saying familial or business ventures

10    or --

11    A.    Yes.

12    Q.    Do you think it was an accurate

13    answer to say that you and Mr. Lorick have

14    no relationship at all?

15    A.    Yes.

16    Q.    So you don't think it was

17    appropriate that Ms. Ortiz should of said

18    they're friends, and they were working to

19    put together a deal like --

20    A.    Put together, but there was no

21    deal yet.

22    Q.    I thought I could of sworn your

23    testimony was that you have the money to

24    close?

25    A.    Yes.  We had the deal and it did

⚲

    1              M. Choudhary
    2   not final.
    3       Q.     I understand that it didn't
    4   finalize.
    5       A.     It's gone to auction, so
    6   everything is finished so all
    7   relationships are gone, finished.
    8       Q.     What I'm saying is do you think
    9   it was proper that she said no, no, to any
   10   kind of relationship?  Meaning no
   11   friendship no working together, no trying
   12   to get a deal together, no means no; do
   13   you think that was proper?
   14       A.     I think she meant from the
   15   auction point of view that we didn't have
   16   anything.
   17       Q.     Do you think she should of
   18   disclosed the relationship that you had
   19   even during the bankruptcy proceeding by
   20   itself, that you were working together to
   21   refinance, and that he owed you 100,000
   22   dollars?
   23       A.     You could ask her.
   24       Q.     I'm asking you.
   25       A.     She knew everything that I'm

⚲
                                    83

oct 4 17(2).txt

1              M. Choudhary

2    refinancing the building.  She knew

3    everything, that I'm buying 10 percent of

4    the building.

5         Q.    Did she know that you were his

6    creditors?

7         A.    I was his?

8         Q.    He owed you money, did she know

9    that he owed you money for your

10   refinancing?

11        A.    Many times I spoke to her.

12   Norma, it's a lot of money we spend on

13   refinance only to be able to pay the bank;

14   what is going on, we want to pay the bank,

15   we want to pay the bank.

16        Q.    Did she know the money that you

17   laid out, that Mr. Lorick and you had

18   agreed that he was gonna pay you back; did

19   she know that?

20        A.    I have no idea.

21        Q.    You told her everything else,

22   but you said you laid out a lot of money,

23   but you didn't say I'm getting it back?

24        A.    I don't remember exactly these

25   words, if I said to her or not.

                                        84


1              M. Choudhary

2              MR. MCCORD:   Mark this in next.

3              (Whereupon, Choudhary Exhibit 5,

4         document captioned "Declaration of

oct 4 17(2).txt

 5      Mohammad Choudhary" was hereby marked

 6         for identification, as of this date.)

 7      Q.    The top of the Exhibit 5 says,

 8  "Declaration of Mohammad Choudhary"; do

 9  you see?

10      A.    Yes.

11      Q.    Have you ever seen this before?

12      A.    No, sir.

13      Q.    Look at the last page.  Not the

14  last page --

15          MS. NADELSON:  Second page.

16          MR. MCCORD:   Thank you.

17      Q.    -- look at the second page.

18      A.    Yes, sir.

19      Q.    It says "S/" that means that you

20  authorized Ms. Ortiz to sign your name;

21  did you do that on August 18?

22      A.    What is that, the answer?

23      Q.    You see your name there, do you

24  see your name?

25      A.    No.  This is the account number.

                                      85


 1               M. Choudhary

 2      Q.    Second page?

 3          MS. NADELSON:   Read what it is.

 4      Q.    Go to the second page.

 5          MS. NADELSON:  Go to the second

 6  page.

 7      Q.    Is that your name?

                    Page 75

oct 4 17(2).txt

8     A.     Yeah.

9     Q.     You see the date August 18?

10    A.     Where is the date on this?

11           MR. MCCORD:   Show him.

12    Q.     You see the date?

13    A.     Yeah.

14    Q.     Have you ever seen this document

15    before?

16    A.     What is this document?

17    Q.     Okay.  The first thing is on the

18    document it says -- Mr. Choudhary?

19           MS. NADELSON:  He's reading.

20    Q.     It says, "I have known Boysin

21    Lorick for over a decade"; is that true?

22    A.     Yes, sir.

23    Q.     Did you give that information to

24    Ms. Ortiz to put in this document?

25    A.     Yes.

                                          86


1            M. Choudhary

2     Q.     So you've seen this document

3     before then?

4     A.     No.  This document, I think I

5     have seen it, but if you would like me to

6     read it.  I don't remember it.

7     Q.     Then take a minute, I'm sorry.

8     A.     No, no.  Can you read it for me.

9     Q.     Sure.  The first paragraph:

10           "Is I have known Boysin Lorick

11     for over a decade.  He is very good
                    Page 76

oct 4 17(2).txt

12      friend of mine.  I own real estate ina

13      business near the building he owns at

14      3126 Coney Island Avenue, Brooklyn.  I

15      have helped him with the building for

16      many years."

17          Is that correct?

18      A.    Yes, sir.

19      Q.    What does it mean, I have helped

20  him with the building for many years?

21      A.    Well, if there is, you know,

22  again the problem is in construction

23  that's my help, you see it's only

24  construction-related help.

25      Q.    That's okay.  What do you mean

                                        87

1              M. Choudhary

2  by construction help, what does that mean

3  building, renovating?

4      A.    Renovating.

5      Q.    So you renovated the building?

6      A.    No, I never renovated but by

7  problem if he needs electrician, there's a

8  problem, he will call me and I will give

9  him my guy.

10      Q.    Isn't that a business

11  relationship?

12      A.    It's not a business

13  relationship.  A business relationship is

14  if I'm doing some money thing with him.

                Page 77

oct 4 17(2).txt

15      Q.      If you give him your

16  electrician, doesn't your electrician get

17  paid?

18      A.      He will pay him directly, I'm

19  not getting commission.

20      Q.      "I own a number of parcels of

21  real estate.  I decided to help Boysin

22  save his building."

23      A.      Number of parcels, okay.

24      Q.      I have been trying to help him

25  obtain financing for months, but he simply

                                          88


 1              M. Choudhary

 2  cannot borrow enough funds without my

 3  assistance to pay off the first mortgage;

 4  is that true?

 5      A.      Yes.

 6      Q.      Did you give that information to

 7  Ms. Ortiz?

 8      A.      Yes.

 9      Q.      Did you know she was putting it

10  in this document?

11      A.      Yes.

12      Q.      Did you know she was filing this

13  with the court to see if she can get an

14  adjournment of the auction?

15      A.      Yes.

16      Q.      You knew all of this?

17      A.      Yes.

18      Q.      So you've seen this before?

oct 4 17(2).txt

19      A.      Yes, yes.

20      Q.      Did you sign it; did you ever

21   sign it?

22              MS. NADELSON:  It's electronic.

23      Q.      Did you ever sign it?

24      A.      I know the document.  I don't

25   remember if I signed it or not, but this

                                        89


1                M. Choudhary

2   is the document she discussed with me and

3   I know about this document.

4       Q.      Are you guaranteeing the secured

5   loan as part of your agreement?

6       A.      I have to read the whole

7   document, then I could guarantee.  I have

8   agreed --

9       Q.      Read it yourself.

10      A.      Yes, your answer is yes.  I have

11   agreed to provide him with a non-secured

12   loan.

13      Q.      That's not a business

14   relationship?  If you were to do that, if

15   it was to be done, would that be a

16   business relationship, would that be

17   business?

18      A.      Yeah, now I'm buying.

19      Q.      If it's done, it's business?

20      A.      It's a business.

21      Q.      All right.  Now you said earlier

                     Page 79

oct 4 17(2).txt
22    that you didn't know about the auction

23    until --

24        A.    The 21st.

25        Q.    -- in the evening when you were

♀

                                          90


 1                M. Choudhary

 2    at your office with Ms. Nadelson and Mr.

 3    Lorick?

 4        A.    Yes, sir.

 5        Q.    That's dated August 18 --

 6        A.    Yeah.

 7        Q.    -- three days before the 21st?

 8        A.    Yeah.

 9        Q.    And that's in support of Ms.

10    Ortiz' motion on behalf of Mr. Lorick to

11    adjourn the auction.

12            So how can you say you didn't

13    know about the auction, when you just said

14    that you provided that information to her

15    to stop the auction at least on August 18?

16        A.    To stop the auction.  I never

17    knew that the auction is already happen,

18    that is allowed.

19            I thought all these papers to

20    stop the auction, so we could pay the

21    bank.  I never knew that the auction

22    already is decided.

23        Q.    Well, it wasn't decided but it

24    was gonna be held on the 22nd, and that is

25    to adjourn it, those papers were to
                    Page 80

oct 4 17(2).txt

```
 1              M. Choudhary
 2  adjourn it?
 3      A.    So it means something that it
 4  was already decided.
 5      Q.    All right.  Do you know if Ms.
 6  Ortiz paid Ms. Nadelson $1,300 --
 7              MS. NADELSON:   1,350.
 8      Q.    -- $1,350 --
 9      A.    No.
10      Q.    -- last December for --
11      A.    She did a lot, I don't know --
12      Q.    She did what?
13      A.    Not paid -- no, no.
14      Q.    Who is "she" did a lot, you said
15  she?
16      A.    Norma.  No, I don't know.
17      Q.    Norma paid Ms. Nadelson for
18  doing work?
19      A.    I don't know.
20              MR. MCCORD:   Ms. Nadelson, you
21      said you paid 1,350 to Ms. Ortiz?
22              MS. NADELSON:   $1,350.
23              MR. MCCORD:   You believe it was
24      December 2016?
25              MS. NADELSON:   December 30,
```

oct 4 17(2).txt

```
 1              M. Choudhary
 2      2016.
 3              MR. MCCORD:   What refreshed your
 4      memory?
 5              MS. NADELSON:   I went through my
 6      bank statement.
 7              MR. MCCORD:   You got that off
 8      your bank statement that you were paid
 9      $1,350 on December 30 by Norma Ortiz;
10      why were you paid that money?
11              MS. NADELSON:   Because I went,
12      you know, like I was kind of, you
13      know, spending my time, I went to the
14      meeting with Mohammad, and Boysin was
15      there.
16              And then I gathered some
17      background information from Boysin
18      before we went there to Norma, to --
19      before she filed.  What else?  I don't
20      remember what exactly, it was like a
21      couple of hours.
22              MR. MCCORD:   So it was a couple
23      hours for doing preliminary work for
24      Norma for Lorick, the Chapter 11?
25              MS. NADELSON:   Right, right.  I
```

                                 93


```
 1              M. Choudhary
 2      think it says it on the check.
 3              MR. MCCORD:   It says on the
 4      check what?
```
                     Page 82

oct 4 17(2).txt

5          MS. NADELSON:  That I helped her

6     with gathering the stuff.  Lorick

7     Boysin -- I have to pull the check,

8     bankruptcy -- I think it says that.

9          MR. MCCORD:  Can you provide me

10     with --

11          MS. NADELSON:  Not for the

12     bankruptcy.

13          MR. MCCORD:  -- provide me with

14     a copy of that check?

15          MS. NADELSON:  I will do it by

16     tomorrow or do you want it today?  I

17     can print it out from your computer.

18          RQ  MR. MCCORD:  What does that

19     mean, you can e-mail it to me or

20     something like that?

21          MS. NADELSON:  If you want.

22          MR. MCCORD:  Yeah, can you

23     e-mail it to me, please.

24          MS. NADELSON:  Yeah.

25          MR. MCCORD:  Do you have my

                                    94


1           M. Choudhary

2     e-mail address?

3          MS. NADELSON:  Yes, I do have

4     it.

5          MR. MCCORD:  So e-mail it to me

6     please, and I'll tell them to print it

7     out.  It won't take long.

                    Page 83

oct 4 17(2).txt

```
 8     Q.     Are you aware of the limited
 9  objection that the bank filed on the day
10  of the sale hearing, I'll show it to you?
11            Hold on a minute, I will show it
12  to you.
13            MS. NADELSON:  The bank filed a
14       limited objection?
15            MR. MCCORD:  I will show it to
16       you, too.
17            MS. NADELSON:  I didn't see
18       that.
19            MR. MCCORD:  I will show it to
20       you.  I am a nice guy.  Mark this in.
21            (Whereupon, Choudhary Exhibit 6,
22       document captioned, "Limited Objection
23       to Sale of Debtor's Real Property and
24       Reservation of Rights Regarding Same"
25       was hereby marked for identification,
```

                                           95


```
 1            M. Choudhary
 2       as of this date.)
 3     Q.     I will show you what's been
 4  marked as Choudhary Exhibit 6, at the head
 5  of it it says "Limited Objection to Sale
 6  of Debtor's Real Property and Reservation
 7  of Rights Regarding Same."
 8            Do you see that?
 9     A.     Yes.
10     Q.     Have you ever seen this document
11  before?
```

                        Page 84

oct 4 17(2).txt

```
12      A.      No.
13              MR. MCCORD:  Have you?
14              MS. NADELSON:  I have not.
15      Q.      This is a document that Wells
16 Fargo filed on the day of the sale hearing
17 which was two days after the auction which
18 was August 22?
19      A.      The auction was August 22.
20      Q.      And the sale hearing was August
21 24, were you there at the sale hearing?
22      A.      Yes.
23      Q.      Wells Fargo filed this with the
24 court, Exhibit 6, on that day, the sale
25 hearing day.  Did you know they filed a
```

96

```
 1              M. Choudhary
 2 limited objection?
 3      A.      No.
 4      Q.      It's a limited objection, and
 5 basically it is objecting to you --
 6      A.      I see.
 7      Q.      -- being qualified the
 8 successful bidder, and they're asking for
 9 you to be disqualified because you haven't
10 proven that you can close.
11      A.      I don't know about this, but
12 they had arguments outside the court with
13 me.
14      Q.      All right.  But --
```

Page 85

oct 4 17(2).txt

15          MR. MCCORD:   Ms. Nadelson, you

16      need to listen.

17      Q.    Who is "they," Mr. Bernardino?

18      A.    Bernardino.

19      Q.    -- had arguments with you

20  outside the court on the day of the sale

21  hearing or another day?

22      A.    24th.

23      Q.    That's the date of the sale

24  hearing?

25      A.    Yes.

                                        97


1          M. Choudhary

2      Q.    When you say outside the court,

3  you mean in the courthouse like in the

4  hallway?

5      A.    No.   This is the room, yeah, in

6  the hallway outside.

7      Q.    When you say they had arguments,

8  you mean Mr. Colin Bernardino?

9      A.    Yeah.

10      Q.    And any other attorneys from the

11  bank?  Is there what's his name Keith?

12          MS. NADELSON:   I think it was a

13      woman.

14          MR. MCCORD:   What's her name?

15          MS. NADELSON:   A woman was

16      there.

17          MR. MCCORD:   What's the woman's

18      name?

                Page 86

oct 4 17(2).txt

19        Q.      Was it Theresa Reyes?

20        A.      I don't know if it was her.

21        Q.      It was a woman not another man,

22   Keith Brandefino (phonetic)?

23        A.      I don't know.

24        Q.      Anyway, so you were in room that

25   was like a conference room?

                                              98

1                 M. Choudhary

2         A.      No, no, outside.

3         Q.      In the hallway?

4         A.      Yeah.

5         Q.      Okay.   And you were with Ms.

6    Nadelson?

7         A.      Yes.

8         Q.      And Ms. Ortiz?

9         A.      Yes.

10        Q.      Mr. Lorick?

11        A.      Yes.

12        Q.      And Colin Bernardino?

13        A.      Yes.

14        Q.      And you say we were arguing,

15   what were you arguing about?

16        A.      I'm sorry.

17        Q.      You want some more water?

18        A.      He just came.   We were already

19   there, and he started the same thing.  He

20   started with me at the bid, on the 22nd.

21                We gonna oppose him, we will

                         Page 87

oct 4 17(2).txt

22   disqualify.  He's shouting we are gonna

23   disqualify him, we are gonna file the

24   motion.  We were doing --

25              I said, listen, take it easy.

                                           99

1                M. Choudhary

2   What are you doing, this is not the way of

3   talking.  Then, you know, Nadelson was

4   slapping me saying you shut up.

5              MS. NADELSON:  I didn't slap

6       you.

7              THE WITNESS:  You push me down.

8      A.     Norma also, the way he was

9   talking, and he was shouting.  And then

10  Norma comes to me, listen, they filing the

11  motion it will be a five-year litigation

12  can you just forget -- this gonna be a

13  long time in litigation.  They are gonna

14  disqualify you anyway.

15             I'm shocked inside.  I don't

16  know what happened.  I went in front of

17  the judge, I'm disqualified.  Even that

18  time I didn't want disqualified.

19     Q.     You didn't want them to?

20     A.     No.

21     Q.     So when Norma came to you

22  outside, and said it will be five years in

23  litigation, and the other things you just

24  said?

25     A.     Then she went in.

                     Page 88

oct 4 17(2).txt

1              M. Choudhary

2       Q.    You didn't say, okay, I

3  withdraw?

4       A.    No, no.

5       Q.    You said you still wanted to buy

6  the property and be the bidder?

7       A.    Yes.  She went inside and what

8  she said to the judge --

9       Q.    Did your attorney Ms. Nadelson

10  know you said that that you still wanted

11  to be the bidder?

12      A.    I said, no, Norma.

13            MS. NADELSON:  I don't recall

14      it.

15      Q.    She went inside?

16      A.    And over this she said to me

17  that I couldn't show the proof or

18  something -- the word she used something,

19  I don't remember exactly -- the bank, no

20  the bank -- the bank is asking me to be

21  disqualified and there was something he

22  said, and the judge disqualified me.

23            Now I want Nadelson to talk to

24  the judge.  And she says I cannot talk any

25  word in this court because it's Bankruptcy

oct 4 17(2).txt

```
 1              M. Choudhary
 2    Court.  And I'm not a --
 3              MR. MCCORD:  Are you admitted in
 4        to practice in the Eastern District of
 5        New York?  Are you admitted to
 6        practice in Federal Court, in the
 7        Eastern District of New York?
 8              MS. NADELSON:  No, I'm not.
 9    A.      And I cannot talk to the judge,
10    I have nothing else.  I just came out.
11    The attitude of Mr. Bernardino.  I don't
12    know, I wish you were there.
13              MS. NADELSON:  How come you were
14        not there?
15              MR. MCCORD:  I wasn't retained
16        by Mr. Ghalchi until afterwards.
17    A.      I don't want to open my mouth
18    too much.  It's making me -- why is that
19    Norma is putting that there is a process,
20    there is a process, and the bank is
21    opposing me.
22              What is in their mind?  It's
23    something in their mind, something is
24    fault in their mind.  I mean this is what
25    I think, something is going on.
```

                                        102

```
 1              M. Choudhary
 2              MS. NADELSON:  In whose mind?
 3              THE WITNESS:  Listen, Norma not
 4        letting us pay the money, bank is not
```
                        Page 90

oct 4 17(2).txt

```
 5        accepting the money.
 6             MR. RINALDI:  Is there a
 7        question?
 8             THE WITNESS:  No, that's the --
 9             MR. RINALDI:  I'm not sure.
10             MR. MCCORD:  I'm letting him --
11             THE WITNESS:  Whatever is the
12        bank and Norma believed.  And I don't
13        know, maybe it's -- how do I know.
14             MR. MCCORD:  Ms. Nadelson,
15        please --
16             THE WITNESS:  They didn't let us
17        pay the money, all along.  We wanted
18        to.
19             MR. MCCORD:  Ms. Nadelson, did
20        you tell Mr. Choudhary before you went
21        to the hearing that you could not
22        represent him in the court, that you
23        weren't admitted in the United States
24        Bankruptcy Court for the Eastern
25        District?
```
                                          103


```
 1             M. Choudhary
 2             MS. NADELSON:  Yes.
 3        Q.    Did she tell you before?
 4        A.    Yes.
 5        Q.    So you knew before you went that
 6   she couldn't?
 7        A.    Yeah.
```
                    Page 91

oct 4 17(2).txt

8          MR. MCCORD:  Did you ever think
9     that maybe you could of stepped up
10    there and said I'm not admitted, but I
11    want something to say on behalf of my
12    client --
13          MS. NADELSON:  You know --
14          MR. MCCORD:  If he didn't want
15    to withdraw his bid and he's being
16    forced to do something he didn't want
17    to do, and he didn't have an attorney
18    there so did you ever think that maybe
19    you want to tell the judge this?
20          MS. NADELSON:  I told him, he
21    asked me a question and I told him --
22          MR. MCCORD:  Did you ever tell
23    Norma that he doesn't want this, and
24    I'm not admitted in the Eastern
25    District, so I can't appear?  Did you

                                            104


1          M. Choudhary
2     ever tell her that, so maybe she could
3     of told them?
4     Q.     She told the judge, it's in the
5     transcript, that they were disqualifying
6     you because of the contingency issue that
7     your means to obtain the money was through
8     a contingency, and Mr. Ghalchi's wasn't
9     through a contingency?
10    A.     What is contingency?
11    Q.     Meaning like you're getting a

oct 4 17(2).txt

12    mortgage or something like that.  So she

13    is saying that the court decided based on

14    that?

15        A.    Oh.

16        Q.    And the bank's consent that

17    Ghalchi's deal was not the highest offer

18    because it's not, but it was the best

19    offer because you were on a contingency,

20    meaning you had to borrow the money and

21    Ghalchi didn't --

22        A.    No.

23        Q.    -- and that's why the court

24    disqualified you.  She just said I'm not

25    going to get into that, I will designate

                                                    105

1                 M. Choudhary

2    Ghalchi the successful bidder.

3              Did anybody tell you that?

4        A.    Now I know.

5        Q.    Now, it's right but that's what

6    happened at the sale hearing.

7              It sounds to me like you didn't

8    want to, and from what your testimony is,

9    you didn't want to withdraw your bid?

10        A.    No.

11        Q.    You wanted to close, and Ms.

12    Nadelson told you she couldn't represent

13    you and you couldn't speak so...

14              MS. NADELSON:  I advised him

oct 4 17(2).txt
```
15        maybe he should get another attorney
16        and he said he doesn't need an
17        attorney.
18             THE WITNESS:  I said can't you
19        even get up and talk to the judge a
20        second.  And she said no, no, no, I
21        can't I'm not admitted.
22             MS. NADELSON:  I didn't say no.
23             MR. MCCORD:  Stop, stop.
24        Q.   You're coming to court tomorrow,
25   right?
```
                                              106


```
 1             M. Choudhary
 2        A.   Yes, sir.
 3        Q.   You're gonna be a witness for
 4   me?
 5        A.   Uh-huh.
 6        Q.   So you're gonna have a chance to
 7   tell the judge everything you just told
 8   me.  So you will have your chance to tell
 9   the judge.
10             So you can tell the judge
11   yourself, and you'll be under oath again
12   and you can tell the judge exactly what
13   you just told me because the judge doesn't
14   know this.
15             The judge doesn't know, and
16   maybe if she knew -- I don't think maybe
17   if she didn't -- but who knows maybe if
18   she knew it she might say get an attorney
```

oct 4 17(2).txt

19   or whatever, but she doesn't know.

20        I didn't know until you just

21   told me this because the transcript

22   doesn't reflect that.  And Norma didn't

23   tell me that and Ms. Nadelson didn't tell

24   me that and the bank didn't tell me that.

25        MS. NADELSON:  I told you on the

107

1        M. Choudhary

2    phone.

3        MR. MCCORD:  Not now.  You're

4        interrupting me 15 times for the

5        record.

6    Q.   So you'll be there tomorrow, and

7    we'll get into it tomorrow.

8        MR. MCCORD:  Do have you any

9        questions for him?

10        MR. RINALDI:  Just a couple of

11        questions.

12   EXAMINATION

13   MR. RINALDI:

14   Q.   Did you have liquid funds to

15   close, did you have the $7.4 million to

16   close?

17   A.   No, I had the commitment was a

18   solid commitment with the bank statement

19   for 5 million approved and the rest of the

20   money I had in the bank.

21   Q.   So it was contingent upon you

Page 95

oct 4 17(2).txt
22    getting the loan?

23        A.    Yeah.

24            MR. MCCORD:  You said I got the

25        loan, the rest of the money you were,

♀                                          108


1            M. Choudhary

2        you were borrowing 5 million, and the

3        balance of 7.4 you already had the

4        bank?

5            THE WITNESS:  I had, yes.

6            MR. MCCORD:  And you had a firm

7        commitment to the 5 million -- Ms.

8        Nadelson, quiet.

9            THE WITNESS:  Yes.

10        Q.    Did the commitment have any

11    conditions?

12        A.    No.  I didn't have any

13    conditions.  The only condition -- I mean,

14    it's the condition the bank is sending me,

15    that they will give me the money.  It's

16    not --

17            MR. MCCORD:  Ms. Nadelson.

18        A.    -- you could say contingency but

19    when you say -- yes, yeah.

20        Q.    There were conditions?

21        A.    Yes.

22    EXAMINATION

23    BY MR. MCCORD:

24        Q.    What were the conditions for the

25    $5 million?

oct 4 17(2).txt

109

```
 1              M. Choudhary
 2       A.    The conditions, you know, that I
 3   have to send them the check.  And I have
 4   to, the properties what they were giving
 5   them on.
 6       Q.    Did you need an appraisal, is
 7   that one of the conditions?
 8       A.    No.  The appraisal was already
 9   done.  We send them from the previous
10   broker the appraisal.  They know the
11   property what is the property worth.  And
12   when they knew I'm putting two points is
13   something from my pocket they were wanted
14   to do it.
15       Q.    Do you remember any other
16   conditions that were on that commitment?
17       A.    I don't remember.  I can see the
18   commitment --
19           MR. MCCORD:  Do you have
20       anything else?
21           MR. RINALDI:  Just one more
22       question.
23   EXAMINATION
24   BY MR. RINALDI:
25       Q.    Were you in the courtroom when
```

110

oct 4 17(2).txt
```
 1              M. Choudhary
 2  Ms. Ortiz gave her statement to the judge
 3  about Mr. Ghalchi's bid and your bid, were
 4  you in the courtroom?
 5      A.    Yes, I was there -- you mean on
 6  the 24th.
 7      Q.    At the sale hearing when she
 8  gave the statement that you were the
 9  contingent bid and Mr. Ghalchi was
10  affirmed, you were there?
11      A.    Yeah, yeah.
12          MR. RINALDI:  Okay.  No further
13      questions.
14          MR. MCCORD:  All right.  Did you
15      send me the check?
16          MS. NADELSON:  I can't send it.
17          MR. MCCORD:  Let me see it.
18      Take it off the charger.  You can't
19      send this?
20          MS. NADELSON:  I tried.
21          MR. MCCORD:  Can you text it.
22          MS. NADELSON:  It goes to the
23      bank that it was cashed.
24          MR. MCCORD:  Let the record
25      reflect -- let me call her in.  She's
                                    111



 1              M. Choudhary
 2      very good at this, maybe she can do
 3      it.
 4          MS. NADELSON:  I can do it
```
Page 98

oct 4 17(2).txt

```
 5        through the computer.
 6              MR. MCCORD:  Off the record.
 7              [Discussion held off the
 8        record.]
 9              MR. MCCORD:  I will show you
10        something.
11              This is a check from the Ortiz &
12        Ortiz bank -- the Ortiz bank account
13        dated December 30, 2016, paid in the
14        order of Jane J. Nadelson, Esquire,
15        $1,350, $1,350 payable to Jane J.
16        Nadelson, 3024 Coney Island Avenue,
17        Brooklyn New York, Memo:  Lorick
18        Bankruptcy Consultation.  TD Bank
19        4302141596 is the account number.
20              MR. RINALDI:  I just e-mailed it
21        to myself, so I will be able to e-mail
22        it to you guys.
23              MS. NADELSON:  Now, your client
24        took a picture of me, now you're
25        taking a picture of my phone check.
```
                                          112

```
 1              M. Choudhary
 2              MR. RINALDI:  He's like the
 3        paparazzi.
 4              MR. MCCORD:  Let the record
 5        reflect that Mr. Rinaldi on behalf of
 6        Wells Fargo and I have both taken a
 7        photo shot of the check paid, that was
```
                     Page 99

oct 4 17(2).txt

8        just identified as paid to Ms.

9        Nadelson from the Ortiz & Ortiz

10       account, and we have a record of it

11       now.

12              We are done.  Do you have any

13       questions for your client?

14              MS. NADELSON:  No.

15              MR. MCCORD:  No questions from

16       Ms. Nadelson.  No more questions from

17       Mr. Rinaldi.

18              MS. NADELSON:  I changed my

19       mind, I have a question.

20  EXAMINATION

21  BY MS. NADELSON:

22       Q.    Mohammad said that --

23              MR. MCCORD:  That's not a

24       question, you don't start a question

25       by telling me something.

                                         113

1              M. Choudhary

2        Q.    On the date of August 24 when we

3   were in court for the second time, was it

4   the judge who disqualified you or Norma

5   with her client who disqualified you?

6        A.    No, I think it was --

7              MS. NADELSON:  Richard, do you

8        want to listen?

9              MR. MCCORD:  No, I'm done.

10             Read the question back.  Hold

11       it.  Read the question back, please.

oct 4 17(2).txt

12          [The requested portion of the
13      record was read.]
14          MR. MCCORD:   What's the answer?
15     A.     The judge disqualified but Norma
16  and Boysin, they leaded it to that one.
17  They were scared of litigation.   They are
18  there, so they disqualified me, they all
19  three disqualified.
20  EXAMINATION
21  BY MR. MCCORD:
22     Q.     When you say they leaded, that's
23  Ms. Ortiz or the judge?
24     A.     Again and again they were
25  talking to me, litigation, litigation that
                                         114


 1           M. Choudhary
 2  it will be five years.  I'm losing this.
 3  Norma was also saying it's a litigation
 4  started.  So what does litigation have to
 5  do with me?
 6          MR. MCCORD:   All right.   Thank
 7      you.   That is it we are done.   Thank
 8      you.
 9          (Time noted:  3:43 p.m.)
10
11                  _____
12              MOHAMMAD CHOUDHARY
13
14
                   Page 101

oct 4 17(2).txt

15

16

Sworn and Subscribed

17

this_____day of _____,2017.

18

19

20

_____

21    Notary Public

22

23

24

25

♀

115

1

2             C E R T I F I C A T E

3

4    STATE OF NEW YORK    )

5                         : ss.

6    COUNTY OF NEW YORK    )

7         I, SUSAN ADAMS , a Shorthand

8    Reporter and Notary Public within and for

9    the State ofNew York, do hereby certify:

10        That MOHAMMAD CHOUDHARY, the

11    witness  whose deposition is hereinbefore

12    set forth, was sworn and that such

13    deposition is a true record of the

14    testimony given by such witness.

15        I further certify that I am not

16    related to any of the parties to this

17    action by blood or marriage; and that I

18    am in no way interested in the outcome of

oct 4 17(2).txt

19   this matter.

20          IN WITNESS WHEREOF, I have

21   hereunto set my hand this 4th day of

22   October, 2017.

23

24                    _____

     SUSAN ADAMS

25

                                    116

1

2   ------------------ I N D E X ------------------

3   WITNESS           EXAMINATION BY      PAGE

4   MOHAMMAD CHOUDHARY  Mr. Mccord  4,108,113

5                       Mr. Rinaldi   107,109

6                       Ms. Nadelson    112

7

8   ----------- INFORMATION REQUESTS --------------

9   (INSERT):  35,58

10  REQUESTS:  93

11  ------------------ EXHIBITS --------------------

12  CHOUDHARY                          FOR ID.

13   Exhibit 1, subpoena to testify     6

14   at a deposition in a bankruptcy

15   case

16   Exhibit 2, check from the          7

17   Brownstone Agency, Inc on behalf

18   of Aspen American Insurance

19   Company

20   Exhibit 3, copy of the permit      10

21   issued to Mohammad Choudhary on

                Page 103

oct 4 17(2).txt

22    July 29, 2013

23    Choudhary Exhibit 4, transcript    75

24    from the auction

25

117

1

2                     INDEX (Continued)

3    ------------------ EXHIBITS -------------------

4    CHOUDHARY                        FOR ID.

5     Exhibit 5, document captioned    84

6     "Declaration of Mohammad

7     Choudhary"

8     Exhibit 6, document captioned,    94

9     "Limited Objection to Sale of

10    Debtor's Real Property and

11    Reservation of Rights Regarding

12    Same"

13

14

15

16

17

18

19

20

21

22

23

24

25

oct 4 17(2).txt

```
 1
 2              ERRATA SHEET
         VERITEXT/NEW YORK REPORTING, LLC
 3   DATE OF DEPOSITION:  October 4, 2017
     WITNESS' NAME: MOHAMMAD CHOUDHARY
 4
     PAGE/LINE(S)/    CHANGE         REASON
 5   ____/_____/_____/_____
     ____/_____/_____/_____
 6   ____/_____/_____/_____
     ____/_____/_____/_____
 7   ____/_____/_____/_____
     ____/_____/_____/_____
 8   ____/_____/_____/_____
     ____/_____/_____/_____
 9   ____/_____/_____/_____
     ____/_____/_____/_____
10   ____/_____/_____/_____
     ____/_____/_____
11   ___/_____/_____/_____
     ____/_____/_____/_____
12   ____/_____/_____/_____
     ____/_____/_____/_____
13   ____/_____/_____/_____
     ____/_____/_____/_____
14   ____/_____/_____/_____
     ____/_____/_____/_____
15   ____/_____/_____/_____
     ____/_____/_____/_____
16   ____/_____/_____/_____
     ____/_____/_____/_____
17   ____/_____/_____/_____
     ____/_____/_____/_____
18   ____/_____/_____/_____
19
          _____
20             MOHAMMAD CHOUDHARY

21   SUBSCRIBED AND SWORN TO
     BEFORE ME THIS_____DAY
22   OF_____, 2017.
     _____
23        NOTARY PUBLIC

24   MY COMMISSION EXPIRES_____

25
```

Page 105