oct 4 17(1)a.txt

1

1

2  UNITED STATES DISTRICT COURT

3  EASTERN DISTRICT OF NEW YORK

4  - - - - - - - - - - - - - - - - - - - -x

5  In re
                        Case No.
6                       16-45646 (CEC)
   BOYSIN RALPH LORICK,
7  CYNTHIA THERESA LORICK,

8            Debtors.
   - - - - - - - - - - - - - - - - - - - -x
9
                        90 Merrick Avenue
10                      East Meadow, New York

11                      October 4, 2017
                        10:52 a.m.
12

13

14     DEPOSITION of JANE J. NADELSON, a

15  Witness in the above-entitled action, held

16  at the above time and place, taken before

17  Susan Adams, a Shorthand Reporter and

18  Notary Public of the State of New York,

19  pursuant to the Federal Rules of Civil

20  Procedure and stipulations between

21  Counsel.

22

23              *      *      *

24

25

2

oct 4 17(1)a.txt

1
2  APPEARANCES:
3
4     CERTILMAN BALIN ADLER & HYMAN, LLP
5          Attorneys for Soleyman Ghalchi
6          90 Merrick Avenue
7          East Meadow, New York 11554
8     BY:  RICHARD J. McCORD, ESQ.
9
10
11    KILPATRICK TOWNSEND & STOCKTON, LLP
12          Attorneys for Defendant
13          Wells Fargo Bank
14          1114 Avenue of the Americas
15          New York, New York 10036
16    BY:  MAXIMILIANO RINALDI, ESQ.
17
18
19
20
21
22
23
24
25

♀

                                    3

1
2                   STIPULATIONS
3       IT IS HEREBY STIPULATED AND AGREED, by
4  and among counsel for the respective

oct 4 17(1)a.txt

```
 5    parties hereto, that the filing, sealing
 6    and certification of the within deposition
 7    shall be and the same are hereby waived;
 8       IT IS FURTHER STIPULATED AND AGREED
 9    that all objections, except as to form of
10    the question, shall be reserved to the
11    time of the trial;
12       IT IS FURTHER STIPULATED AND AGREED
13    that the within deposition may be signed
14    before any Notary Public with the same
15    force and effect as if signed and sworn to
16    before the Court.
17                 *      *      *
18
19
20
21
22
23
24
25
```

♀

4

```
 1              J. Nadelson
 2    J A N E    J.    N A D E L S O N,
 3         a Witness herein, having first
 4           been duly sworn by the Notary
 5           Public, was examined and
 6           testified as follows:
 7    EXAMINATION BY
```

oct 4 17(1)a.txt

8    MR. MCCORD:

9       Q.      Please state your name for the

10   record.

11      A.      Jane Nadelson.

12      Q.      What is your home address?

13      A.      3024 Coney Island Avenue,

14   Brooklyn, New York 11235.

15      Q.      Good morning, Ms. Nadelson, my

16   name is Richard McCord.  I represent

17   Soleyman Ghalchi in the matter pertaining

18   to Boysin Ralph Lorick and Cynthia Theresa

19   Lorick, Chapter 11, Case Number

20   16-45645-NLH.

21           I will be asking you some

22   questions today, and I ask you to if you

23   don't understand them, tell me and I'll

24   try to clarify it.  If you don't know the

25   answer, please tell me and I will try to

                                             5




1                    J. Nadelson

2    rephrase it, but I do ask you not to

3    guess.  So if you don't know the answer

4    please just tell me, and we'll proceed.

5           Okay?

6       A.      Okay.

7       Q.      And let's try to speak one at a

8    time.  When you're speaking I'll try not

9    to interrupt you, and when I'm speaking

10   please don't interrupt because the

11   reporter can't take down two people

Page 4

oct 4 17(1)a.txt

12    talking at one time.

13              Do you understand that?

14      A.     I understand.

15      Q.     All right.  Have you ever been

16    deposed before?

17      A.     No.

18      Q.     Okay.

19      A.     I was.  A car accident, it was

20    an EBT.

21      Q.     And you're an attorney at law?

22      A.     Yes.

23      Q.     And you're licensed to practice

24    law in the State of New York?

25      A.     Yes.

                                          6


 1                  J. Nadelson

 2      Q.     And you're an attorney in good

 3    standing?

 4      A.     Very good standing.

 5      Q.     So therefore you don't need to

 6    have an attorney here with you today to

 7    proceed or you're waiving you're right to

 8    have an attorney today?

 9      A.     Yes.

10      Q.     Okay.  When were you admitted to

11    practice?

12      A.     2004.

13      Q.     Okay.  Do you have an area of

14    specialty?

oct 4 17(1)a.txt

15      A.      General practice.

16      Q.      Okay.

17      A.      Mainly general practice.

18      Q.      Do you do bankruptcy?

19      A.      No, I don't.

20      Q.      Have you ever done bankruptcy?

21      A.      No.

22      Q.      Do you do real estate?

23      A.      Yes.

24      Q.      Commercial real estate,

25      residential?

7

1                  J. Nadelson

2       A.      Real estate.

3       Q.      Okay.

4       A.      You're talking about

5       transactional?

6       Q.      Whatever.

7       A.      Yes, I do.

8       Q.      Are you familiar with the

9       Chapter 11 case that I just identified,

10      Boysin Ralph Lorick and Cynthia Theresa

11      Lorick, that I will be referring to as

12      Lorick?

13      A.      More or less.

14      Q.      Explain what that means.

15      A.      I just know he filed for

16      bankruptcy.

17      Q.      Okay.  When did he file for

18      bankruptcy?

oct 4 17(1)a.txt

19    A.    Last year.

20    Q.    Do you know when?

21    A.    I don't recall maybe November,

22   maybe December, maybe October.

23    Q.    How did you come to know that he

24   filed maybe November, December, October of

25   last year, 2016?

                                                    8

1                    J. Nadelson

2    A.    I actually gave out Norma Ortiz'

3   phone number because --

4    Q.    To who?

5    A.    To Lorick -- not to Lorick to

6   Mohammad.

7    Q.    Mohammad who?

8    A.    I don't remember -- Lorick,

9   Lorick.

10    Q.    Boysin Lorick?

11    A.    Boysin, I don't know.  Cynthia.

12    Q.    You gave Boysin Lorick Ms.

13   Ortiz' phone number?

14    A.    No, but I said I know the

15   bankruptcy attorney if he needs, you know,

16   like because he said that maybe, you know,

17   he wants to consult somebody.  I said,

18   well, I know the attorney.  And that's it.

19    Q.    Is he a client of yours?  Mr.

20   Lorick, is he a client of yours?

21    A.    No.

oct 4 17(1)a.txt

22      Q.      So what was the occasion that
23   you were speaking to him about filing
24   bankruptcy?
25      A.      Rephrase the question, please.

9

1                J. Nadelson
2       Q.      You said that he asked you, he
3   said he wanted to file bankruptcy and he
4   asked you about that, correct?
5       A.      He didn't ask me about
6   bankruptcy because I don't know
7   bankruptcy.
8                He just mentioned that, you
9   know, like if, you know, if I know any
10  bankruptcy attorneys.
11      Q.      When was this?
12      A.      Last year.
13      Q.      When?
14      A.      I don't remember.  Last year,
15  maybe in the second part of the year,
16  probably.
17      Q.      In the summer, in the fall?
18      A.      I don't recall.  Maybe in the
19  fall.
20      Q.      Fall --
21      A.      Fall, we have September --
22      Q.      September to December so?
23      A.      Probably from September to
24  December.
25      Q.      So when did you speak to him

oct 4 17(1)a.txt

10

1                    J. Nadelson

2      about this conversation about if you knew

3      a bankruptcy attorney?

4          A.     I don't recall an exact date.

5          Q.     Was it September?

6          A.     I don't recall.  I don't

7      remember.

8          Q.     Not even October, November?

9          A.     Come on, you're asking a year

10     ago.  I don't remember.  Maybe September,

11     maybe October, maybe August.

12         Q.     And how did this conversation

13     come about?  Did you know Mr. Lorick, do

14     you know Mr. Lorick at all?

15         A.     I've seen him.  I've seen him

16     around because --

17         Q.     Before all of this, before the

18     bankruptcy filing --

19         A.     Yes.

20         Q.     -- you've seen him around?

21         A.     Yes.

22         Q.     Explain what that means you've

23     seen him around.  You've seen him in the

24     grocery store or you've seen him in court,

25     I mean what does that mean you've seen him

11

oct 4 17(1)a.txt

1                    J. Nadelson

2    around?

3         A.    His building is in the area of

4    my office.  It's very, like, five

5    buildings down.

6         Q.    His building is located at 3126

7    Coney Island Avenue, Brooklyn, New York?

8         A.    Correct, the building he owns.

9               And, um, I'm just trying to

10   remember the circumstances what I met him.

11              And I do, you know, my client, I

12   have a client, Mohammad Choudhary.

13              You know him, you know him

14   definitely [indicating].  And --

15        Q.    Why would the bank attorney have

16   met him definitely?

17        A.    Because he met him in court.

18        Q.    When did he meet him in court?

19        A.    At the auction.

20        Q.    You were at the auction --

21        A.    I was at the auction.

22        Q.    -- on August 22, 2017?

23        A.    I was.

24        Q.    So this attorney sitting right

25   here?

                                            12

1                    J. Nadelson

2         A.    I don't know if this attorney,

3    maybe not this attorney.

4         Q.    You pointed at this attorney Mr.

oct 4 17(1)a.txt

```
 5    Rinaldi, and you said he knows Mr.
 6    Choudhary.
 7            How do you know he knows Mr.
 8    Choudhary?
 9        A.    I don't recall even which
10    attorney was at the auction.
11        Q.    But you said he knows him?
12        A.    Somebody from the bank, I'm sure
13    they heard of him or something.
14        Q.    All right.  So you said that you
15    know Mr. Lorick from around.  And you also
16    then testified that it's because your
17    office is a few buildings away from Mr.
18    Lorick's property; is that correct?
19        A.    Partial.
20        Q.    Continue, give me the whole
21    answer then, and not just the partial
22    answer.
23        A.    I met Boysin in Mohammad
24    Choudhary's office.  Mohammad Choudhary is
25    my client.
```

                                        13


```
 1                J. Nadelson
 2        Q.    Where is Mohammad Choudhary's
 3    office?
 4        A.    Between 3126, and between 3024
 5    where my office is, on Coney Island
 6    Avenue.
 7        Q.    Do you know the exact address?
```

Page 11

oct 4 17(1)a.txt

8      A.      3072.

9      Q.      3072?

10     A.      He has an office there.

11     Q.      3072 Coney Island Avenue,

12 Brooklyn, New York?

13     A.      Correct.

14     Q.      So you met Mr. Lorick in Mr.

15 Choudhary's office, correct?

16     A.      Correct, correct.

17     Q.      When did you meet him?  When did

18 you first meet Mr. Lorick in Mr.

19 Choudhary's office?

20     A.      Three years ago.

21     Q.      Three years ago?

22     A.      Uh-huh.

23     Q.      So that would be --

24     A.      Three, four, maybe five.  I

25 don't recall.

                                        14


1                    J. Nadelson

2      Q.      Okay.

3      A.      I do not recall really when was

4 it.

5      Q.      Do you know what the purpose of

6 meeting him in Mr. Choudhary's office was?

7      A.      I didn't meet him in his office

8 particularly, but what is the purpose of

9 the question?

10     Q.      Was it a business meeting?

11     A.      How is it relevant?

oct 4 17(1)a.txt

12      Q.      Were you having lunch?

13      A.      How is it relevant to the

14  auction?

15      Q.      I'm trying to establish a

16  timeline here, I'm trying to get to the

17  auction questions.

18      A.      It was not a business meeting,

19  it was not lunch.  It was a question to me

20  that -- I don't recall, but I think his

21  building was in foreclosure or something.

22          He went for foreclosure maybe --

23  I don't recall the facts -- and he asked

24  me would I know a solution how to save the

25  building or would I know what to do.

                                        15

1               J. Nadelson

2           And I said I don't know, let me

3  think, because I don't deal with

4  foreclosures.  I don't deal with

5  foreclosures, I don't deal with

6  bankruptcies.

7      Q.      And then when you thought about

8  it, what happened?  What did you tell him?

9  Did you think about it at that meeting?

10      A.      No.  Honestly I didn't see him

11  since until last year.

12      Q.      So you saw him three, four, five

13  years ago in Mr. Choudhary's office

14  because he was having difficulty with the

oct 4 17(1)a.txt

15    secured creditors as far as the

16    foreclosure issue, correct?

17         A.    Yes.

18         Q.    He asked you if you could help

19    him or if you had some suggestions --

20         A.    Actually, I didn't see him.

21    Mohammad wanted to buy a building because

22    the building was in foreclosure.  He

23    wanted, he expressed and I don't know

24    that, he could be willing, he wanted maybe

25    the building because it's a nice -- it's

                                        16


 1                   J. Nadelson

 2    next to his, property blah-blah, like

 3    that.

 4              So he expressed that he wants

 5    that building.  If it's gonna go to

 6    foreclosure or something he maybe wants to

 7    help -- not help, but to get Boysin out

 8    and just buy his building.  I believe he

 9    always wanted to buy that building.

10         Q.    And what happened, did he do it,

11    did he make him an offer?

12         A.    I think he did.  I don't know

13    the facts, but I don't know if it went

14    through.  I guess not, apparently not.

15         Q.    So you were not involved with --

16         A.    I was not involved I only saw

17    him once, and that's it.

18         Q.    Is it your testimony that Mr.

oct 4 17(1)a.txt

19   Choudhary and Mr. Lorick negotiated this

20   potential --

21        A.    My testimony, no, don't put

22   words.

23        Q.    I am?

24        A.    It's not, I don't know if they

25   negotiated or not.

♀

17

1                  J. Nadelson

2        Q.    Is it your testimony that you

3    met Mr. Lorick for the first time several

4    years ago, and then haven't met or seen

5    him until the end of 2016 since then; is

6    that correct?

7        A.    More or less.

8        Q.    Well, more or less means?

9        A.    Maybe I saw him on the street

10   I'm telling you my office -- no.

11        Q.    At your office or Mr.

12   Choudhary's office?

13        A.    No, no.

14        Q.    Would you describe the meeting

15   that you just testified about, Ms.

16   Nadelson, in Mr. Choudhary's --

17        A.    I'm not testifying about the

18   meeting.  You asked me if I met him

19   before, and I said yes.

20        Q.    And you said --

21        A.    I'm not testifying about the

Page 15

oct 4 17(1)a.txt

22   meeting that I had three, four, five years

23   ago because I don't remember any facts.

24     Q.   You said you had it in Mr.

25   Choudhary's office?

                  18

1          J. Nadelson

2     A.   I didn't say Mr. Choudhary's

3   office.  I took my words back.

4       I don't remember.  Maybe it was

5   he came by my car or something.  I do not

6   remember.

7     Q.   And asked you about this trouble

8   that he was having regarding the

9   foreclosure?

10     A.   People when they know that

11   somebody is an attorney, they shoot all

12   kinds of questions, you know that so.

13     Q.   Are you still testifying that

14   Mr. Choudhary was at the meeting or are

15   you changing your testimony?

16     A.   I'm not changing my testimony.

17   You're talking about three, four, five

18   years ago.

19     Q.   Was Mr. Choudhary at this

20   meeting?

21     A.   It was not a meeting.

22     Q.   Was Mr. Choudhary at this

23   discussion that you had with Mr. Lorick?

24     A.   Yes.

25     Q.   Okay.  It could of been in the

oct 4 17(1)a.txt

```
 1                   J. Nadelson
 2    street by your car, but it was you Mr.
 3    Lorick and Mr. Choudhary?
 4        A.     Maybe it was by Mohammad's
 5    office.  I don't remember where it was
 6    exactly.  It was not in my office, it was
 7    not actually a consultation.
 8        Q.     Were you paid a fee for the
 9    consultation?
10        A.     No.
11        Q.     Would you describe this
12    discussion that you had with Mr. Lorick as
13    a business discussion or a social?
14        A.     No, it was more like a social
15    because I don't deal with bankruptcy, and
16    I don't do -- I mean I don't deal with
17    foreclosures and I don't deal with
18    bankruptcies, so I don't have any
19    knowledge about it.
20        Q.     Is it your testimony that you
21    talked to people on a social level about
22    legal things?
23        A.     No.  My testimony is not about
24    that they asked me a question.  I said
25    it's not my expertise.  I don't know much
```

20

oct 4 17(1)a.txt

1                    J. Nadelson

2    about it.

3        Q.      I thought you said something

4    about let me think about it?

5        A.      I did not say let me think

6    about.

7        Q.      That's what you testified to

8    just a minute ago.

9        A.      I said let me think about it,

10   meaning that I don't know -- maybe I

11   didn't express myself right -- meaning

12   that maybe I will ask somebody, maybe

13   something, maybe I'll refer somebody to

14   them, something.  I meant it in that.

15       Q.      Did you do that?

16       A.      No.  I'm telling you no, I did

17   not see Boysin.  They never call me.  They

18   never ask me.  They never really -- that

19   was it.

20       Q.      Do you know an attorney named

21   Frank Wharton?

22       A.      No, I don't.

23       Q.      Do you know that before Mr.

24   Lorick and Ms. Lorick filed Chapter 11

25   they filed Chapter 13?

                                              21

1                    J. Nadelson

2        A.      I heard about this.

3        Q.      Who did you hear it from?

4        A.      I believe I believe Norma said

oct 4 17(1)a.txt

5    that, I think.

6         Q.    When did you talk to Norma about

7    that?

8         A.    I believe they were talking

9    about this I don't know when I heard that,

10   but I don't know the guy I don't know any

11   facts.

12        Q.    You said Norma, do you mean

13   Norma Ortiz?

14        A.    Norma Ortiz, I'm sorry.

15        Q.    So you know he filed Chapter 13,

16   but you don't know who told you.   You

17   don't know any facts.   You don't know the

18   attorney?

19        A.    I didn't say I don't know who

20   told me.   I just said maybe it came up in

21   the conversation.

22        Q.    Who told you?

23        A.    Norma, Norma Ortiz.

24        Q.    When?

25        A.    A year ago when I referred.

                                        22


1                 J. Nadelson

2         Q.    When you referred what?

3         A.    When I referred Boysin to Norma

4    Ortiz -- not referred him.   I said I know

5    an attorney that does bankruptcy.

6         Q.    What did you do then?

7         A.    Why?

oct 4 17(1)a.txt

8       Q.      When?

9       A.      Last year.

10      Q.      And what did you do after you

11   told him that?

12      A.      I gave him the phone number.

13      Q.      And was Mr. Choudhary with him

14   and you at the time that you did this?

15      A.      I think -- yes, I accompanied

16   Mr. Choudhary.

17      Q.      Accompanied Mr. Choudhary?

18      A.      I think we, yes, we met in the

19   office because --

20      Q.      What office?

21      A.      Norma Ortiz.

22      Q.      Because who knows each other?

23      A.      I referred Boysin to Ms. Ortiz

24   as a bankruptcy attorney.  I didn't refer,

25   I gave the phone number and I said that

                                            23


1                    J. Nadelson

2   she does bankruptcy for many years, and he

3   can go and consult.

4       Q.      Did he?

5       A.      He did.

6       Q.      Okay.  Do you know when he

7   consulted with her?

8       A.      You already asked me that

9   question.

10      Q.      And the answer?

11      A.      And the answer is last year.

oct 4 17(1)a.txt

12      Q.      But you're not exactly sure if

13   it was October, November or December, is

14   that correct, that's what you said?  So I

15   want to make sure you didn't change your

16   testimony.

17      A.      I don't change my testimony,

18   September October, November maybe

19   December.

20      Q.      All right.  So after you gave

21   Mr. Lorick her name and number?

22      A.      I know it was chilly.  If you

23   want to establish exactly what season, it

24   was I believe it was more or less chilly

25   because I was dressed just about the same

                                        24


1                    J. Nadelson

2   as I am dressed now.

3      Q.      Was Ms. Lorick involved with any

4   of this?

5      A.      I don't know.

6      Q.      Did you ever meet Ms. Lorick?

7      A.      No.

8      Q.      To this day as you sit here

9   today have you ever met Ms. Lorick?

10      A.      No.

11      Q.      After you gave Mr. Lorick Ms.

12   Ortiz' number to contact her, what

13   happened then as far as your involvement

14   with Mr. Lorick and Ms. Ortiz?

                    Page 21

oct 4 17(1)a.txt

15      A.      All I know is that he was filing

16   bankruptcy.  I don't know the details.  I

17   don't know the amounts.  But by now I do

18   know the amount.

19      Q.      What amount, what do you mean?

20      A.      The amount of creditors more or

21   less because it's been an extensive

22   discussion between everybody until now

23   regarding how much is owed and how much it

24   has to be paid and so on, and so forth.

25              So I was not involved in this

                                        25


1                    J. Nadelson

2   bankruptcy until, you know, I know I heard

3   bits and pieces, but I was not involved.

4   I have nothing to do with his bankruptcy

5   case.

6       Q.      Were you given any kind of

7   participation fee or any kind of fee from

8   Ms. Ortiz?

9       A.      Not for the bankruptcy.

10      Q.      For referring Mr. Lorick?

11      A.      No.

12      Q.      Were you given any fee or

13   participation fee or money or payment from

14   Ms. Ortiz for anything?

15      A.      For some other work.

16      Q.      Explain, please.

17      A.      I don't have to explain to you.

18   What, I have to explain what kind of work

oct 4 17(1)a.txt

19    I did for her?

20        Q.    Yes.   You're under oath.

21        A.    Paperwork, you know.

22        Q.    Paperwork for what?

23        A.    Maybe some research I did.

24        Q.    For what?

25        A.    I don't recall.  It was last --

                                        26

1                    J. Nadelson

2    a while ago, last year, a while ago but I

3    didn't do nothing pertaining to bankruptcy

4    because I don't know anything about

5    bankruptcy.

6        Q.    How much were you paid?

7        A.    I do not recall the exact

8    amount.

9        Q.    Approximately?

10        A.    I don't know, a thousand

11    dollars, $1,200 for a few hours.

12        Q.    So she asked you to do some work

13    for her?

14        A.    No, she didn't ask me.  I did

15    some work.  I believe I collected some

16    paperwork from Mohammad.  Maybe it's not

17    last year, I don't remember.  Maybe it

18    was --

19        Q.    You collected some paperwork

20    from?

21        A.    From Mohammad.

oct 4 17(1)a.txt

22      Q.      Choudhary?

23      A.      Yes, because there was some not

24   from Mohammad, for the whole -- maybe I

25   read something.  I don't recall it.  I

                                              27

1                    J. Nadelson

2    don't recall what type of work.  It was

3    maybe research, I was looking up something

4    for her.  I don't recall.

5       Q.      Pertaining to?

6       A.      But it was not pertaining to

7    this case.

8       Q.      Was it pertaining to Mohammad

9    Choudhary?

10      A.      It was in general, she's not

11   representing Mohammad Choudhary.

12      Q.      I know that.  You are right.

13      A.      Right.

14      Q.      So was it pertaining to Mohammad

15   Choudhary?

16      A.      She can't pay me for

17   representing Mohammad Choudhary, correct,

18   I mean how else?

19      Q.      I'm asking you a question.

20              You said Mohammad's name a

21   minute ago, so I'm following up on it.

22      A.      I don't remember.  Maybe it was

23   something very unrelated maybe it was some

24   matrimonial.

25      Q.      I don't want to hear maybe.

oct 4 17(1)a.txt

                    J. Nadelson

1  What was it?

3     A.     It was some contract for her, I

4  don't recall it.

5     Q.     Why would she hire you to do

6  anything or why would she pay you to do

7  anything?

8     A.     No because --

9     Q.     For any reason?

10     A.     She didn't hire me but --

11     Q.     Why did she pay you?

12     A.     Because I did some work, but it

13  was not related to the bankruptcy.

14            Why would I be doing something

15  for free for somebody?

16     Q.     Exactly, I understand your

17  point.  But why wouldn't she do it

18  herself; she has herself and Ms. DeJesus?

19     A.     I think it was unrelated to

20  bankruptcy that it was related to the real

21  estate.  She's not a real estate attorney.

22     Q.     The 3126 Brooklyn, New York real

23  estate?

24     A.     No.  Some question she had, a

25  general question about real estate

                                         29

oct 4 17(1)a.txt

1                          J. Nadelson

2      transaction, and --

3          Q.      So she called you up --

4          A.      Right.

5          Q.      -- and asked you to do some work

6      for her?

7          A.      Right, maybe it was a contract

8      that I checked.  I don't remember.  You

9      know I honestly don't remember because

10     I've seen so many papers since last year.

11         Q.      So there's at least that one

12     occasion the $1,200 you said she paid you,

13     or you don't know how much she paid you?

14         A.      I don't recall.  Maybe 1,200

15     maybe 1,600, maybe --

16         Q.      At sometime last year?

17         A.      -- 1,800, 1,600, sometime last

18     year.

19         Q.      And it's your testimony it had

20     nothing to do with the Lorick case?

21         A.      No.  It was with the real estate

22     transactional, transaction question.  They

23     had nothing to do with the Lorick case.

24         Q.      Did it have anything to do --

25         A.      I was also doing, I believe,

                                              30


1                          J. Nadelson

2      looking for something maybe capital gain

3      issues or something like that which I

4      didn't have to do for, but...

                    Page 26

oct 4 17(1)a.txt

5      Q.      Just to clarify that last point

6    you made, that was a major issue with the

7    sale of this building as described in Mr.

8    Choudhary's declaration -- which I will

9    show you in a few minutes -- and Mr.

10    Lorick's declaration that Mr. Lorick was

11    concerned with what the capital gains

12    would be?

13      A.      Right.  And I think, I don't

14    recall it, but I think there was I did

15    something on that.  It was a real estate

16    issue because Norma doesn't do real estate

17    as far as I know.

18      Q.      So again, I will show you in a

19    minute but in the declaration of both of

20    these men -- withdrawn.

21      A.      Honestly --

22      Q.      Let me show it to you and you

23    will see what we are talking about.

24      A.      I didn't read the declarations

25    so.

                                        31


1                J. Nadelson

2      Q.      I will show it to you.

3      A.      But I didn't read --

4      Q.      I will show it to you because

5    you will see what I'm talking about

6    because I think it's what you're talking

7    about, the capital gains.

Page 27

oct 4 17(1)a.txt

8                  Let me get it for you, so you

9    know what I'm talking about.

10       A.     Boysin I would definitely not

11    read.

12       Q.     Hold on a minute.

13       MR. MCCORD:  Mark this in,

14       please, as Nadelson Exhibit 1.

15       (Whereupon, Nadelson Exhibit 1,

16       document captioned "Declaration of

17       Mohammad Choudhary" was hereby marked

18       for identification, as of this date.)

19       Q.     I show you a document entered in

20    as Nadelson Exhibit 1; do you see it?

21       A.     Yeah.

22       Q.     At the top of the page it says

23    "Declaration of Mohammad Choudhary,"

24    correct?

25       A.     Yes.

                                32

♀

1                J. Nadelson

2       Q.     Is he your client?

3       A.     Clarify the question?

4       Q.     Is he your client, a legal

5    client, do you perform legal services for

6    him?

7       A.     Yes.

8       Q.     Okay.  All right.  This is dated

9    August 18, 2017; have you ever seen it

10    before?

11       A.     I didn't read it before.

oct 4 17(1)a.txt

12      Q.      Excuse me?

13      A.      I did not read it before.

14      Q.      Okay.  But have you seen it

15  before?

16      A.      No, I've seen it in the other

17  documents when I scan them in because I

18  got numerous e-mails with documents, so I

19  scanned them in but I didn't read this

20  particular one.

21      Q.      Did you --

22      A.      I honestly don't represent Mr.

23  Mohammad in this.

24      Q.      Did he consult with you before

25  he signed this document?

                                             33

1                   J. Nadelson

2       A.      No.

3       Q.      Did Ms. Ortiz?

4       A.      Did Ms. Ortiz consult with me?

5       Q.      Did Ms. Ortiz consult with you?

6       A.      No.

7       Q.      Did anyone tell you that Mr.

8   Choudhary was signing this declaration?

9       A.      Maybe I don't remember maybe Mr.

10  Mohammad mentioned, but I have other, you

11  know, I'm not -- I mean I'm not on his

12  permanent retainer so I don't sit in his

13  office all the time.  So if he gets

14  something, it's not necessarily that I go

oct 4 17(1)a.txt

15    over it.

16        Q.    How often do you represent him?

17        A.    How is it relevant to this?

18        Q.    Are you on general retainer?

19        A.    No.

20        Q.    Do you represent him on a

21    frequent basis?

22        A.    I represent him from time to

23    time.

24        Q.    Is it a frequent time to time?

25        A.    Frequent.

                                          34


1                  J. Nadelson

2         Q.    Do you represent him weekly?

3         A.    I don't understand --

4         Q.    Do you represent him every week?

5         A.    If he has something to do, I

6    give him -- I provide him my services.

7         Q.    Well, isn't this something to do

8    this declaration?

9         A.    Yeah, but I don't believe that

10    he, you know, certain things -- Mr.

11    Mohammad is a very knowledgeable and

12    educated person, so he can read a lot of

13    documents himself without the need of an

14    attorney, believe it or not, especially

15    that he's not called as a party to this

16    action, you know, and this is a very short

17    form.  So I don't know if he even bothered

18    me for this.

19      Q.      Do you know where Ms. Ortiz got

20   this information from to put in this

21   declaration?

22      A.      Maybe from Mohammad himself, I

23   don't know.

24      Q.      You didn't give her the

25   information?

                                              35


1                    J. Nadelson

2       A.      No, this I know about

3    [indicating].

4       Q.      What are you referring to in the

5    exhibit?

6       A.      This I know about, but I don't

7    recall that he signed it with me standing

8    over him.

9       Q.      One at a time.  You said this I

10   know about, what do you mean this, the

11   whole declaration?

12      A.      This was for the motion, and I

13   know about this motion.

14      Q.      What motion?

15      A.      This was for the motion for

16   adjournment or something.

17      Q.      To adjourn the auction?

18      A.      Yes, yes, this was, yes

19   because --

20      Q.      Paragraph 3 of the terms of the

21   deal between Mr. Lorick and Mr. Choudhary,

oct 4 17(1)a.txt

22    the proposed terms --

23        A.      Proposed.

24        Q.      -- right or wrong?

25        A.      It was proposed, yes.

♀                                                    36

1                    J. Nadelson

2        Q.      Were you aware of the terms, the

3    proposed terms?

4        A.      I was not.  These terms, maybe

5    these terms also.  I don't recall.  It was

6    many terms proposed.  He wanted to buy the

7    building.  Then he wanted to lend him

8    money, but it didn't work out.  He wanted

9    to buy the building.  You know.  Then he

10   wanted to buy a building and he, you know,

11   like Boysin was trying to save his

12   building, but I guess it didn't work out.

13       Q.      What involvement did you have as

14   the attorney for Mr. Choudhary in these

15   proposals to buy --

16       A.      I discussed it with Mr.

17   Choudhary because it was real estate for

18   me it's a real estate transaction whether

19   he buys it in the interest of a building

20   or he buys the whole building.

21       Q.      Did you discuss it with Ms.

22   Ortiz?

23       A.      Ms. Ortiz, yes, because -- yes.

24       Q.      Is it your testimony you did not

25   prepare this exhibit?

                    Page 32

oct 4 17(1)a.txt

```
1                    J. Nadelson
2      A.      This, no.
3      Q.      Do you know who did?
4      A.      No.
5      Q.      Does Mr. Choudhary have another
6   attorney besides you?
7      A.      No.   Maybe he writes it himself,
8   I don't know.
9      Q.      So you don't know if Ms. Ortiz
10  prepared this or not?
11     A.      I don't know.  I did not prepare
12  it.  Maybe he typed it up himself.  Maybe
13  he had a sample of it, I don't know.  I
14  did not because I don't do bankruptcy.
15             So I have no idea what the
16  declaration stands for in the Bankruptcy
17  Court.  I mean I know what declaration
18  stands for, but I don't know what the
19  exact purpose of it is.
20             MR. MCCORD:  Mark this in as
21         Nadelson Exhibit 2.
22             (Whereupon, Nadelson Exhibit 2,
23         "Declaration of Boysin Lorick" was
24         hereby marked for identification, as
25         of this date.)
```

oct 4 17(1)a.txt

1                    J. Nadelson

2        Q.    I show you what's been marked in

3    as Nadelson Exhibit 2, have you ever seen

4    that before?

5        A.    No.   Maybe I said, maybe I

6    skimmed through the document but since I

7    was not -- I cannot be retained on this.

8              I was not retained on this on

9    any consultation, even why should I, you

10   know, spend most of my time, my concern is

11   that what my client wants.

12       Q.    Okay.   I want you to look at

13   page 3, paragraph 7.   Page 3 of the

14   exhibit, paragraph 7.

15             Are you there?

16       A.    Yes.

17       Q.    "When Mohammad offered to help

18   me," were you aware of that, "to save this

19   building"?

20       A.    Yes.

21       Q.    "We explored different options

22   on how to refinance my debt on the

23   building."

24             Were you aware of that, that he

25   was trying to refinance his building Mr.

                                          39

1                    J. Nadelson

2    Lorick with Mr. Choudhary's help?

3        A.    Yes, I heard.

4        Q.    "We have been working on

oct 4 17(1)a.txt

```
 5   finalizing our options for weeks."
 6              Were you aware of that?  This is
 7   dated August 20, were you aware of that?
 8       A.    I thought it was the 21st.
 9       Q.    It says August 20.
10       A.    It was filed August 21.
11       Q.    "We have been working on
12   finalizing our options for weeks," were
13   you aware of that?
14       A.    Yes, they were talking for a
15   while.
16       Q.    This is weeks before August 20
17   which is the month of August, maybe July,
18   correct?
19       A.    Yes.
20       Q.    And then it says:
21              "However, we were advised that
22       if I sell a whole or portion of the
23       building, I will incur an enormous
24       capital gains tax liability."
25              Were you aware of that?
```
♀
                                        40


```
 1              J. Nadelson
 2       A.    Capital gain, yes.  I know the
 3   issue.
 4       Q.    Excuse me?
 5       A.    I heard -- yes.
 6       Q.    So before I showed you these
 7   exhibits, Mr. Choudhary's declaration and
```

oct 4 17(1)a.txt

8   Mr. Lorick's, you said that Ms. Ortiz paid

9   you 12 to $1,800 in that range for

10   investigating a capital gains tax issue,

11   correct?

12       A.   I didn't say that she paid me

13   for investigating capital gain issue.  I

14   just said that I don't remember what she

15   paid me for exactly, but there was one of

16   them was that I was searching myself also

17   for capital gains because I'm not a tax

18   attorney.

19       Q.   Was this the basis for you

20   searching the issue on the capital gains

21   tax liability?

22       A.   I don't know.

23       Q.   You don't remember?

24       A.   What do you mean basis, this was

25   the basis?

41

1             J. Nadelson

2       Q.   Is this the reason you were

3   looking into it?

4       A.   Yes.  And for my own good also.

5       Q.   Is it your testimony you were

6   aware Mr. Mohammad Choudhary and Mr.

7   Lorick were trying to save the building

8   for Mr. Lorick one way or another, either

9   to refi or sell in part to Mr. Choudhary,

10   correct?

11       A.   Yes, but I'd say I don't know.

oct 4 17(1)a.txt

12    Mohammad always wanted to buy a building,

13    this was why they could not agree on a

14    lot, you know, on the -- they could not

15    agree before the auction on it because --

16        Q.    Were they friends?

17        A.    I don't know.

18        Q.    Now Mr. Choudhary --

19        A.    I don't know if they were

20    friends or associates or workers.  I don't

21    know.  I never you know seen the guy for

22    long, you know for many times.

23        Q.    Mr. Choudhary says he's been

24    friends with Mr. Lorick for decades?

25        A.    It seemed that way to me, but I

                                          42


1                    J. Nadelson

2    don't know because I only met Mr. Boysin

3    and Mr. Lorick last year, the second time.

4        Q.    Did Mr. Choudhary ever talk to

5    you about Mr. Lorick other than what you

6    already testified to meaning you gave him

7    a bankruptcy attorney and you looked into

8    the capital gains tax?

9        A.    No.  We don't talk about people

10    like that.

11        Q.    Are you a friend of Mr.

12    Choudhary's or just his attorney?

13        A.    I know him for 13 years.

14        Q.    So is it a business

                    Page 37

oct 4 17(1)a.txt

15   relationship?

16        A.    It's a business relationship,

17   but it's you know like it's been 13 years.

18   So we know each other.  I don't know his

19   family.  I know his children because they

20   come to the office, but I don't know his

21   wife.  So whatever you want to call that,

22   whether we're friends or not.

23        Q.    Is it a business relationship

24   then, attorney-client relationship?

25        A.    It's not business relationship I

                                           43

1                   J. Nadelson

2   don't have any business with Mr. Mohammad.

3        Q.    You don't represent him?

4        A.    You said is it a business

5   relationship or attorney-client

6   relationship?

7        Q.    Is your relationship with Mr.

8   Choudhary a social relationship or a

9   business relationship meaning

10  attorney-client?

11       A.    Business.

12       Q.    Okay.  Have you ever represented

13  Mr. Lorick for any reason at all for any

14  purpose?

15       A.    No.

16       Q.    And the only thing that you've

17  done where you got paid by Ms. Ortiz is

18  looking into this capital gains tax

oct 4 17(1)a.txt

19    liability issue; is that correct?

20         A.    Yes.  But I didn't do it for

21    this particular purpose.  You know I was

22    doing it just in general, maybe she had

23    some other cases where she needs to know.

24    I don't know what she wanted me --

25         Q.    She didn't tell you it was about

                                          44


1                   J. Nadelson

2    this case, she just asked you to look

3    into --

4         A.    I don't recall the time frame.

5    This came up this year, you know, I guess.

6         Q.    Yeah, August.

7         A.    And I did the work last year.

8         Q.    That's not what you testified to

9    already.

10        A.    Yes, I did.  I got paid last

11   year.

12        Q.    2016?

13        A.    Yes.

14        Q.    Okay, by her?

15        A.    Yeah, for something.

16        Q.    For the capital gains issue?

17        A.    I didn't say this.  Don't put

18   words in my mouth.

19        Q.    I am not putting words in your

20   mouth.

21        A.    You do, because you just said

                    Page 39

oct 4 17(1)a.txt

22    this is what I said.  This is the capital

23    gains issue that this was the work that I

24    did for Ms. Ortiz on this, but it was the

25    last year.  This is dated, as you said

⚲                                              45

1                   J. Nadelson

2    yourself, August 21.

3         Q.    So is it your testimony the only

4    time you were ever paid any money at all

5    by Ms. Ortiz for anything was in 2016 for

6    in the area of 12 to $1,800; is that

7    correct?

8         A.    Maybe less, maybe more.

9         Q.    Well, how much more?

10        A.    Very little more.  Maybe very

11   little, maybe in that range.  Maybe a

12   little more.  I don't know.  Maybe 1,900

13   maybe 2,100.  I don't remember.  Maybe

14   1,800.  I don't remember.  You want me to

15   find the check, I'll find you the check by

16   tomorrow.  I don't remember.

17        Q.    I will leave a space in the

18   transcript for you to produce the

19   cancelled check by tomorrow?

20        A.    Are you serious, I'm not gonna

21   do that.

22        Q.    You just said you were gonna do

23   that?

24        A.    I am not gonna do this, I don't

25   have time.

⚲

46

```
 1                    J. Nadelson
 2        Q.    You just said to me you will
 3   give it to me you just said to me that you
 4   will give me the check by tomorrow, so I
 5   said give it to me.
 6        A.    It was just a blurt.
 7        Q.    Well, I'm demanding it.  If you
 8   don't give it to me then, you don't give
 9   it to me I demand it.  I need to know when
10   you were paid and how much you were paid
11   and what it was for.  You are not being
12   very clear.  One minute it's for this, one
13   minute it's last year.  I mean --
14        A.    I don't recall.
15        Q.    -- you keep changing your story.
16              You do know that you're under
17   oath, under penalties of perjury.  I have
18   deposed people that have testified in this
19   matter.  You're aware of that, correct?
20        A.    Yes, I do.
21        Q.    Okay.  So just as long as you're
22   giving me truthful honest answers, I'll be
23   happy.
24        A.    I'll produce a check --
25        Q.    Thank you.
```

⚲

47

oct 4 17(1)a.txt

1                    J. Nadelson

2      A.     -- if you're demanding it.

3      Q.     I am demanding it.  Thank you.

4   (Insert)_____

5   _____

6             (Whereupon, a short recess was

7      taken.)

8             MR. MCCORD:  Back on the record.

9      Q.     So you've never seen the

10  Exhibits 1 and 2, the declarations of

11  Choudhary or the declaration of Lorick,

12  correct other than pulling if off the

13  docket after they were filed with the

14  court, correct?

15     A.     Yes.

16     Q.     The motion to adjourn the

17  auction that these --

18     A.     I'm sorry, go back.  Not through

19  the docket of the court, I received it on

20  my e-mail I said.

21     Q.     After all this was done in the

22  court, correct?

23     A.     Yes, I believe so.

24     Q.     Okay.  The motion, the return

25  date, the appearance in court --

                                        48


1                    J. Nadelson

2      A.     I don't recall.

3      Q.     The return date for the motion

4   to hear the request to adjourn the auction

oct 4 17(1)a.txt

 5    was on August 21, the day before the

 6    auction; did you know that?

 7        A.    Once again, please.

 8        Q.    Exhibits 1 and 2 are part of a

 9    motion seeking --

10        A.    Yes.

11        Q.    -- seeking to adjourn the

12    auction, correct?

13        A.    Correct.

14        Q.    Okay.  That motion was

15    returnable in the Bankruptcy Court on

16    Monday, August 21, correct, if you know?

17        A.    It was filed on August 21.

18        Q.    Okay.  It was heard on August 21

19    before the court, correct?

20        A.    I don't know.  I am not part of

21    that motion.

22        Q.    Okay.  So is it your testimony

23    you had nothing to do with the motion to

24    request an adjournment of the auction; is

25    that correct?

                                          49


 1                J. Nadelson

 2        A.    I am not part of this case.  I'm

 3    not part of the auction, and I was not in

 4    this [indicating].  I know there was a

 5    motion filed to adjourn the auction, but I

 6    don't know.  I was not part of the

 7    discussion on this.

oct 4 17(1)a.txt

8            MR. MCCORD:   Mark this in,

9      please.

10            (Whereupon, Nadelson Exhibit 3,

11      document was hereby marked for

12      identification, as of this date.)

13      Q.     I am showing you Nadelson

14   Exhibit 3.  In the middle of the page, the

15   first page, it says:

16            "Debtors emergency motion for an

17      order adjourning the auction sale of

18      property known as 3126 Coney Island

19      Avenue, Brooklyn New York scheduled

20      for August 22nd."

21            Have you ever seen this before?

22      A.     Yes, I did.

23      Q.     When did you see it?

24      A.     Maybe the day it was filed.

25      Q.     Which was August 21?

                                      50


1                   J. Nadelson

2      A.     Possibly, yes.

3      Q.     Did Ms. Ortiz serve it on you?

4      A.     No.

5      Q.     How did it come that you saw it?

6      A.     Maybe it was not the 21st, I

7   don't remember.  Maybe this motion was not

8   on the 21, I don't remember.  Maybe I saw

9   it later.  Maybe I heard about it and ask

10   what is it.

11      Q.     It's dated August 21?

oct 4 17(1)a.txt

12      A.      I understand it's the day before

13   the auction.  As matter of fact I was not

14   retained on this, and I also was not paid

15   for anything like that.

16              So I'm not sure if I read all

17   the documents through and I didn't see the

18   need for it for me personally nor for my

19   client, because we were going to the

20   auction on the 22nd to buy the building.

21   He wanted to go and buy the building.

22      Q.      When did your client retain you

23   or request your legal services to assist

24   him in buying the building at the auction

25   on August 22?

51

1                  J. Nadelson

2      A.      I don't remember.

3      Q.      Was it a week before, a month

4   before, two months before?

5      A.      I don't know when they found out

6   about the auction.  There was -- I don't

7   even know what I did in August.  I don't

8   remember.

9              I spent a lot of time with

10   Mohammad, but I don't recall that it was

11   on this particular motion.  I just know

12   that the day before the auction they tried

13   to adjourn the case.

14      Q.      Were you at the court for this

Page 45

oct 4 17(1)a.txt

15   hearing on the day before the auction?

16       A.    No.

17       Q.    Did you speak to Ms. Ortiz about

18   this motion, the adjournment of the

19   auction motion?

20       A.    I believe so.

21       Q.    When?

22       A.    I don't recall.  I just know

23   that maybe the day before -- the day of

24   the motion of this, whatever she filed we

25   spoke on the phone because my client

♀

                                    52


1                J. Nadelson

2    wanted to buy the building before the

3    auction.

4        Q.    Okay.  When did he first discuss

5    that with you to buy the building?

6        A.    It was throughout the whole

7    summer to buy the building.  He was trying

8    to buy, to lend money he was trying to do

9    everything to get it.

10       Q.    Did you represent him as his

11   attorney in this process?

12       A.    On some, on certain parts of it.

13       Q.    Did you discuss --

14       A.    Not represent, he consulted with

15   me I was not retained or I was not paid

16   for that, he consulted with me.

17       Q.    Did you discuss any of this with

18   Ms. Ortiz during this period of time?

oct 4 17(1)a.txt

19    A.    Yes, we did.

20    Q.    Okay.  How did you know that the

21  auction was proceeding?

22    A.    My client told me, I mean

23  Mohammad told me.

24    Q.    When did he tell you?

25    A.    A couple days before.  But it

                                          53


1                    J. Nadelson

2  was always in the air that he wanted to go

3  to the auction, he was trying to get the

4  funds -- not funds, financing.

5    Q.    Okay.

6    A.    As matter of fact, I'll add --

7  you're not asking me but I'll add if it's

8  interesting -- he actually refinanced his

9  building for the purpose of buying this

10  building.  He refinanced his own building.

11  And I was representing him with this

12  refinancing, whatever mortgage refinancing

13  transaction.

14    Q.    How much was that for?

15    A.    He actually got -- what do you

16  mean?

17    Q.    What amount of money did he get

18  on the refi of his building?

19    A.    In his bank or in general?

20    Q.    In general.

21    A.    4.8 -- hold on.

oct 4 17(1)a.txt

22      Q.      And that money is to be --

23      A.      No, no, no.

24      Q.      Let me finish.

25      A.      He refinanced his building.   He

♀
                                              54

1                   J. Nadelson

2      refinanced his mortgage.  So he still had

3      a mortgage and he got overage for the

4      building.

5      Q.      How much overage did he get for

6      the building, you mean Lorick's building?

7      A.      Not for the Lorick's building,

8      he got money 1.8.

9      Q.      For what purpose?

10     A.      To buy the building.

11     Q.      Lorick's building?

12     A.      Lorick's building.

13             He always wanted to buy the

14     building.  He wanted to buy it before the

15     auction, this is why the question was of

16     adjourning it.

17     Q.      Does he still have the money?

18     A.      He still has the money, he still

19     wants to buy the building even today.

20     Q.      Did you ever find out what

21     happened to the debtor for Lorick's motion

22     to adjourn the auction, this motion that

23     we are talking about Exhibit 3, did you

24     ever find out what happened?

25     A.      I think the night before we were

oct 4 17(1)a.txt

```
 1                J. Nadelson
 2   told that it was not adjourned and the
 3   auction is going.
 4        Q.     Who is "we," is that you and Mr.
 5   Choudhary?
 6        A.     Yes.
 7        Q.     Who told you?
 8        A.     I believe Norma Ortiz told me.
 9        Q.     Told you?
10        A.     I believe so.
11        Q.     What did she tell you?
12        A.     And I think -- hold on.  It was
13   so many things going on with this case.
14   Hold on.
15               She said that the motion was
16   denied and the auction is gonna proceed
17   the next day, and that's what she said.
18        Q.     Is there any reason why your
19   client, pursuant to your testimony, always
20   wanted to buy the building and had
21   discussed buying it in the summer of last
22   year -- no, this year, why did he wait
23   until the morning of the auction to
24   attempt to be a qualified bidder?
25        A.     Because he was trying to get
```

oct 4 17(1)a.txt

1                    J. Nadelson

2    financing, and he was getting a financing.

3    Every time he would go through the

4    initial -- you know, I'm not a mortgage

5    broker so I don't know -- through the

6    initial steps and he kept putting money in

7    for, you know, like a good faith deposit

8    or something and he would get preapproved,

9    but then we kept, we were held back by

10   this bankruptcy proceeding.

11                   And every time he would put on a

12   time frame that you have to close on that

13   date we never proceeded, you know, and he

14   couldn't get a financing from one place, I

15   mean, to finalize it.

16                   Then he was always getting

17   approved from everywhere he went because

18   he has, I guess, equity and we couldn't

19   finalize it.

20                   And then we were under short,

21   um, we were under a time constraint all

22   the time.  And then he decided that he

23   should, you know, like that's it, you

24   know, the auction is the auction and he

25   should go to the auction and bid at the

♀

                                                    57


1                    J. Nadelson

2    auction.

3        Q.    On the morning --

4        A.    He offered to purchase this

oct 4 17(1)a.txt

5  building way before.

6      Q.    How much did he offer to pay for

7  it?

8      A.    6 million.

9          MR. MCCORD:    Mark this in.

10          (Whereupon, Nadelson Exhibit 4,

11      notice of the hearing for a motion for

12      an order was hereby marked for

13      identification, as of this date.)

14      A.    Because.

15      Q.    Because what?

16      A.    I haven't seen -- this is not my

17  case, I haven't seen and I haven't read.

18      Q.    You were saying something.

19  Because what?

20      A.    I was thinking in my mind of

21  something, and I continued aloud so I was

22  thinking --

23      Q.    I asked you --

24      A.    Why would I be involved in this

25  if I'm not in the bankruptcy proceedings

                                        58


1                  J. Nadelson

2  representing anybody, that's my question

3  so I asked myself.

4      Q.    Let me ask you a question.   Is

5  that true, since you represented Mr.

6  Choudhary at the auction to buy the

7  property, didn't he bid on the property?

oct 4 17(1)a.txt

8      A.     Yeah, but it was not a

9   bankruptcy proceeding it was a motion.

10      Q.     Yes, it was.  It was an auction

11   at the Bankruptcy Court approved by the

12   Bankruptcy Court, and you were there and

13   you represented to the court on the

14   record --

15      A.     Yes on that day.

16      Q.     -- that you were his attorney.

17      A.     On that day.

18      Q.     Okay.  Are you his attorney

19   today?

20      A.     You know --

21      Q.     Yes or no?

22      A.     -- I represent him.  I consult,

23   he consults with me.

24      Q.     Are you representing him in the

25   drafting of the proposed settlement of

59

1              J. Nadelson

2   this case by way of the assignment?

3      A.     Yes, I am.

4      Q.     Have you been negotiating with

5   me and Ms. Ortiz on his behalf?

6      A.     Yes.

7      Q.     Are you telling me that you're

8   doing that and you're not his attorney?

9      A.     I am.  I'm sorry, you know, but

10   on the date of the auction I only came to

11   the auction.  I was not representing him

oct 4 17(1)a.txt

12     all along, it was only for a consultation
13     purpose.
14          Q.     Well, according to the Code of
15     Ethics and Disciplinary Rules of New York
16     State Attorneys, if you're representing
17     him for consultation you're representing
18     him.  You're his attorney.  I hope you
19     realize that.
20          A.     Okay.
21          Q.     Do you know that?
22          A.     I do.
23          Q.     You can't give out legal advice
24     and say:  By the way, I'm not your
25     attorney?

                                                60

1                    J. Nadelson
2          A.     I do.
3          Q.     So then you were representing
4     him.
5                 Take a look at Exhibit 4.  Have
6     you ever seen that before?  It says:
7                 "Notice of the hearing for a
8           motion for an order pursuant to 105
9           and  3, basically approving bidding
10          procedures and conditions of sale."
11          A.     Yes.  I came through, I looked
12     at it.
13          Q.     When?
14          A.     Before the auction.

oct 4 17(1)a.txt

15      Q.      Are you familiar with the

16   bidding procedures what a party has to do,

17   any party has to do to be qualified as a

18   bidder?

19      A.      Yes.

20      Q.      Okay.   Is it from reading the

21   bidding procedures?

22      A.      No.

23      Q.      How do you know?

24      A.      Because I went to the auction,

25   not in the Bankruptcy Court.

                                             61

1               J. Nadelson

2       Q.      Did you know what the bidding

3   procedures were, the approved bidding

4   procedures were in this case?

5       A.      Yes.   You have to be

6   prequalified before the auction, and you

7   have to have 10 percent at the auction.

8       Q.      And did your client do that?

9       A.      Yes.

10      Q.      So did your client bring a check

11   to the auction?

12      A.      Yes.

13      Q.      How much?

14      A.      He brought $700,000 to the

15   auction.   And, um, he brought -- to the

16   auction he brought 700,000.

17      Q.      Did he provide any documentation

18   to the debtor or Ms. Ortiz at the day of

oct 4 17(1)a.txt

19    the auction, August 22, regarding his

20    ability to close?

21        A.    Yes, yes.

22        Q.    Did he give any documentation to

23    Ms. Ortiz or Ms. DeJesus in advance of the

24    auction date, August 22, regarding his

25    ability to close?

                                    62

1                    J. Nadelson

2        A.    I did not -- I don't know what

3    Mohammad did.  Maybe he provided by fax or

4    something, but I don't know, it all

5    happened at night, the day before the

6    auction.  All this talk about him

7    attending the auction.  On the day of the

8    auction --

9        Q.    Talk between whom the night

10    before?

11        A.    We all talked.

12        Q.    Who is "we"?

13        A.    I'm sorry, me and Norma and me

14    and Mohammad.

15        Q.    What about Mr. Lorick?

16        A.    I didn't talk to him the night

17    before.

18        Q.    Well, he wasn't in on your

19    conversation?

20        A.    Say it again.

21        Q.    He was not part of the

                            Page 55

oct 4 17(1)a.txt

22    conversation that you're referring to just

23    now?

24        A.    I don't recall if he was in

25    Mohammad's office the day before.  I don't

♀

                                        63


 1                    J. Nadelson

 2    recall.

 3        Q.    Do you recall if Mr. Mohammad

 4    Choudhary and Mr. Lorick spoke at all the

 5    day before about this?

 6        A.    I don't know, I wasn't part of

 7    it.

 8        Q.    Would you be surprised to hear

 9    Mr. Lorick testify that he did, in fact,

10    discuss the auction with Mr. Choudhary the

11    day before?

12        A.    What do you mean will I be

13    surprised?  I probably will not because

14    they talk.

15        Q.    All the time?

16        A.    I don't know.  I didn't -- I

17    wasn't on the phone with them all the time

18    I was not part of the conversations all

19    the time.  I don't know if they talk all

20    the time.

21            And can you clarify the question

22    all the time, the day before?

23        Q.    Frequently?

24        A.    Frequently, they spoke

25    frequently.

oct 4 17(1)a.txt

64

1                    J. Nadelson

2       Q.      About this building?

3       A.      About the building.  About, I

4    don't know what else because I was not

5    part of the conversation.  I'm not in

6    Mohammad's office all the time.

7       Q.      Would you describe Mr. Lorick

8    and Mr. Choudhary's relationship as a

9    business relationship, social relationship

10   or both or neither?

11      A.      I can't describe it.  I don't

12   know what do you mean, exactly to what

13   extent you mean business?

14             In business they help each other

15   all the time with the building, they have

16   supers that go back and forth in the

17   buildings.  I don't know.  Social, I don't

18   know.  It's not my --

19      Q.      What about --

20      A.      -- place to even inquire.

21      Q.      Are you aware that in 2013 Mr.

22   Choudhary was basically acting as a

23   general contractor to fix up Mr. --

24      A.      I'm not aware.

25      Q.      Let me finish.

65

oct 4 17(1)a.txt

1          J. Nadelson

2          -- to fix up Mr. Lorick's

3    building after the fire?

4     A.    He had a fire, I didn't know.

5     Q.    How long have you been

6    representing Mr. Choudhary?

7     A.    13 years, but I'm representing

8    him on a small -- I know him for 13 years,

9    and I was representing him in some

10   unrelated completely action in Supreme

11   Court.

12          Then we kind of went apart.  I

13   was not his attorney on anything.  And

14   then a few years ago he came back and he

15   said he needed something unrelated to

16   this, and then some landlord-tenant cases.

17   And that's about it.  I'm not or I was not

18   involved in their business relationship or

19   their social.  I didn't even know Mr.

20   Lorick.

21    Q.    Did you ever do any landlord

22   tenant work for Mr. Lorick?

23    A.    No.  I only met Mr. Lorick once

24   three, four, or five years ago.  I don't

25   remember.  Three years, four years ago.

                                        66


1          J. Nadelson

2    And I met him from last year and only a

3    few times.

4          MR. MCCORD:  Mark these two in

                Page 58

oct 4 17(1)a.txt

5          please.

6                  (Whereupon, Nadelson Exhibit 5,

7          New York City Buildings document

8          issued July 29, 2013 to Mohammad

9          Choudhary was hereby marked for

10         identification, as of this date.)

11                 (Whereupon, Nadelson Exhibit 6,

12         transcript of the auction that took

13         place on August 22, 2017 was hereby

14         marked for identification, as of this

15         date.)

16         Q.    I show you what's been marked as

17    Nadelson Exhibit 5, it says at the top of

18    it "New York City Buildings" in the middle

19    it says "Issued July 29, 2013 to Mohammad

20    Choudhary."

21                 Do you see all that?

22         A.    Yes.

23         Q.    Do you know Mr. Choudhary, is

24    Mr. Choudhary a general contractor?

25         A.    Hold on, where does it say Mr.

                                          67

1                     J. Nadelson

2    Choudhary?

3         Q.    Is Mr. Choudhary a general

4    contractor?

5         A.    Yes.

6         Q.    Do you see where it says:

7                 "Work alteration type 2, general

                   Page 59

oct 4 17(1)a.txt

```
 8          construction interior renovation
 9          apartments A2, A5, A6, A7, A8, D5,
10          lobby and cellar"; do you see all of
11          that?
12     A.     Yeah.   Yes, I see.
13     Q.     Did Mr. Choudhary do this work?
14     A.     I don't know.
15     Q.     Did you represent Mr. Choudhary
16 in 2013?
17     A.     No.
18     Q.     Now before twice, you said you
19 represented him for 13 years.  As far as I
20 can calculate July 29 of 2013 is four
21 years ago.
22     A.     All right, let me see.
23     Q.     Did you represent --
24     A.     Whatever I testify --
25     Q.     It's my turn.  Did you
```

                                              68


```
 1                  J. Nadelson
 2 represent --
 3     A.     No.
 4     Q.     Miss, please let me ask the
 5 question.  Did you represent Mr. Choudhary
 6 at any time during the year 2013?
 7     A.     I don't recall.  I believe not,
 8 but I do not remember.
 9     Q.     So then was your testimony
10 erroneous when you said before twice that
11 you represented him for the past 13 years?
```
                         Page 60

oct 4 17(1)a.txt

12        A.      It was inadvertently, a
13    statement was made inadvertently erroneous
14    because I know him for 13 years.  I
15    started representing him when -- 2005 or
16    '06.  And then we went apart and I already
17    stated that not apart but he didn't hire
18    me for anything.
19            And then I start doing some work
20    for him, again, but I don't recall, 2013.
21    And I definitely do not know anything
22    about this what I have in front of me
23    which is the work permit date of
24    7/29/2013.
25        Q.      I show you what's been marked as

69

1                    J. Nadelson
2    Nadelson Exhibit 6; do you see that?
3        A.      Yes.
4        Q.      Go to page 9.  This is the
5    transcript of the auction that took place
6    on August 22, 2017, correct?
7        A.      Uh-huh.
8        Q.      Were you at the auction?
9        A.      Yes, I was.
10        Q.      In the middle of the page it
11    starts "So does anyone have any questions
12    before we proceed," that's Ms. Ortiz.
13    Mr. Aryeh -- withdrawn.
14            This is at 11:30 a.m.  Do you

oct 4 17(1)a.txt

15    know what time the auction was supposed to

16    start?

17        A.    10:00 a.m.

18        Q.    This is a question from Ms.

19    Ortiz:

20              "So does anyone have any

21        questions before we proceed?"

22              Mr. Aryeh, that is Mr.

23    Ghalchi's attorney, correct?

24        A.    Yes.

25        Q.    Okay.

                                                70

1              J. Nadelson

2              "I did, Eli Aryeh representing

3        Soleyman Ghalchi.  I just wanted to

4        know regarding Mr. Choudhary, does he

5        have any relationship to the debtor at

6        all?

7              "MS. ORTIZ:   A familial

8        relationship?

9              "MR. ARYEH:   Familial

10       relationship, whether or not he had

11       any type of relationship, is there

12       any?

13             MS. ORTIZ:   I asked the debtor

14       so that I am not speaking on his

15       behalf.

16             "MR. ARYEH:   Please."

17             They go off the record.

18             "MS. ORTIZ:   I just asked Boysin

oct 4 17(1)a.txt

19          Lorick if he had a familial interest

20          with Mohammad Choudhary, and he said

21          no."

22               Is that true?

23     A.    You're asking me?

24     Q.    Is that true?

25     A.    Familial, what that means is

                                                          71

1                    J. Nadelson

2     family; it's true.

3          Q.    I asked him if he shared any

4     interest in any real estate, shared in any

5     interest in partnership or LLC or any

6     other business venture with him and he

7     said no; is that true?

8          A.    Yes -- I don't know how you

9     delineate business venture or if it's --

10    it's contractual, then this is true.

11         Q.    If it's not contractual?

12         A.    Then you can't say that he has

13    an interest in real estate or partnership,

14    LLC, corporation, business venture or so

15    on.

16         Q.    So what kind of business

17    relationship do you believe, if any, that

18    exists between Mr. Choudhary and Mr.

19    Lorick?

20         A.    I can't, I cannot state for that

21    because I don't know them too long.  So I

oct 4 17(1)a.txt

22  cannot say for the whole stretch of a time

23  they know each other.

24      Q.    I'm not asking for the whole

25  stretch.  I'm asking you as you sit here

72

1                  J. Nadelson

2  today.

3      A.    He helped him, he was trying to

4  help him to save the building, and then he

5  was trying to buy the building this is all

6  I know.  Anything else, maybe he paves the

7  front or you know does the roof.  I have

8  no idea.

9      Q.    What a minute, what does that

10  mean?

11      A.    I don't know what kind of

12  relationship they have.

13      Q.    You said you knew that they

14  exchanged superintendents or something

15  like that, right?

16      A.    There is superintendents, I know

17  from Mohammad, that he maybe sent to the

18  other building to look at it, but other

19  than that I don't know to look at the

20  problem or something, but other than that

21  I do not know.

22      Q.    Do you agree that there is some

23  kind of business relationship between Mr.

24  Choudhary and Mr. Lorick?

25      A.    Define the business

oct 4 17(1)a.txt

73

1                    J. Nadelson
2    relationship.
3        Q.    Working together in a nonsocial
4    way to obtain a goal in an objective
5    between the parties.
6              For example, Mr. Choudhary
7    performing construction work for Mr.
8    Lorick on his building in 2013 and getting
9    paid for it, would you describe that as a
10   business relationship although you had
11   nothing to do with it?
12       A.    I would say this is service for
13   hire, that is what I would say a business
14   relationship is.
15       Q.    Is it business or social?
16       A.    I would say business.
17       Q.    So --
18       A.    Maybe I'm wrong, but I would say
19   it's business definitely not social.
20       Q.    So then would you say her remark
21   is inaccurate about the business venture
22   part, when she said there was none in that
23   transcript, Ms. Ortiz?
24       A.    I can't say if he said if it's
25   inaccurate.  I don't know what he exactly

74

oct 4 17(1)a.txt
1                    J. Nadelson

2    meant.

3         Q.    It's not he, it's she?

4         A.    No, no, no.  You said I ask him

5    if he had, or if he shared an interest and

6    partnership, LLC or any other business

7    venture with him and he said no.  So

8    whatever he said I can't say.  She asked

9    the question, and Lorick said no.

10              MR. MCCORD:   Mark this in,

11         please.

12              (Whereupon, Nadelson Exhibit 7,

13         document captioned, "Voluntary

14         Petition For Individuals Filing

15         Bankruptcy" was hereby marked for

16         identification, as of this date.)

17         Q.    I show you Nadelson Exhibit 7.

18    It states at the top of the page, the top

19    portion of the page, "Voluntary Petition

20    For Individuals Filing Bankruptcy."

21              Then below that part one it says

22    Cynthia Boysin, "Cynthia Theresa" -- not

23    Boysin -- withdrawn on that -- "Cynthia

24    Theresa Lorick, Boysin Ralph Lorick"; do

25    you see that?

                                          75


1                    J. Nadelson

2         A.    Uh-huh.

3         Q.    This is their Chapter 11

4    petition which includes schedules, debts,

oct 4 17(1)a.txt

 5    assets and liabilities.

 6            You may take a moment to look

 7    through this document, if you would like.

 8    And then look up when you're ready to

 9    proceed.

10        A.    I'm ready to proceed.

11        Q.    Have you ever seen this document

12    before?

13        A.    No, I did not.

14        Q.    Did you discuss this with Mr.

15    Lorick in any way?

16        A.    This [indicating]?

17        Q.    The bankruptcy petition.

18        A.    No.

19        Q.    You have to answer.

20        A.    No, I don't because I have no

21    knowledge in bankruptcy, how can I

22    discuss.

23        Q.    Did you discuss this bankruptcy

24    petition or any of the information in it

25    with Mr. Choudhary?

                                        76


 1                J. Nadelson

 2        A.    No.

 3        Q.    Did you discuss this bankruptcy

 4    petition or any of the information in it

 5    with Ms. Ortiz or Ms. DeJesus?

 6        A.    Only when I was collecting some

 7    information.

                     Page 67

oct 4 17(1)a.txt

8      Q.      Please explain.

9      A.      You know, honestly I don't

10   remember.  Maybe I just got Boysin's name

11   and, you know, like the address and all

12   this, just the background, before I even

13   said I know somebody who does bankruptcy,

14   possibly that.

15             But I have not discussed

16   bankruptcy petition, I have not discussed

17   it with Ms. Ortiz or Ms. DeJesus at any

18   time because I don't even know what's

19   involved.  I know the amount

20   approximately, but that's about it.

21     Q.      Who did you give the information

22   to that you just discussed as far as Mr.

23   Boysin Lorick?

24     A.      What information I discussed?

25     Q.      You just said that you gave them

                                    77


1             J. Nadelson

2    his name and his address and other type of

3    pedigree information; is that correct?

4      A.      Right I just --

5      Q.      Who did you give it to?

6      A.      Norma.  I mean Norma Ortiz.  How

7    else can I say take the case if I couldn't

8    explain to Ms. Ortiz what he's looking

9    for.  I don't even know if she ask like,

10   you know, take him as a client so I had to

11   gather a little information give to her in

oct 4 17(1)a.txt

12    the beginning so she takes the case or not

13    and then.

14        Q.    What other information did you

15    give her at the beginning to see if she's

16    gonna take the case or not?

17        A.    Name, that he, his house is in

18    foreclosure, that he owes a certain amount

19    of money, whatever he thought he owes, and

20    that he's married.

21            I don't recall the rest.  You

22    know all kind of, this information usually

23    you say I have a potential client.  You

24    say what do they want, what do they do,

25    what are they looking for.  So you have to

78

1                J. Nadelson

2    gather certain things.  Because I haven't

3    seen this, I don't know anything about it.

4        Q.    Look at the first page.  On the

5    first page of the petition, did you give

6    the names to Ms. Ortiz or Ms. DeJesus of

7    the debtors?

8        A.    You know as far as I know I knew

9    that Boysin is his last name, that's how I

10    talk to him, Mr. Boysin.

11        Q.    You called the debtor Mr.

12    Boysin?

13        A.    In the beginning when he came,

14    when I met him I didn't call him Mr.

Page 69

oct 4 17(1)a.txt

15   Boysin.  I said that I thought it was his

16   last name but then when I said what is the

17   first name, last name and what's the

18   address of the building.

19        Q.    Do you see the information on

20   the first page?

21        A.    Yes, I do.

22        Q.    Did you give that information to

23   Ms. Ortiz?

24        A.    Maybe I did only his name with

25   his wife, but I didn't even know that they

                                        79


1                  J. Nadelson

2    had middle names.

3         Q.    You gave it to Ms. Ortiz or Ms.

4    DeJesus?

5         A.    I don't remember.

6         Q.    Do you know who Ms. DeJesus is?

7         A.    Yes.

8         Q.    Who is she?

9         A.    She's Ms. Ortiz' associate.

10        Q.    Have you ever dealt with her

11   ever?

12        A.    Yes, I met her.

13        Q.    When did you meet her?

14        A.    I met her in Ms. Ortiz' office.

15        Q.    Pertaining to this case or

16   something else?

17        A.    Something else.  I met her.  I

18   don't remember when, but I met Ms. DeJesus

oct 4 17(1)a.txt

19    at the old office also.

20        Q.    What old office?

21        A.    They used to have an office on

22    Livingston Street prior to moving to where

23    they are now in Astoria.

24        Q.    Have you ever given Ms. DeJesus

25    any work, legal work or referrals of

♀

                                               80


1                    J. Nadelson

2    cases?

3        A.    Ms. DeJesus?

4        Q.    Yes.

5        A.    No.

6        Q.    Is this the first legal referral

7    that you given Ms. Ortiz' law firm, Mr.

8    Lorick's case?

9        A.    No.  First one?

10        Q.    Yeah.

11        A.    No, it's not the first.

12        Q.    How many have you given?

13        A.    Maybe one that I know they did

14    do work on.

15        Q.    Was it a bankruptcy case?

16        A.    It was a bankruptcy case.

17        Q.    When was it?

18        A.    2005.

19        Q.    What kind of case was it?

20        A.    It was a bankruptcy case.  I had

21    a client.

oct 4 17(1)a.txt

22      Q.      Do you know if it's Chapter 11

23   or Chapter 7 or Chapter 13, if you know?

24      A.      I don't know.

25      Q.      So between 2005 and 2016, have

                                        81


1                  J. Nadelson

2    you given Ms. Ortiz' firm any legal

3    referrals of any kind?

4       A.      Maybe I gave a phone number a

5    couple times, but I don't know if it went

6    through or not I mean it's not my --

7       Q.      Have you received any

8    participation fees or any fees other than

9    what you already said?

10      A.      No.

11      Q.      Second page --

12      A.      No.

13      Q.      Go through the petition, please,

14   with me.

15              Go to the third page, his

16   address is there.  Did you give that

17   information to Ms. Ortiz and Ms. DeJesus?

18      A.      I don't recall.

19      Q.      Let me see that exhibit, please.

20   Please note that the first stapled part of

21   the Exhibit 7 was filed on December 15,

22   2016, correct?

23      A.      Yes.

24      Q.      Okay.  The second stapled part

25   which is Schedule A, B, property and other

oct 4 17(1)a.txt

82

1                    J. Nadelson

2    schedules was filed February 3rd, 2017,

3    correct?

4         A.    Uh-huh.

5         Q.    There's information on here

6    regarding his real property and his

7    obligations.  Did you give any of that

8    information to Ms. Ortiz or Ms. DeJesus?

9         A.    No, because I only knew that he

10   has other properties maybe in Georgia, he

11   mentioned or not Georgia, in New Jersey.

12        Q.    Did you disclose that to Ms.

13   DeJesus or Ms. Ortiz?

14        A.    Maybe in conversation, but I

15   don't remember.

16        Q.    When were these conversations,

17   before or after the filing of the

18   bankruptcy on December 15 --

19        A.    You know.

20        Q.    -- of 2016?

21        A.    Now that I looked at the date of

22   the December 16, can you repeat the

23   question, please?

24        Q.    When did you have these

25   conversations with Ms. DeJesus and Ms.

83

oct 4 17(1)a.txt

1                   J. Nadelson

2    Ortiz regarding Mr. Lorick's information,

3    before or after they filed the bankruptcy

4    on December 15, 2016 or both?

5        A.    I don't remember.  Maybe after,

6    maybe on the day of filing.

7        Q.    Ms. DeJesus said she spoke to

8    you afterwards and got information from

9    you?

10       A.    Right, I don't remember.

11       Q.    Is that correct?

12       A.    I don't remember.  Maybe after,

13   correct.

14       Q.    Now, on the third stapled

15   package --

16       A.    I don't know.  I'm sorry, I

17   don't know all the details of that.

18       Q.    I'm not asking you what details.

19   I'm asking what information and when you

20   gave it to them.

21             The third package?

22       A.    I'm sorry, the information

23   regarding the background of the Boysin and

24   Cynthia?

25       Q.    Any information at all that you

                                    84

1                   J. Nadelson

2    gave Ms. DeJesus regarding the Loricks --

3        A.    Yes.

4        Q.    -- it was after the filing?

                   Page 74

oct 4 17(1)a.txt

5      A.     I believe so.

6      Q.     Do you know how long after the

7  filing, how long after December 15?

8      A.     No, I don't.

9      Q.     The third stapled packet is

10  entered on December 29, 2016, correct?

11      A.     Correct, but I don't -- if you

12  show me forms I don't know anything about

13  them.

14      Q.     So you have the initial --

15      A.     I'm not, I don't know anything

16  about bankruptcy forms so.

17      Q.     You have the initial filing took

18  place December 15, that's the first

19  package, and then you have additional

20  documents, schedules, things that were

21  filed December 29, 2016, correct?

22      A.     Correct.

23      Q.     And then you have the last

24  document group of documents --

25      A.     February 3rd.

85

1                  J. Nadelson

2      Q.     -- filed February 3rd, correct?

3      A.     Correct, because you mentioned

4  that.

5      Q.     Okay.  So you stated that you

6  spoke with Ms. DeJesus after the filing,

7  the initial filing of December 15, 2016,

Page 75

oct 4 17(1)a.txt

8    about information --

9        A.    Maybe I spoke before also, I

10   don't remember.

11       Q.    Before and after, okay.

12             How about Ms. Ortiz did you

13   speak to Ms. Ortiz after the filing, the

14   initial filing of December 15, 2016?

15       A.    Of course we talk --

16       Q.    About this case?

17       A.    Up through now.

18       Q.    About this case?

19       A.    Yes, up to now.

20       Q.    You were representing Mr.

21   Choudhary for those purposes of those

22   discussions that you had from then through

23   now, correct?

24       A.    Yes.  Because he wanted to buy

25   the building and nothing let him, I don't

                                              86


1                   J. Nadelson

2    know.

3        Q.    So Mr. Choudhary introduced you

4    to Mr. Lorick.  And Mr. Lorick sometime in

5    the fall of last year, 2016 asked you for

6    a bankruptcy attorney's name, correct?

7        A.    He was looking for one, yes.

8        Q.    And he didn't tell you he filed

9    Chapter 13 already?

10       A.    At that time, I don't believe --

11   I don't remember.  I don't believe -- to

oct 4 17(1)a.txt

12    me -- I'm sorry, to me I'm not a

13    bankruptcy attorney.   Chapter 11/Chapter

14    13 I mean, I don't know the difference.

15    Now I do.

16         Q.    In the fall of 2016 when you

17    spoke to Mr. Lorick whether it was in

18    September or October, did he tell you he

19    was already in bankruptcy of any kind, any

20    kind of bankruptcy?

21         A.    Maybe he mentioned he filed, but

22    I never dwell on the facts.

23         Q.    Did he tell you why --

24         A.    I don't think he said he was in

25    bankruptcy.   He said maybe he filed it

87

1                   J. Nadelson

2    before, but I didn't for me I had no

3    interest on the facts because it has

4    nothing to do with me or my client at that

5    moment.

6         Q.    If he was already in bankruptcy

7    as you just testified, that he filed?

8         A.    I didn't say he filed.  I said

9    he mentioned, but I didn't know whether it

10    was filed complete or whatever what

11    happened to it, he mentioned.

12         Q.    Did he say why he needed another

13    bankruptcy attorney, if he was already in

14    bankruptcy?

Page 77

oct 4 17(1)a.txt

15     A.     Yes, he did.

16     Q.     Why?

17     A.     Now I remember he said that he

18  filed the wrong bankruptcy, the attorney

19  before filed the wrong bankruptcy.

20          You ask me about the attorney

21  before.  I don't know who he is, but I

22  know the name was maybe the name was

23  mentioned, maybe not, but he said whoever

24  he hired filed for wrong bankruptcy.  This

25  is how he ended up in this foreclosure

88

1               J. Nadelson

2  sale, I believe, I don't know.

3     Q.     He found out about you through

4  Mr. Choudhary, correct, or was it a result

5  of remembering you from that meeting that

6  you had three years before?

7     A.     Yes.  Maybe he met me last year.

8  As I said I do work for Mr. Choudhary,

9  maybe landlord-tenant, maybe contractual,

10  maybe real estate.  I do work and I come

11  to his office because my office is under

12  renovation.

13     Q.     Did Mr. Choudhary refer Mr.

14  Lorick to you or did Mr. Lorick come to

15  you on his own?

16     A.     I believe he just walked in, I

17  was there and he asked me a question.

18     Q.     You were there at Mr.

oct 4 17(1)a.txt

19    Choudhary's office?

20        A.    Mr. Choudhary knows I do not do

21    bankruptcy.  I mean Mr. Choudhary knows

22    that I do not do foreclosures/bankruptcy.

23    I don't do this type of work on extensive

24    basis so.  And maybe he walked in and he

25    just asked me because I was there.  I

                                          89

1                    J. Nadelson

2    don't remember.

3        Q.    Okay.  So --

4        A.    But I know that he asked this is

5    the situation I had, you know.  I said how

6    did you end up -- I remember that I asked

7    him, how did you end up in foreclosure

8    three years before that.

9             And he said that he was filing

10   for bankruptcy -- I mean not a foreclosure

11   sale but he said he was filing for

12   bankruptcy.  And the attorney -- so many

13   names -- did not file the right one.

14       Q.    Was it Mr. Wharton?

15       A.    I don't recall it.  It probably

16   was because if he one who filed it

17   probably was.  I don't know Mr. Wharton.

18   I don't know who he is.  And I don't know

19   what he filed.  So I couldn't answer him

20   that question.

21             And I said, I'm not a bankruptcy

                    Page 79

oct 4 17(1)a.txt
22   attorney, so I cannot answer you what you
23   have to file, but I know somebody who does
24   bankruptcy.
25        Q.    And that's when you gave him

                                          90


1                   J. Nadelson
2    Norma Ortiz' number?
3         A.    I said maybe you can consult
4    her.
5         Q.    Did he?
6         A.    Obviously, he did.
7         Q.    And did you know when he did?
8         A.    I don't know the date, maybe it
9    was December.  I'm sorry if I got my dates
10   wrong.  I just remember it was not very
11   cold.
12        Q.    Do you know when Mr. Lorick
13   consulted with Ms. Ortiz first consulted
14   with Ms. Ortiz?
15        A.    Honestly, I don't remember maybe
16   it was in December looking at the filing.
17        Q.    It was filed December 15?
18        A.    Right.  Maybe it was in
19   December, or maybe it was at the end of
20   November.
21        Q.    But you don't know?
22        A.    I don't know.  I don't know the
23   exact date.  I know approximately the time
24   that he went, but I don't know --
25        Q.    How do you know the approximate
                    Page 80

1                   J. Nadelson
2       time that he went?
3           A.      Because you have the date
4       filing.  I'm sure he didn't go after the
5       foreclosure sale.
6           Q.      Do you know when the foreclosure
7       sale was scheduled?
8           A.      No.
9           Q.      Is it your testimony that it's
10      basically an assumption on your part that
11      he met with Ms. Ortiz for the first time
12      before December 15 after looking at --
13          A.      Yes.
14          Q.      -- at Exhibit 7?
15          A.      Yes, I would assume so.  I have
16      no knowledge, concrete knowledge, but I'm
17      under the assumption I believe he met with
18      her before she filed.  I mean you can't
19      meet for the first time after she filed it
20      on her own.
21          Q.      So is it your testimony that you
22      have no independent knowledge of when he
23      met for the first time with Ms. Ortiz
24      about filing the Chapter 11 until you had
25      seen Exhibit 7?

oct 4 17(1)a.txt

1                    J. Nadelson

2       A.      Maybe I don't remember maybe

3   first time because I remember I was in Ms.

4   Ortiz' office also.

5       Q.      When?

6       A.      At some point but...

7       Q.      When?

8       A.      Maybe after this.  Maybe, you

9   know.

10      Q.      About this or about something

11  else?

12      A.      Mr. Mohammad wanted to buy the

13  building all along.  So I came to the

14  office maybe with Mr. Mohammad.  I do not

15  recall exactly when, but I came to discuss

16  maybe he, you know, can purchase the

17  building, I don't know, from foreclosure.

18              And she said the time is out for

19  foreclosure sale, you know, so he wants to

20  file bankruptcy.  He filed bankruptcy.

21  And she said maybe you can propose that

22  you want to buy it now.

23              I don't remember the exact

24  facts, because I'm not familiar with the

25  bankruptcy proceedings.  So I don't even

⚲

                                    93


1                    J. Nadelson

2   know if the person did come in and say I

3   want to buy it, you know.

4       Q.      Do you remember when you had

oct 4 17(1)a.txt

 5     that meeting with her about buying the

 6     real estate from Mr. Lorick?

 7          A.     I don't.  I really don't

 8     remember.

 9          Q.     Was it around December 15, 2016?

10          A.     Maybe it was after it was filed.

11          Q.     After the bankruptcy was filed?

12          A.     Maybe, yes.

13          Q.     That's when you first got

14     involved with Ms. Ortiz on behalf of Mr.

15     Choudhary to buy or -- to buy the

16     property?

17          A.     I believe so, yeah.  Maybe, you

18     know, I don't recall exactly what was said

19     but you know maybe I got involved after

20     the new year.  I don't remember, because

21     this was in the discussion all the time

22     for longest.

23              Since last when he went there

24     Mr. Mohammad wants to buy, but how, you

25     know, listen here is the thing if Mr.

                                        94



 1                J. Nadelson

 2     Mohammad wants to buy and Mr. Lorick did

 3     not want to sell at that moment, whatever

 4     Mr. Mohammad wants is a moot point because

 5     he's not gonna agree to it, and nobody can

 6     do anything so.  And this is why I guess

 7     this is why Mr. Mohammad ended up at the

oct 4 17(1)a.txt

8    auction because nothing went.

9        Q.    Right now I'm asking you about

10    your involvement with Ms. Ortiz, Ms.

11    DeJesus and Mr. Lorick as it pertains to

12    him filing the Chapter 11 bankruptcy

13    petition on December 15, 2016; that's what

14    I'm asking you about.

15        A.    Okay.

16        Q.    You're telling me that you

17    weren't involved; is that correct, other

18    than --

19        A.    I wasn't.

20        Q.    -- other than referring the case

21    to him?

22        A.    I was not involved in the

23    bankruptcy case, I have nothing to do with

24    it.

25        Q.    You went on to say that you

95

1                J. Nadelson

2    have, in fact, met with Ms. Ortiz between

3    then and now numerous times on behalf of

4    Mr. Choudhary, correct, to buy the

5    property?

6        A.    After the bankruptcy was filed.

7        Q.    And Ms. DeJesus?

8        A.    And maybe the day before.

9        Q.    And which is it?

10        A.    I don't remember I honestly

11    don't remember.  I did not know exact

Page 84

12    dates when it was filed, so I don't know.

13        Q.    Are you aware or can you give me

14    a reason why you would participate in the

15    bankruptcy filing with Mr. Lorick and Mr.

16    Choudhary and Ms. Ortiz, is there any

17    reason why you would be involved with this

18    bankruptcy petition for the Loricks?

19        A.    I'm not involved with the

20    bankruptcy petition.

21        Q.    Ever, is it your testimony?

22        A.    For the petition?

23        Q.    Yeah.  For the bankruptcy.

24        A.    Why would I be involved with the

25    bankruptcy?

                                    96


1                    J. Nadelson

2        Q.    Ma'am, I'm asking you the

3    questions, you don't ask me the questions.

4        A.    Maybe I don't understand the

5    meaning of it.

6        Q.    Can you give me any explanation

7    as to why you would be involved with Mr.

8    Lorick and Ms. Ortiz in this bankruptcy

9    proceeding, the preparation of and the

10    filing of this bankruptcy --

11        A.    I was not involved in the

12    preparation of the bankruptcy proceedings.

13    The only thing is Mr. Choudhary wanted to,

14    he offered Boysin, Mr. Lorick, everything

oct 4 17(1)a.txt

15  you know from buying, lending money, you

16  know, salvaging the building.  He offered

17  everything, but Mr. Lorick wanted to, he

18  didn't agree to this I guess.  And he,

19  this is why he ended up in the bankruptcy

20  proceedings.

21          I was not involved in the

22  preparation or discussions or anything of

23  the bankruptcy because this is not my --

24      Q.    So you didn't meet with Ms.

25  Ortiz and Mr. Lorick at her office

97

1              J. Nadelson

2  regarding the bankruptcy petition; is that

3  your testimony?

4      A.    I believe that Mr. Mohammad

5  went --

6      Q.    No, I asked you a question, yes

7  or no, did you meet with --

8      A.    We did.  And I told you we met

9  in her office.

10      Q.    Who is "we"?

11      A.    Me and Ms. Ortiz and Mohammad,

12  and there was Boysin.  They all came.

13      Q.    You left out that part that

14  Boysin?

15      A.    I said that.

16      Q.    Now you're saying it.

17      A.    No, I said that before.

18      Q.    Hold it.

oct 4 17(1)a.txt

19          A.      I said that before, we all met.

20    You asked me the same question.   You said

21    who is "we."   And I said Boysin, Mohammad,

22    Ortiz and me.

23          Q.      All right.   So let me --

24          A.      If you want to ask me the next

25    question why did we meet, I will tell you

                                                    98


 1                     J. Nadelson

 2    why.

 3                     It's because Mohammad knows

 4    Boysin.   And he said, can you come with

 5    me.   I mean he wants to do bankruptcy.   I

 6    want to help him out, can you come with

 7    me.

 8                     And I did come to the office not

 9    for the purpose of filing bankruptcy or

10    negotiating or anything else.   And I don't

11    know what you're referring to, how did I

12    get involved in all of this.

13          Q.      What did Choudhary mean when he

14    said he wanted to help him out?   I thought

15    you told me all morning he's trying to buy

16    the property?

17          A.      Is it not salvaging the

18    building?

19          Q.      Let me speak, it's my turn.   You

20    said all along that he wants to buy the

21    building.   Now you're saying he wanted to

oct 4 17(1)a.txt

22   help Lorick save the building, which is

23   it? Which is it? Did he want to help him

24   or did he want to buy his building?

25      A.    If he wants to buy a building so

                                  99

♀

  1              J. Nadelson

  2   it doesn't go to any other person, but him

  3   and he knows Boysin for, I don't know, 15

  4   years, you don't think it's helping?

  5      Q.    How? No, I don't.

  6      A.    Then you and me have different

  7   views of a friendship.

  8      Q.    What -- Ms. Nadelson --

  9      A.    Yes.

 10      Q.    -- how is that different than

 11   any other business transaction with buying

 12   a building, are you telling me that Mr. --

 13   let me speak -- are you telling me --

 14      A.    Please don't yell at me.

 15      Q.    Then stop interrupting me.

 16      A.    Well, don't insinuate anything

 17   that you shouldn't.

 18      Q.    Are you telling me Mr. Choudhary

 19   was of the position and expressed to you

 20   that he believed by him buying the

 21   building, was helping Mr. Lorick; yes or

 22   no?

 23      A.    I don't know. I really don't

 24   know. You and me have different views on

 25   everything, so I cannot answer your

oct 4 17(1)a.txt

1                    J. Nadelson

2    question.

3        Q.    I'm not asking you to agree with

4    my view, I'm asking you to answer my

5    question.

6        A.    I cannot answer this question

7    because I don't know the answer to it.  I

8    only can say that he tried to help before

9    and, you know, he offered to finance it,

10   to pay off the creditors, which he

11   couldn't do because I guess.

12              I'm not familiar with the

13   procedures, but I believe the foreclosure

14   sale was scheduled and, you know, that's

15   it.

16       Q.    Are you aware the night before

17   the auction Mr. Choudhary, and on August

18   21, 2017 the auction was the 22nd, that

19   Mr. Choudhary and Mr. Lorick met and

20   discussed Mr. Choudhary bidding and

21   participating at the auction; are you

22   aware of that?

23       A.    Met where?

24       Q.    I don't know where.

25       A.    I am not aware of that.  I am

oct 4 17(1)a.txt

1                    J. Nadelson

2    not aware of that and I don't know if they

3    discussed any bidding procedures?

4        Q.    Bidding at the auction.

5        A.    No, I don't know about that.

6        Q.    And it's your testimony that the

7    only money you've ever received from Ms.

8    Ortiz for this case or any other case is

9    that couple thousand dollars for doing

10   some research for her a year ago?

11       A.    Are you implying that I received

12   more?

13       Q.    I'm asking you a question?

14       A.    I'm asking you a question, too.

15       Q.    You know what, this is my

16   deposition if you would like to subpoena

17   me to come to a deposition, I'll be more

18   than happy to come and then I will answer

19   your questions.

20       A.    We don't have time.

21       Q.    Right now you're under oath

22   under penalties of perjury.  I will be

23   doing research into bank records and

24   things like that.  I'm not threatening

25   you, I'm just telling you.

                                            102


1                    J. Nadelson

2        A.    You're threatening me now and I

3    don't care.

4        Q.    I'm asking you if it's true that

oct 4 17(1)a.txt

5    the only funds you received from Ms. Ortiz

6    was that couple thousand dollars for a

7    year ago doing some kind of research?

8        A.    Not a year ago, less than a year

9    ago.

10       Q.    When was it?

11       A.    I don't remember.  Maybe after

12   the bankruptcy, maybe before, I don't

13   remember.

14             And I'll tell you you can do

15   research into my bank accounts all you

16   want.  And you will find only one small

17   check.  If you're insinuating that I

18   received funds or fees for the whatever --

19       Q.    Ms. Nadelson.

20       A.    -- whatever you're insinuating.

21       Q.    Ms. Nadelson.

22       A.    I'm under oath.

23       Q.    You're under oath, you're an

24   attorney.

25       A.    I'm an attorney, but you know

                                              103


1             J. Nadelson

2    something it's very upsetting --

3        Q.    I'm speaking.

4        A.    -- you're insinuating, you're

5    threatening me, you're demanding.  I'm

6    here as a witness, I'm not your defendant

7    witness.

oct 4 17(1)a.txt

8      Q.     Ms. Nadelson --

9      A.     Yes.

10     Q.     -- you're under oath under

11   penalties of perjury.  You're an officer

12   of the court, you're a licensed

13   practitioner in the State of New York, and

14   you tell me that you're in good standing.

15            I have no reason to --

16     A.     I'm in very good standing.

17     Q.     I have no reason to believe

18   otherwise, but what I'm telling you is

19   that it's very, very, very serious and

20   it's very important that you tell me the

21   truth.

22            You received this $2,000?

23     A.     Maybe less.

24     Q.     Maybe less.

25            You're saying it could of been

                                        104


1                  J. Nadelson

2    after the filing on December 15, 2016,

3    which is almost a year ago, it could of

4    been before, it could of been for doing

5    some research in this capital gains issue

6    or it could of been for something else

7    but --

8      A.     I don't know how she delineated

9    what I was paid for.

10     Q.     It is my turn.

11            Ms. Ortiz paid you money to

oct 4 17(1)a.txt

```
12    perform legal services, correct?
13         A.    I received the check, yes.
14         Q.    I'm telling you I'm asking you
15    to tell the truth because --
16         A.    Yes, I was paid yes.
17         Q.    -- first of all, I'm leaving a
18    space in the transcript for you to provide
19    me with a check or any other information
20    you have regarding this before tomorrow.
21    (Insert)_____
22    _____.
23         Q.    But I'm just urging you to be as
24    clear and distinct on this issue because I
25    will be pursuing it, and I will find out,
```

                                            105


```
1                   J. Nadelson
2    and if it's something different than what
3    you're telling me, I'll be forced to do
4    something I don't want to do.
5             I'm not threatening you.  I'm
6    just telling you the reality of what we
7    are dealing with here.  So it would be to
8    your benefit if you could be more
9    specific, if you can't --
10         A.    Do you want me to call the bank
11    now?
12         Q.    Sure.   Sure.
13         A.    If you give me the amount, I'll
14    tell them and they will tell me.
```

                        Page 93

oct 4 17(1)a.txt

15      Q.      I don't know what the amount is,

16   you're telling me.

17      A.      Do you want me to call Ms. Ortiz

18   on the phone and ask her how much the

19   check was for?

20      Q.      You can do that.  We don't have

21   to keep the reporter here, we will break.

22      A.      Now, you're threatening me.  I

23   don't want to proceed now because I want

24   to now call in and see what's the check

25   amount.

                                        106

1                J. Nadelson

2                Maybe it's $2,200.  You gonna

3   hold me to the fact that I don't remember

4   how much was the check for?

5      Q.      No.  That's not what I'm holding

6   you to.  That's not what I'm talking

7   about.  It doesn't matter if it's $1,200

8   or $2,000 or $2.

9      A.      What does it matter?

10      Q.      -I want to know when you got it

11   and why she paid you.  She's an attorney

12   with the law firm.  You're an attorney

13   with a law firm.  It's not a difficult

14   question.

15                You're saying within a year,

16   last year, maybe after the petition, maybe

17   it was for the capital gains tax issue,

18   the liability issue, maybe it wasn't.

oct 4 17(1)a.txt

19    Maybe it was for something else.

20            You're being so vague.  I'm

21    asking you within a year, and you can't

22    remember.

23            According to your testimony she

24    only paid you one time.  If she gave you

25    more money and paid you more than once, I

                                        107

1                  J. Nadelson

2    need you to tell me when.

3            Well, first tell me if she paid

4    you more than once.

5        A.    Give me one second, please --

6        Q.    No, no.

7        A.    -- I'll tell you the date.  You

8    want the date?

9        Q.    But I don't want you calling.

10        A.    I'm not calling anybody, I'm

11    looking at my phone.

12            MR. MCCORD:  While she's doing

13        that if you would mark this in,

14        please.

15            (Whereupon, Nadelson Exhibit 8,

16        document was hereby marked for

17        identification, as of this date.)

18        A.    So what do you need to know?

19        Q.    You testified Ms. Ortiz paid you

20    money to perform legal services for her

21    firm.  When did she pay you?

oct 4 17(1)a.txt

22      A.      I don't know.

23      Q.      What's the matter?

24      A.      It's my personal check.

25      Q.      It's nothing to do with this.  I

                                                108

1              J. Nadelson

2    thought you -- it wasn't to do with this?

3      A.      No.  But I can call the bank.

4              MR. MCCORD:  You can call the

5       bank, but we don't have to keep the

6       reporter for this.  If I think it's

7       necessary we will go back on the

8       record before we start with Mr.

9       Choudhary.

10              THE WITNESS:  Are we done?

11              MR. MCCORD:  Do have you any

12       questions, Mr. Rinaldi?

13              MR. RINALDI:  I have one.

14              MR. MCCORD:  This is a courtesy.

15              THE WITNESS:  I'm not a party

16       here.

17              MR. MCCORD:  You're a subpoenaed

18       witness.

19              Go ahead, Mr. Rinaldi.  I'm

20       sorry, before you start.

21      Q.      I am showing you what's been

22    marked as Exhibit 8.

23      A.      I saw that.

24      Q.      It's a subpoena to testify at a

25    deposition, is that why you're here today

oct 4 17(1)a.txt

109

```
 1                    J. Nadelson
 2    pursuant to this deposition.
 3         A.    That's for tomorrow.
 4         Q.    No, that's for today.
 5         A.    Let me see.
 6         Q.    That's for today.
 7         A.    I didn't have this.  I have it
 8    on me.  Do you want me to show you the
 9    check?
10              I'll show you the subpoena to be
11    trial witness tomorrow at whatever time it
12    says, and it has a check attached to it,
13    because I was not in this case and I am
14    not involved in this case and you make me
15    involved in this case.
16              I'm getting paid $40 for it, if
17    that's believable.
18         Q.    Ms. Nadelson.
19         A.    I understand this is your
20    procedural rules.
21         Q.    Okay.
22              MR. MCCORD:  All right.  Go
23         ahead, Mr. Rinaldi.
24    EXAMINATION
25    BY MR. RINALDI:
```

110

oct 4 17(1)a.txt

```
 1                    J. Nadelson
 2        Q.      Are you coordinating any
 3    financing for Mr. Choudhary with respect
 4    to --
 5        A.      Please clarify coordinating.
 6        Q.      Are you involved with any
 7    financing?
 8        A.      No.  He's doing, involved in
 9    what way, as consulting him as attorney,
10    what it means, what's the facts?
11        Q.      Let me finish, and then you can
12    determine whether or not what you think of
13    my question.
14                With respect to purchasing the
15    properties with respect to the bid, are
16    you involved with assisting Mr. Choudhary
17    as an attorney in his financing of, for
18    the property?
19        A.      What does it mean assisting him
20    with his financing?
21        Q.      Are you involved with any
22    refinance or are you involved --
23        A.      Involved as an attorney --
24        Q.      Yes, as an attorney?
25        A.      -- at closing or involved I'm
```

                                        111


```
 1                    J. Nadelson
 2    getting him the mortgage brokers?  Because
 3    I don't know anything, where he goes he
 4    does it on his own.  I just assist him at
```

oct 4 17(1)a.txt

 5    the closing and transaction.

 6        Q.     Are you aware of any financing

 7    that he's --

 8        A.     Yes.   We are waiting for the

 9    assignment for him to come back and buy

10    the building right now.

11             I'm aware that he's, you know,

12    we have been talking, he talks to mortgage

13    brokers that he dealt with before on his

14    refinancing of the other building, and

15    they gave him the green light but we are

16    stuck.

17             He can't do it right now.   He

18    can't do it because we have a trial

19    pending tomorrow.   Then there is -- I'm

20    not a bankruptcy attorney, so I don't even

21    know what is gonna take place on the 11th.

22             All I know is by the 11th he has

23    to close or do something to have an

24    extension.   And he's talking to, you know,

25    to get his finances together to close and

                                        112

 1             J. Nadelson

 2    he has good intentions to do so.

 3             If everybody is not objecting

 4    but he can't do this because everybody is

 5    objecting -- not everybody, but I'm

 6    talking about in general.   I mean, he

 7    would do -- he would already probably have

                 Page 99

oct 4 17(1)a.txt

8    a mortgage by now if we kind of moved

9    along and if the judge can move up along.

10   EXAMINATION

11   BY MR. MCCORD:

12        Q.    Are you aware that Mr. Lorick

13   retained a mortgage broker in July for

14   $25,000?

15        A.    What do you mean for $25,000?

16        Q.    Hired a mortgage broker.

17              MR. RINALDI:  Lorick you said?

18              MR. MCCORD:   Boysin Lorick.

19        A.    For what purpose?

20        Q.    I don't know.  I assume to save

21   the property he a hired a mortgage broker

22   and paid him $25,000.

23        A.    He paid him or Mohammad hired.

24   Maybe Mohammad lend him money.  How does

25   he have money?  I didn't think he had

                                        113


1                   J. Nadelson

2    money.

3         Q.    So the answer to my question is

4    you're not aware of that?

5         A.    Listen --

6         Q.    I need you to say yes or no.

7         A.    -- for Boysin no.

8         Q.    For Mr. Choudhary, did he hire a

9    mortgage broker?

10        A.    I don't know if it was for

11   Boysin -- hold on one second.

                    Page 100

oct 4 17(1)a.txt

12          In July he went to several

13    mortgage brokers, Mr. Choudhary, that's

14    all I know, and he wanted to get finances

15    because he wanted to try you know to buy

16    the building before the auction.

17      Q.     Did you know Mr. Lorick took

18    money out of his bank account and paid a

19    mortgage broker in July, July 18, 2017 and

20    paid the mortgage broker $25,000; are you

21    aware of that?

22      A.     Boysin paid?

23      Q.     Yes.

24      A.     I'm not aware.  I'm not sure --

25    I'm not aware of it.  I'm not sure how

114

1                 J. Nadelson

2    transactionally it took away.  I'm not

3    aware of a lot of things.

4      Q.     Did you ever here of a company

5    called Eretz, E. R. E. T. Z., Realty?

6      A.     Let me see.  Can I see?

7      Q.     E. R. E. T. Z --

8      A.     No.

9      Q.     -- on 18th Avenue in Brooklyn?

10      A.     I have no idea.  Why, he said I

11    do?  If I do I will sue him because I

12    don't.  I don't.  All I know is three

13    companies that Mohammad went through and

14    couldn't buy the building and they just

oct 4 17(1)a.txt

15   couldn't wait.

16            MR. MCCORD:   We are breaking

17      now.   Mr. Choudhary is here.

18            THE WITNESS:   How do you know?

19            MR. MCCORD:   Because my people

20      just told me.

21            THE WITNESS:   You didn't talk to

22      anybody.

23            MR. RINALDI:   Can I ask one

24      question about the 1.8 million?

25            MR. MCCORD:   Sure.

                                              115


1                 J. Nadelson

2   EXAMINATION

3   BY MR. RINALDI:

4      Q.    You testified that Mr. Choudhary

5   refinanced one of his buildings?

6      A.    His building.

7      Q.    And cashed out 1.8 million in

8   the refinance?

9      A.    Yes.   He actually paid $202,000

10   to get that money for the purpose of

11   buying that building.   And he kind of

12   stuck -- I changed, I stopped.

13            MR. MCCORD:   Why did you stop?

14      This is my assistant.

15            THE WITNESS:   I understand, I

16      know.

17            MR. MCCORD:   Read back her

18      answer.

oct 4 17(1)a.txt

19          [The requested portion of the

20      record was read.]

21  EXAMINATION

22  BY MR. MCCORD:

23      Q.    He kind of stuck what, finish

24  your sentence?

25      A.    Stuck with the money.  He didn't

116

1                J. Nadelson

2  have to refinance, if he wouldn't want to

3  buy the building.  He could of gone with a

4  better rate, less payments and everything.

5  And he paid off not $202,000; it was not

6  that he paid, they --

7          MR. RINALDI:  Refinanced?

8      A.    -- closing fees all the closing

9  fees was about 200-something thousand

10  dollars.

11      Q.    Are you aware that Mr. Choudhary

12  paid $30,000 in fees related to getting

13  his property refinanced, you know, for his

14  property?

15      A.    To whom?

16      Q.    To either a lender or related

17  party, are you aware of that?

18      A.    He paid $30,000, yes.

19      Q.    To whom?

20      A.    To, I don't know.  Which one was

21  before the last one?  E. R. E. G., no, I

Page 103

oct 4 17(1)a.txt

22    don't.

23        Q.    I'll leave a space in the

24    transcript, please fill it in.

25    (Insert)_____

117

1                J. Nadelson

2    _____.

3        A.    You're talking about as a good

4    faith deposit or what do you call it?

5        Q.    I don't know, so that's why I'm

6    saying.

7        A.    When you go to a lender, they

8    want a fee upfront for, I don't know what

9    for.

10        Q.    He paid $30,000?

11        A.    He did.  I believe he did, but I

12    don't know what happened.

13        Q.    Did he get it back?

14        A.    I have no idea.

15            (Continued on the next page to

16        accommodate the jurat.)

17

18

19

20

21

22

23

24

25

oct 4 17(1)a.txt

1              J. Nadelson

2              MR. MCCORD:  All right.  We will

3       break now.

4           Off the record.

5           [Discussion held off the

6       record.]

7           (Time noted:  12:55 p.m.)

8

9              _____

10             JANE J. NADELSON

11

Sworn and Subscribed

12

this_____day of _____, 2017.

13

14

15    _____

16      Notary Public

17

18

19

20

21

22

23

24

25

oct 4 17(1)a.txt

1

2          C E R T I F I C A T E

3

4    STATE OF NEW YORK      )

5                          : ss.

6    COUNTY OF NEW YORK     )

7          I, SUSAN ADAMS , a Shorthand

8    Reporter and Notary Public within and for

9    the State ofNew York, do hereby certify:

10          That JANE J. NADELSON, the

11    witness  whose deposition is hereinbefore

12    set forth, was sworn and that such

13    deposition is a true record of the

14    testimony given by such witness.

15          I further certify that I am not

16    related to any of the parties to this

17    action by blood or marriage; and that I

18    am in no way interested in the outcome of

19    this matter.

20          IN WITNESS WHEREOF, I have

21    hereunto set my hand this 4th day of

22    October, 2017.

23

          _____

24

          SUSAN ADAMS

25

                                        120

1

2    ------------------ I N D E X ------------------

3    WITNESS          EXAMINATION BY      PAGE

4    JANE NADELSON    Mr. Mccord      4,112,115
                    Page 106

oct 4 17(1)a.txt

```
 5                    Mr. Rinaldi     112,115
 6
 7      ----------- INFORMATION REQUESTS --------------
 8      (INSERT):  47,104,117
 9      REQUESTS:   (None)
10
11      ------------------ EXHIBITS --------------------
12      NADELSON                         FOR ID.
13       Exhibit 1, document captioned    31
14       "Declaration of Mohammad
15       Choudhary"
16       Exhibit 2, "Declaration of       37
17       Boysin Lorick"
18       Exhibit 3, document              49
19       Exhibit 4, notice of the hearing 57
20       for a motion for an order
21       Exhibit 5, New York City         66
22       Buildings document issued July
23       29, 2013 to Mohammad Choudhary
24
25
```

♀

                                                              121


```
 1
 2                    INDEX (Continued)
 3      ------------------ EXHIBITS --------------------
 4      NADELSON                         FOR ID.
 5       Exhibit 6, transcript of the     66
 6       auction that took place on
 7       August 22, 2017
```

oct 4 17(1)a.txt

8    Exhibit 7, document captioned,    74

9    "Voluntary Petition For

10   Individuals Filing Bankruptcy"

11   Exhibit 8, document               107

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                        122



1

2              ERRATA SHEET
         VERITEXT/NEW YORK REPORTING, LLC
3    DATE OF DEPOSITION:   OCTOBER 4, 2017
     WITNESS' NAME: JANE J. NADELSON
4
     PAGE/LINE(S)/     CHANGE        REASON
5    ____/_____/_____/_____
     ____/_____/_____/_____
6    ____/_____/_____/_____
     ____/_____/_____/_____
7    ____/_____/_____/_____
     ____/_____/_____/_____
8    ____/_____/_____/_____
     ____/_____/_____/_____
9    ____/_____/_____/_____
     ____/_____/_____/_____
10   ____/_____/_____/_____
     ____/_____/_____/_____
11   ___/_____/_____/_____
     ___/_____/_____/_____

oct 4 17(1)a.txt



12
13
14
15
16
17
18

19

20            JANE J. NADELSON

21  SUBSCRIBED AND SWORN TO
    BEFORE ME THIS_____DAY
22  OF_____, 2017.

23            NOTARY PUBLIC

24  MY COMMISSION EXPIRES_____

25