UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
In re:

                                       Chapter 11

Boysin Ralph Lorick and
Cynthia Theresa Lorick,

                                       Case No. 16-45645-NHL

                    Debtors.
-----------------------------------------------------------X

## MOTION FOR APPOINTMENT OF CHAPTER 11 TRUSTEE, OR, ALTERNATIVELY, CONVERSION TO CHAPTER 7

Wells Fargo Bank, N.A., as Trustee for the registered holders of Sovereign Commercial mortgage Securities Trust, 2007-C1, Commercial Pass-Through Certificates, Series 2007-C1 (the "Lender"), a secured creditor of the above-captioned debtors (the "Debtors"), submits this motion (the "Motion") for entry of an order, pursuant to section 1104 of chapter 11 of title 11, United States Code (the "Bankruptcy Code") appointing a chapter 11 trustee in this case. In support of the Motion, the Lender shows the Court as follows:

### JURISDICTION

1.      The Court has jurisdiction over the Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b). Venue of this chapter 11 case (the "Chapter 11 Case") in this District is proper under 28 U.S.C. §§ 1408 and 1409.

### BACKGROUND

2.      On December 15, 2016 (the "Petition Date"), the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.[1] The Debtors have continued as debtors and

---

[1] The chapter 11 petition was the Debtors' second bankruptcy petition filed within six months. On July 20, 2016, the Debtors filed a voluntary chapter 13 petition through then-counsel Frank Wharton, Esq. Case No. 16-43194-nhl. The Debtors' chapter 13 case was dismissed on October 11, 2016, because the Debtors' noncontingent, liquidated, secured debts exceeded the $1,149,525 limit for eligibility under chapter 13 pursuant to section 109(e) of the Bankruptcy Code.

debtors-in-possession in the operation of their business pursuant to sections 1107 and 1108 of the Bankruptcy Code. No committee of unsecured creditors has been appointed.

3.      On or about September 13, 2005, Independence Community Bank, the Lender's predecessor-in-interest, made a loan to the Debtors in the original principal amount of $2,250,000.00. The loan was secured by a first mortgage on the 3126 Coney Island Avenue, Brooklyn, New York 11235 (the "Property").

4.      The Debtors do not conduct any substantial business on the Property other than the business of operating the Property and activities incidental thereto.

5.      On January 30, 2013, the Lender acting by and through Waterstone Asset Management LLC, its sub-special servicer, commenced an action to foreclose the first mortgage on the Property in the Supreme Court for the State of New York, County of Kings (the "Receiver Court"), Index Number 500469/2013 (the "Foreclosure Action").

6.      On June 3, 2016, the Receiver Court entered an Amended Final Judgment of Foreclosure and Sale, providing for the scheduling of a foreclosure sale by Lender and noting that Lender was owed more than $3,668,619.69.[2] Douglas Rosenberg (the "Receiver") was appointed receiver in the Foreclosure Action by order dated April 2, 2013. The Debtors repeatedly obstructed the Receiver during the course of the Foreclosure Action. Debtor Boysin Lorick failed to confirm the Property's rent rolls for the Receiver, converted over $36,762.89 in tenant security deposits,[3] and failed to return the security deposits to the Receiver, notwithstanding being ordered to do the same. On October 15, 2015, the Receiver Court adjudged Boysin Lorick to be in contempt of

---

[2] The amount owing to the Lender has increased since the entry of the judgment. On at least three occasions, the Debtors have requested a payoff letter. The Lender's counsel has provided those to the Debtors. However, the Debtors have been unwilling or unable to pay off the Lender.

[3] *See Transcript of October 9, 2015 Hearing in Foreclosure Action* at 90 (relevant excerpts of which are attached hereto as **Exhibit G**) ("[t]here are no security deposits. Mr. Lorick spent [the security deposits].").

2

court for his failure to comply with orders in the Foreclosure Action.  See Order, Foreclosure Action (Oct. 15, 2015) (a true and correct copy of which is attached hereto as **Exhibit A**) (the "October 15th Contempt Order").

*a.  Sale of the Property in the Chapter 11 Case*

7.      On June 9, 2017, the Debtors filed a *Motion for an Order Pursuant to Sections 105(a) and 363 of the Bankruptcy Code (i) Approving Bidding Procedures and Certain Terms and Conditions of Sale, (ii) Scheduling the Deadline for an Auction and Hearing Date, and (iii) Authorizing Sale of Real Property "As Is" and "Where Is", Free and Clear of All Liens, Claims, Encumbrances, and Interests* [Dkt. No. 67] (the "Sale Motion") seeking to sell the Property.  On July 25, 2017, the Court entered an order approving the sale procedures proposed under the Sale Motion (the "Sale Procedures Order") and scheduling an auction for August 22, 2017 at 11:00 a.m.

8.      Less than one day prior to the auction, the Debtors filed an Emergency Motion to Adjourn the auction (the "Emergency Motion") on the basis that the Debtors had obtained alleged financing for the Property from Mohammad Choudhary ("Choudhary"), a friend of the Debtors. [Dkt. No. 80].  The Court denied the relief requested by the Debtors and ordered that the auction would proceed in accordance with the Sale Procedure Order.  [Dkt. No. 82].  An auction was held on August 22, 2017.

9.      A hearing on the Sale was held by the Court on August 24, 2017.  By Order dated September 8, 2017 (the "Sale Confirmation Order"), the Court approved Soleyman Ghalchi as the successful bidder with a bid of $7.35 million and Jack Geula as the backup bidder with a bid of $6.95 million for the sale of the Property (the "Sale") [Dkt. No. 95].

10.      During a hearing held on October 26, 2017, the Court directed Debtor Boysin Lorick to turn over to Ghalchi's counsel any and all Property leases and related documents in

3

Debtor Boysin Lorick's control.   The Court head a hearing on November 2, 2017, and it was reported that Debtor Boysin Lorick had not complied with the Court's order to turn over the Property leases and related documents.   At the November 2nd hearing, and by Order dated November 3, 2017, the Court again directed Debtor Boysin Lorick to turn over to the purchaser's counsel any and all Property leases and related documents in Debtor Boysin Lorick's control by November 6, 2017.  [Dkt. No. 155].  At a hearing held on November 7, 2017, it was reported that Debtor Boysin Lorick had still not complied with the Court's orders directing him to turn over the documents.

11.     As reported at the hearing on November 2, 2017, the Sale was scheduled to close during the afternoon of November 7, 2017.  At the hearing before the Court on November 7, 2017, the Court ordered that the Debtors appear at the closing that afternoon and directed them to execute all necessary documents to close the Sale.

12.     At the November 7, 2017 scheduled closing, Debtor Boysin Lorick appeared without Debtor Cynthia Lorick.   The Debtors' counsel of record, Norma E. Ortiz, Esq., the purchaser, and the purchaser's counsel also appeared.   Debtor Boysin Lorick refused to close the Sale without his proposed counsel, Karamvir Dahiya,[4] who was allegedly out of the country [**Exhibit B**, Closing Tr. 5:18-23] (Ms. Ortiz:  "But I think, Mr. Lorick, am I correct in saying that you will not execute the [quit] claim deed today?  Is that correct?  Mr. Lorick:  Right, because I don't have representation.").

---

[4] On November 1, 2017, Dahiya Law Offices, LLC filed an Application for Entry of an Order Approving its Retention as Counsel for the Debtors ("Dahiya Retention Application") [Dkt. No. 150].  The presentment date for the Dahiya Retention Application is November 20, 2017 at 12:00 p.m.

4

***b. District Court Action***

13.     Prior to the scheduled closing, on October 27, 2017, the Debtors filed an action (the "District Court Action") in the United States District Court for the Eastern District of New York against Bankruptcy Judge Nancy Hershey Lord and Debtors' counsel of record, Norma E. Ortiz. *See Lorick v. Lord,* 17-cv-06307-ENV-JO.  On October 30, 2017, the Debtors filed an emergency request to stay all proceedings in this chapter 11 case (the "Emergency Request") [*Lorick v. Lord,* Dkt. No. 4].  Construing the Debtors' emergency request as a request for a temporary restraining order or a writ of mandamus petition, the District Court issued an opinion (the "November 2, 2017 Order") denying both requests for relief and casting doubt on whether the District Court had jurisdiction to entertain the balance of the complaint [*Lorick v. Lord*, Dkt. No. 6].

14.     The Debtors filed an order to show cause for a preliminary injunction and a temporary restraining order on November 2, 2017 seeking to prevent the defendants from selling the Property. [*Lorick v. Lord*, Dkt. No. 7].  The District Court construed the Debtors' order to show cause as a motion for reconsideration of the November 2, 2017 Order (the "First Motion to Reconsider") and denied the First Motion to Reconsider by text order because the Debtors did not make a sufficient showing under the standard for reconsideration.  [*See Lorick v. Lord,* text order dated November 2, 2017].

15.     Not to be deterred, on November 3, 2017, the Debtors filed a letter apparently complaining about their representation in this case, which the District Court construed as a second motion to reconsider its November 2, 2017 Order (the "Second Motion to Reconsider").  On November 8, 2017, the District Court denied the Second Motion to Reconsider, finding again that the Debtors failed to meet their burden.  [*See Lorick v. Lord,* text order dated November 8, 2017].

5

16.     The Debtors have now sought an interlocutory appeal from the District Court

Action.  [*See Lorick v. Lord,* Dkt. No. 11].[5]

## **ARGUMENT**

17.     Section 1104 of the Bankruptcy Code Provides:

(a) At any time after the commencement of the case but before confirmation
of a plan, on request of a party in interest or the United States trustee, and
after notice and a hearing, the court shall order the appointment of a trustee –

(1) for cause, including fraud, dishonesty, incompetence, or gross
mismanagement of the affairs of the debtor by current management, either
before or after the commencement of the case, or similar cause, but not
including the number of holders of securities of the debtor or the amount of
assets or liabilities of the debtor; or

(2) if such appointment is in the interests of creditors . . . and other interests
of the estate, without regard to the number of holders of securities of the
debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104(a).

18.     The Lender asserts that cause exists for the appointment of a chapter 11 trustee and

that the appointment of such a trustee is in the best interests of the Debtors' estate and creditors

under section 1104 of the Bankruptcy Code as a result of the Debtors' continuing, pre- and post-

petition efforts to prevent the sale of the Property and to delay any meaningful reorganization.

Cause further exists as a result of the Debtors' lack of candor to the Court and unauthorized use of

estate funds.

19.     A debtor in possession owes fiduciary duties to the bankruptcy estate, including "a

duty of care to protect assets, a duty of loyalty and a duty of impartiality."  *In re Bowman,* 181

B.R. 836, 843 (Bankr. D. Md. 1995).  "To fulfill its duty of loyalty, a debtor in possession must

---

[5] The Debtors did not identify what ruling they are appealing in the notice of appeal but based on their other filings,
it is clear that the Debtors intend to continue to collaterally attack the Sale Confirmation Order.

'avoid self-dealing, conflicts of interest and the appearance of impropriety.' " *In re Eurospark Industries, Inc.*, 424 B.R. 621, 627 (Bankr. E.D.N.Y. 2010) (quoting *Bowman,* 181 B.R. at 843). When determining whether cause exists under section 1104(a)(1) of the Bankruptcy Code, the court may assess both pre- and post-petition behavior of the debtor. *Schuster v. Dragone,* 266 B.R. 268, 272 (Bankr. D. Conn. 2001).

20.    Courts have identified conflicts of interests held by the debtor's management and creditors' lost confidence in the debtor's management as cause for appointing a chapter 11 trustee. *See, e.g., In re Marvel Entm't Grp.*, 140 F.3d 463, 474 (3d Cir. 1998); *In re Sundale, Ltd.,* 400 B.R. 890, 909-10 (Bankr. S.D. Fla. 2009); *In re Patman Drilling Int'l, Inc.*, No. 07-34622, 2008 WL 724086, at *6 (N.D. Tex. Mar. 14, 2008); *Euro-Am Lodging,* 365 B.R. 421, 428-32 (Bankr. S.D.N.Y. 2007); *In re Cajun Elec. Power Coop., Inc.,* 191 B.R. 659, 663 (M.D. La. 1995); *In re Ionosphere Clubs, Inc.,* 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990); *In re Nautilus of N.M., Inc.,* 83 B.R. 784, 789-90 (Bankr. D.N.M. 1988).

21.    With respect to the best interests of creditors and the estate, this court has opined that:

> [w]hen deciding whether relief under section 1104(a)(2) is warranted a court will consider:
>
> (i) the trustworthiness of the debtor;
>
> (ii) the debtor in possession's past and present performance and prospects for the debtor's rehabilitation;
>
> (iii) the confidence – or lack thereof- of the business community and of creditors in present management; and
>
> (iv) the benefits derived by the appointment of a trustee, balanced against the cost of appointment.

*Eurospark Industries, Inc.,* 424 B.R. at 627.

7

22.     However, the standard under section 1104(a)(2) is flexible and the court should consider the practical realities and necessities of the case.  *Id.* (citations omitted); *see In re Taub*, 427 B.R. 208 (E.D.N.Y. 2010) (chapter 11 trustee appointed, pursuant to section 1104(a)(2) of the Bankruptcy Code, twenty-one months following the petition date where debtor did not file a plan, made no meaningful progress toward reorganization, retained multiple attorneys, and animosity with creditors existed).

23.     As noted above, the Debtors have failed to comply with multiple orders of this Court, including the Court's orders to close the Sale and the Court's directive to turn over all leases related to the Property to the purchaser's counsel, as well as the prepetition orders issued in the Foreclosure Action.  The Debtors are engaged in ongoing disputes with their counsel of record. The Debtors now seek to retain new counsel, who, in conjunction with the Debtors, has already attempted to collaterally attack the Sale.  In a letter dated November 1, 2017, Mr. Dahiya improperly attempted to move this Court, by letter and prior to any Court-approved retention of the Dahiya Law Offices LLC as the Debtors' counsel, for a cancellation of the Sale, dismissal of the case, and a suspension of all proceedings in this case, if the Court did not dismiss the case. [Dkt. No. 151].

24.     The appointment of a chapter 11 trustee will allow this case to move forward instead of being stalled by noncompliant Debtors, who, by all indications, will continue their pattern of defiance of this Court's Orders in an attempt to prevent the Sale.  A trustee should be appointed to step into the shoes of the Debtors and to fulfill any outstanding obligations of the Debtors under the Sale Order, the Sale Confirmation Order, and any other orders of this Court.  A

chapter 11 trustee would be disinterested and would be better able to deal with the parties impartially to effectively and efficiently achieve a resolution to this chapter 11 case.

25.     Throughout the Foreclosure Action and this chapter 11 case, certain behavior of the Debtors has come to light that reflects the Debtors' inability to maintain their debtor in possession status and further supports a finding of cause and the appointment of a chapter 11 trustee.  During the Foreclosure Action, Debtor Boysin Lorick converted over $36,762.89 in tenant security deposits and failed to turn over the security deposits to the Receiver, notwithstanding being ordered to do the same.  *See* **Exhibit G** at 90 ("[t]here are no security deposits.  Mr. Lorick spent [the security deposits].")

26.     In 2014, the Debtors received a check from the Brownstone Agency, Inc., NY on behalf of Aspen American Insurance Company in the amount of $153,356.02 payable to Boysin Lorick, Wells Fargo Bank, N.A. as Trustee, Douglas Rosenberg, Sovereign Bank, Berkadia Commercial Mortgage, LLC, as Master Servicer, and the New York Adjustment Bureau, Inc. as insurance settlement proceeds following a fire at the Property.  *See* **Exhibit C**, October 5, 2017 Hearing Tr. 202:9-22, Martha De Jesus Testimony; **Exhibit D**, October 6, 2017 Hearing Tr. 89:18-23, 90:16-92:21, Boysin Lorick Testimony.[6]  A copy of the check is attached hereto as **Exhibit E**. The Debtors failed to schedule the $153,356.02 insurance check.  Debtor Boysin Lorick testified that he intends to use the check to pay his prior bankruptcy counsel, Frank Wharton.  *See* **Exhibit D**, October 6, 2017 Hearing Tr. 89:18-23, 90:16-92:21, Boysin Lorick Testimony.

27.     The Debtors also failed to disclose a $25,000 payment made post-petition to Choudhary to reimburse Choudhary for expenses he incurred while seeking financing for the

---

[6] The check is currently being held by Debtors' former bankruptcy counsel, Frank Wharton.

US2008 13569623 3

Property.  Debtor Cynthia Lorick testified that she listed the payment as $2,500 for "legal fees" on the Debtors' July 2017 monthly operating report [Dkt. No. 79].[7]  [**Exhibit D**, October 6 Hearing Tr. 77:20-78:14].  Debtor Boysin Lorick testified that he gave Choudhary a check for $25,000 around July 2017 for the expenses Choudhary incurred while seeking financing for the Property. [October 6 Hearing Tr. 97:1-11; 98:2-9].

28.    A $25,000 payment to a debtor's friend for his "expenses" in attempting to obtain financing for a debtor cannot be considered use of property of the estate in the ordinary course of business.  Thus, the Debtors required Court approval for such a payment pursuant to section 363 of the Bankruptcy Code.

29.    The Debtors have shown that an inherent conflict of interest exists between the Debtors' personal interests and their duties as fiduciaries to the estate.  The Debtors continue to seek financing for the Property without success.  In pursuit of this endeavor, the Debtors have dissipated at least $25,000 of which the Lender and this Court are aware.  The Debtors have repeatedly contested the Sale.  The Debtors continue to put their interests above their duties as fiduciaries to this estate and their creditors.  "[T]he higher duty of the debtor as trustee/fiduciary must take precedence over the more self-interested concerns of the debtor . . ." *Bowman,* 181 B.R. at 844.

30.    Further, it is clear that the Debtors have not accurately reflected their assets and liabilities and continuing income and expenses each month on at least two occasions.  The estate continues to be diminished by the Debtors' noncompliance and recalcitrance.  As the Debtors

---

[7] The bank statements attached to the July 2017 monthly operating report reflect a $2,500 check dated July 18, 2017. The Debtors testified that TD Bank made an error, and the check was actually in the amount of $25,000.  The Debtors' August monthly operating report reflects that the payment was, in fact, for $25,000.  [Dkt. No. 146 at 18] ("CHECK #1092678 POSTED AS $2,500.00 SHOULD BE $25,000.00.").

continue to prevent the closing of the Sale, they have shown no efforts to make any progress toward a plan of reorganization nearly a year into this chapter 11 case and 16 months since the filing of the Debtors' chapter 13 case.  A chapter 11 trustee would be able to close the Sale and proceed with administering the remainder of this case, including recovering the insurance proceeds, recovering improper payments to Mr. Choudhary, and distributing the proceeds of the Sale to creditors.

31.     If past behavior is any indication, the Debtors will continue their pattern of defying court orders, collaterally attacking the Sale with the assistance of their proposed counsel, mismanaging the Property, converting property of others, and failing to use the Property for the benefit of creditors of the estate.  It is in the best interests of creditors and the estate to appoint a chapter 11 trustee to oversee this case as the Debtors have shown that they are incapable of achieving an effective reorganization.  Alternatively, this case should be converted to a case under chapter 7.[8]

## CONCLUSION

The above-described behavior of the Debtors and status of this case call out for the appointment of a chapter 11 trustee to consummate the Sale and lead this case to an effective resolution, whether that be reorganization or liquidation.  Although the Lender filed a motion to dismiss on March 23, 2017 [Dkt. No. 51] (the "Motion to Dismiss"), which is still pending, the Lender believes, following the recent events in this case and the revelations regarding the Debtors' use of estate funds and failure to account for more than $153,000 in insurance proceeds, that the

---

[8] Section 1112((b)(4) provides that "cause" for conversion includes gross mismanagement of the estate, unauthorized use of cash collateral substantially harmful to one or more creditors, and failure to comply with orders of the court.  11 U.S.C. § 1112(b)(4).

appointment of a chapter 11 trustee or conversion to a chapter 7 is now in the best interests of creditors and the estate.[9]

WHEREFORE, in view of the foregoing, the Lender respectfully requests that the Court enter an order substantially in the same form as the order attached here to as **Exhibit F**: (i) granting the Motion; (ii) appointing a chapter 11 trustee; or, alternatively, (iii) converting this case to a case under chapter 7 of the Bankruptcy Code; and (iv) ordering such other and further relief as is just and proper.

Dated: November 13, 2017        Respectfully submitted,

/s/ Colin M. Bernardino
Colin M. Bernardino, Esq. (Ga. Bar No. 054879)
(Admitted *pro hac vice*)
KILPATRICK TOWNSEND & STOCKTON LLP
1100 Peachtree Street, Suite 2800
Atlanta, Georgia 30309
Telephone: (404) 815-6500
Facsimile: (404) 815-6555
Email: cbernardino@kilpatricktownsend.com

and

Keith Brandofino, Esq. (NY Bar No. KB 2128)
KILPATRICK TOWNSEND & STOCKTON LLP
31 West 52nd Street, 14th Floor
New York, New York 10019
Telephone: (212) 775-8700
Facsimile: (212) 954-5555
Email: kbrandofino@kilpatricktownsend.com

*Counsel for Wells Fargo Bank, as Trustee for the registered holders of Sovereign Commercial Mortgage Securities Trust, 2007-C1, Commercial Pass-Through Certificates, Series 2007-C1*

---

[9] The Lender does not withdraw its Motion to Dismiss and reserves its right to continue to prosecute the Motion to Dismiss depending upon the outcome of the present Motion to Appoint a Chapter 11 Trustee.

## **<u>EXHIBIT A</u>**

Contempt Order dated October 15, 2015

At an I.A.S. Trial Term, Part con-6 of the Supreme
Court of the State of New York, held in and for the
County of Kings, at the Courthouse, located at
Civic Center, Borough of Brooklyn, City and State
of New York, on the 9 day of October 2015

P R E S E N T :
Hon. Knipel
                    Justice

Wells Fargo                 Plaintiff(s)

Cal. No.
Index No. 500469/13

- against -

Boysin Lorick et al
                            Defendant(s)

| The following papers numbered 1 to    read on this motion | Papers Numbered |
|---|---|
| Notice of Motion - Order to Show Cause and Affidavits (Affirmations) Annexed___ Contempt motion | 1 |
| Answering Affidavit (Affirmation)___ Cross-motion | 2 |
| Reply Affidavit (Affirmation)___ reply | 3 |
| _____Affidavit (Affirmation)___ | |
| Pleadings - Exhibits___ | |
| Stipulations - Minutes___ | |
| Filed Papers___ | |

Upon the credible evidence adduced at the
evidentiary hearing held on 10/9/15, defendant
Boysin Lorick is adjudged in Contempt of Court.
See minutes of hearing for the reasoning of the court.
Cynthia Lorick is not in contempt. Cross motion is denied.
This case is adjourned to 11/6/15 for imposition of penalty,
which may include a term of incarceration.

For Clerks use only
MG √
MD      √
Motion Seq. #
8   9

E N T E R
                    J.S.C.

EJV-rev 11-04

HON. LAWRENCE KNIPEL
SUPREME COURT JUSTICE

# **EXHIBIT B**

Relevant Portions of November 7, 2017 Scheduled Closing Transcript

```
 1

 2    UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF NEW YORK
 3    -------------------------------------------X
      SOLEYMAN GHALCHI,
 4
                              BUYER,
 5
                  -against-        Index No.:
 6                                 1-16-45645-NHL

 7    BOYSIN RALPH LORICK and
      CYNTHIA THERESA LORICK,
 8
                              DEBTORS.
 9    -------------------------------------------X

10

11                  DATE: November 7, 2017

12                  TIME: 3:40 P.M.

13

14

15                  STATEMENT in the above-entitled

16    matter, held at the offices of Ortiz &

17    Oritz, LLP, 32-72 Steinway Street, Suite

18    402, Astoria, New York 11103, before Kevin

19    Haghnazari, a Notary Public of the State of

20    New York.

21

22

23

24

25
```

```
 1
 2    A P P E A R A N C E S:
 3
 4    ELAZAR ARYEH, PC.
         Attorney for the Buyer
 5    SOLEYMAN GHALCHI
         110-20 71st Road, Suite 110
 6    Forest Hills, New York 11375
         BY: ELAZAR ARYEH, ESQ.
 7    elie@aryehlaw.com
 8
 9
10    ORTIZ & ORTIZ, LLP
         Attorneys for the Debtors
11    BOYSIN RALPH LORICK and
         CYNTHIA THERESA LORICK
12    32-72 Steinway Street, Suite 402
         Astoria, New York 11103
13    BY: NORMA ORTIZ, ESQ.
                  -and-
14         MARTHA J. DE JESUS, ESQ.
         emal@ortizandortiz.com
15
16
17
      ALSO PRESENT:
18         AVIV GHALCHI - Buyer's Son
19
20                        *           *
21
22
23
24
25
```

```
  1                    PROCEEDINGS
  2              MS. ORTIZ:  Judge Lord.  Oh my
  3         goodness.  Can I strike that?
  4              MR. ARYEH:   Lord.  I did the
  5         same thing.
  6              MS. ORTIZ:  Judge Lord did
  7         direct Mr. and Mrs. Lorick to appear
  8         today, but I've explained the
  9         circumstances that I've been
 10         informed; and I've also asked
 11         Mr. Lorick to speak on his own
 12         behalf.  Whatever he wants to say, he
 13         had asked me to say some things; and
 14         I think since he's here he should
 15         place his statement on the record,
 16         and then, Mr. Aryeh, whatever you
 17         want, you can place on the record.
 18              But I think, Mr. Lorick, am I
 19         correct in saying that you will not
 20         execute the quick claim deed today?
 21         Is that correct?
 22              MR. LORICK:  Right, because I
 23         don't have representation.
 24              MS. ORTIZ:  Okay.  Do you want
 25         to make your statement for this
```

6

```
 1                    PROCEEDINGS
 2        gentleman so that he could --
 3             MR. LORICK:  My name is Boysin
 4        Lorick and my statement is that, your
 5        Honor, Judge Lord, you asked my
 6        attorney to step down and tell him
 7        you make him qualified or available
 8        to become my attorney, and I respect
 9        that.  And I do respect also that you
10        give me an opportunity to represent
11        myself in any way, and I think I
12        still have those representation and I
13        ask respectfully for me to do have
14        those respect -- those
15        representation.
16             And since he's coming back on
17        Monday and my wife have therapy on
18        Tuesdays and Thursdays, I would like
19        to have a court hearing, and then we
20        set a date for the closing.
21             MS. ORTIZ:  I would like to
22        say, Mr. Lorick, that Judge Lord
23        adjourned all hearings to
24        November 17th, next Friday.  However,
25        there may be motions filed by people
```

```
1                    PROCEEDINGS
2         based upon that, right now, I'm going
3         to direct to not respond to you.  I
4         know that we responded to that
5         question to you many times, but
6         that's not what we're here for,
7         right?  We're here about the closing,
8         and you brought your suit and that
9         can be heard in a different place,
10        okay?
11             Anything about this closing
12        that you want to say, other than what
13        you've said?
14             MR. LORICK:  Well, I think from
15        the record, I wasn't, I wasn't
16        represented properly, and I was
17        misrepresented and underrepresented
18        by my attorneys and I would like to
19        look deeper into this before any
20        closing takes place.  I appreciate
21        your concern and my concern, so that
22        we can look into it and see if there
23        were mistakes made, because I don't
24        think people's property should be
25        taken away from them because of
```

```
 1                    PROCEEDINGS
 2         underrepresentation and
 3         misrepresentation.
 4              This, I felt very strongly of,
 5         and I think it should be taken care
 6         of before you go forward.
 7              MS. ORTIZ:  Okay.  Mr. Aryeh?
 8              MR. ARYEH:  Mr. Lorick, you do
 9         understand that Ms. Norma Ortiz is
10         still your attorney of record,
11         correct?
12              MR. LORICK:  She said she
13         wasn't, so --
14              MR. ARYEH:  It's a yes or no.
15         Sir, do you understand that as per
16         court's order, Ms. Norma Ortiz is
17         still your attorney of record?
18              MR. LORICK:  No, I don't.
19              MR. ARYEH:  Were you present
20         last week at the court hearing before
21         Judge Lord, where she indicated that
22         she will not sign any documents that
23         is not before her by Mr. Karam
24         Dahiya, your purported attorney,
25         until such time as Mr. Dahiya has
```

```
 1                   PROCEEDINGS
 2           filed documents to be your attorney;
 3           were you there for that?
 4                 MR. LORICK:  I don't understand
 5           the process.  So, I can't say
 6           anything else.
 7                 MR. ARYEH:  Were you present at
 8           court last week?
 9                 MR. LORICK:  Yes, I was.
10                 MR. ARYEH:  Okay.  Did you hear
11           Judge Lord directing you to provide
12           us, the buyer, with leases that has
13           to do with the property located 3126
14           Cony Island Avenue?
15                 MR. LORICK:  No, I don't want
16           to answer any question anymore.
17                 MR. ARYEH:  I'm sorry?
18                 MR. LORICK:  No.
19                 MS. ORTIZ:  Why don't you just
20           make your statement about the
21           closing, because if he feels that
22           he's --
23                 MR. LORICK:  Wait until my
24           attorney is here.  I am not
25           represented yet, so I don't want to
```

| | |
|---|---|
| 1 | PROCEEDINGS |
| 2 | answer anything. |
| 3 | MR. ARYEH: Okay. So, we were |
| 4 | ordered by Judge Lord, the bankruptcy |
| 5 | court judge presiding over this |
| 6 | chapter 11 petition filed by the |
| 7 | debtors/sellers, Mr. & Mrs. Lorick, |
| 8 | to appear for the closing today in |
| 9 | connection with the purchase of the |
| 10 | property located at 3126 Coney Island |
| 11 | Avenue, Brooklyn, New York. |
| 12 | Currently it is 3:50, |
| 13 | approximately, and Mr. Lorick is here |
| 14 | without his wife, Mrs. Lorick. The |
| 15 | buyer and myself, the attorney for |
| 16 | the buyer, are present at the Law |
| 17 | Office of Ortiz & Ortiz, which is |
| 18 | still the seller's attorney on record |
| 19 | and my client is ready, willing, and |
| 20 | able to move forward with the closing |
| 21 | and to consummate the purchase of the |
| 22 | property. |
| 23 | I mentioned before and to |
| 24 | further pay the remainder of the |
| 25 | purchase price by a bank check to the |

| | |
|---|---|
| 1 | PROCEEDINGS |
| 2 | order of Ortiz & Ortiz. However, |
| 3 | since Mrs. Lorick is not here and |
| 4 | Mr. Lorick has indicated he will not |
| 5 | sign any documents, we cannot move |
| 6 | forward with the closing. Mr. Lorick |
| 7 | and Mrs. Lorick will not be |
| 8 | delivering their required deed and |
| 9 | the necessary documents to us today. |
| 10 | As such, it was clear that, |
| 11 | one, the debtors have defaulted in |
| 12 | moving forward with the sale as one |
| 13 | of -- as -- since Mrs. Lorick has not |
| 14 | appeared for the scheduled closing |
| 15 | and even though Mr. Lorick is here, |
| 16 | he refuses to sign and does not have |
| 17 | power of attorney from Mrs. Lorick to |
| 18 | sign the required deed pursuant to |
| 19 | the terms of the memorandum of sale |
| 20 | and terms and conditions of sale. |
| 21 | Two, the debtors have failed to |
| 22 | transfer title regarding the subject |
| 23 | property pursuant to memorandum of |
| 24 | sale and terms and condition of sale, |
| 25 | and therefore, they have failed to |

```
 1                    PROCEEDINGS
 2         deliver insurable title as required
 3         by the memorandum of sale and terms
 4         and condition of sale on the date of
 5         the closing, which is today,
 6         November 7th, 2017.
 7              Three, the debtors have failed
 8         to turn over any of the leases for
 9         the 38-unit apartments located at
10         3126 Coney Island Avenue, Brooklyn,
11         New York, pursuant to two court
12         orders.
13              Four, the buyers will no longer
14         be responsible for any fees or costs
15         associated with the property,
16         including, but not limited to
17         interest on the purchase price at a
18         nine percent annual fee.
19              And four -- I mean five.  I'm
20         sorry.  The extension of time to
21         close -- I'm sorry.  Since the
22         closing is not going to take place
23         today for the reasons I have just
24         mentioned, I believe that we will be
25         entitled to the return of buyer's
```

```
 1                    PROCEEDINGS
 2          down payment currently held by
 3          Ms. Norma Ortiz.
 4               We do have a hearing scheduled
 5          on November 17th, 2017 before Judge
 6          Lord, and as such, if Judge Lord
 7          would like this to be closed on
 8          November 17th, 2017, we will be
 9          ready, willing, and able to do so on
10          that date.
11               We are not adjourning this
12          closing whatsoever.  We believe the
13          buyer -- the sellers are default,
14          however, we will wait until
15          November 17th, 2017, and we'll extend
16          the closing until such date unless
17          otherwise ordered by court.
18               MR. GHALCHI:  We have the
19          copies of the checks.
20               MS. ARYEH:  All parties are
21          here for the closing.  We do have
22          bank checks, a copy will be shown to
23          Ms. Ortiz, showing that the checks
24          are available and ready for today's
25          closing.
```

| | |
|---|---|
| 1 | PROCEEDINGS |
| 2 | Just a quick note that |
| 3 | Mr. Lorick just indicated a few |
| 4 | minutes ago that he will wait until |
| 5 | Mr. Karam Dahiya to come back from |
| 6 | wherever he is in order to be able to |
| 7 | move forward to close. |
| 8 | I'm not sure if that means that |
| 9 | he is contemplating to actually close |
| 10 | in this matter, or he is just stating |
| 11 | that he will close, but his intention |
| 12 | is to wait and see what happens with |
| 13 | regards to the action he has brought |
| 14 | against various parties. I'm not |
| 15 | sure exactly what that means. If |
| 16 | Mr. Lorick would like to clarify, he |
| 17 | can. If not, then, we'll just move |
| 18 | forward with that. |
| 19 | MR. LORICK: I have something |
| 20 | to say. |
| 21 | MS. ORTIZ: I think in terms of |
| 22 | who you're going to speak to, and |
| 23 | then, inform your parties of your |
| 24 | course of action, okay? Right now, I |
| 25 | don't think you need to elaborate -- |

```
 1                    PROCEEDINGS
 2              MR. LORICK:  I need to
 3         elaborate a little bit.
 4              MS. ORTIZ:  Okay.
 5              MR. LORICK:  Your Honor, you
 6         have executed an auction which would
 7         have had a big gathering in a
 8         hotel-type setting, and that would
 9         have brought me probably a better
10         deal and that wasn't carried out; and
11         this, this type of, of auction is --
12         that's more for just two legal people
13         in that auction.  There's no way that
14         I can raise the right amount of money
15         and that's a wrongful auction, and
16         that's a Ponzi scheme in a court, and
17         I will stand up to that, because it
18         was a Ponzi scheme-type setup and it
19         should be redone.
20              It's an action that should be
21         redone the way you had explained it,
22         and you did write that there was a
23         timeline set up for all of this and
24         the timeline was never explained and
25         carried out properly.
```

| | |
|---|---|
| 1 | PROCEEDINGS |
| 2 | It was -- I was short with time |
| 3 | to get this done, and I couldn't and |
| 4 | after I ask for an extension, it |
| 5 | wasn't given to me. |
| 6 | So, I think and I do need, and |
| 7 | I should be given the proper timing |
| 8 | and the consideration for this |
| 9 | property to be sold properly. If you |
| 10 | want to sell it or you want to give |
| 11 | it back to me, I'll give both |
| 12 | options, but the option is that there |
| 13 | should be the auction that you |
| 14 | described. It wasn't anything close |
| 15 | to it, and it should be redone. |
| 16 | Thank you very much, your Honor. |
| 17 | MR. ARYEH: One last thing. We |
| 18 | have brought checks, blank checks for |
| 19 | today's closing. We have made copies |
| 20 | of those checks. We have given the |
| 21 | copies of the checks to Norma Ortiz |
| 22 | and have shown them the -- have |
| 23 | showed her the checks, the actual |
| 24 | checks as well. I just want |
| 25 | Ms. Ortiz to state on the record that |

# **EXHIBIT C**

Relevant Portions of October 5, 2017 Hearing Transcript

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    EASTERN DISTRICT OF NEW YORK

3

4    - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    BOYSIN RALPH LORICK AND

8    CYNTHIA THERESA LORICK,            Case No. 16-45645-nhl

9

10           Debtors.

11   - - - - - - - - - - - - - - - - - - - - - - - - - x

12

13                    U.S. Bankruptcy Court

14                    271-C Cadman Plaza East

15                    Brooklyn, New York 11201-1800

16

17                    October 5, 2017

18                    10:17 AM

19

20

21   B E F O R E :

22   HON CARLA E. CRAIG, CHIEF JUDGE

23   U.S. BANKRUPTCY JUDGE

24

25

1   Hearing re:  Evidentiary Hearing RE: [108] ORDERED,

2   scheduling a hearing on Ghalchi's request for relief under

3   Federal Rule of Bankruptcy Procedure 9023 (RE: related

4   document(s)[96] Motion to Authorize/Direct filed by Creditor

5   Soleyman Ghalchi).

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Dawn South, Sheila Orms, and Nicole Yawn

```
 1    A P P E A R A N C E S :

 2    ORTIZ & ORTIZ LLP

 3         Attorneys for the Debtors

 4         32-72 Steinway Street

 5         Suite 402

 6         Astoria, NY 11103

 7

 8    BY:  NORMA E. ORTIZ, ESQ.

 9         MARTHA J. DE JESUS, ESQ.

10

11    LAW OFFICES OF MARIYN MACRON, P.C.

12         Attorney for the Debtors

13         211 Beach 134th Street

14         Belle Harbor, NY 11694

15

16    BY:  MARILYN MACRON, ESQ.

17

18    LAW OFFICE OF STEPHEN L. BARRY

19         Attorney for the Debtors

20         61-43 186th Street

21         Suite 525

22         Fresh Meadows, NY 11365

23

24    BY:  STEPHEN L. BARRY, ESQ.

25
```

Page 4

1   OFFICE OF THE UNITED STATES TRUSTEE

2        Attorney for the U.S. Trustee

3        Brooklyn Office

4        U.S. Federal Office Building

5        201 Varick Street, Suite 1006

6        New York, NY 10014

7

8   BY:  NAZAR KHODOROVSKY, ESQ.

9

10  KILPATRICK TOWNSEND & STOCKTON LLP

11       Attorneys for Wells Fargo Bank, Creditor

12       1100 Peachtree Street

13       Suite 2800

14       Atlanta, GA 30309

15

16  BY:  COLIN M. BERNARDINO, ESQ.

17       THERESE REYES, ESQ.

18       KEITH MICHAEL BRANDOFINO, ESQ.

19

20  CERTILMAN BALIN ADLER

21       Attorneys for Soleyman Ghalchi

22       90 Merrick Avenue

23       East Meadow, NY 11554

24

25  BY:  RICHARD J. MCCORD, ESQ.

1        CAROL A. GLICK, ESQ.

2

3   ALSO PRESENT:

4   BOYSIN RALPH LORICK

5   CYNTHIA THERESA LORICK

6   SOLEYMAN GHALCHI

7   AVIV GHALCHI

8   MOHAMMAD CHOUDHARY

9   JANE NADELSON, ESQ.

10  JACK GEULA

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q    And the answer to --

2    A    I'd have to look at the schedules, but it shouldn't.

3    Q    And it shouldn't because you believe that he was not a

4    prepetition creditor, is that your position?

5    A    I've already testified that I had -- was not informed

6    by the debtors that Mr. Choudhary was a prepetition

7    creditor, and I didn't see any documentation in the debtors'

8    -- in the documents provided to me by the debtors that he

9    was a prepetition creditor, so I don't -- wouldn't expect to

10   see it here.

11   Q    You also testified, is it not correct, that you were

12   not informed that he was a post-petition creditor, correct?

13           MR. BARRY:  Objection, asked and answered.

14           THE COURT:  Sustained.

15   BY MR. MCCORD:

16   Q    In these schedules is there any reference to an asset

17   of a payment of funds as a result from -- from an insurance

18   company as a result of a fire at the premise in 2013?

19           MR. BARRY:  Objection, relevance.

20           THE COURT:  Overruled.

21           THE WITNESS:  Would you restate the question?

22   BY MR. MCCORD:

23   Q    Is there any reference in this exhibit, the summary of

24   assets and liabilities and related schedules, to the

25   recovery of a settlement from a fire at the subject premise,

1  3126 Coney Island Avenue, Brooklyn, New York, from an

2  insurance company?

3  A    No, there is not.

4  Q    Were you aware of the existence of a settlement?

5  A    No, not until recently.

6  Q    And when did you become aware of that?

7  A    After Mr. Lorick's deposition.

8  Q    And did you take any steps to amend any schedules after

9  you found that out?

10  A    I contacted Mr. Lorick's former counsel, Frank Wharton

11  (ph), to determine whether he was holding funds for the

12  debtor, and through email correspondence he explained that

13  there was a 2014 check that was issued to the debtors, Wells

14  Fargo, the mortgagee, and I think -- and a contractor, and

15  he just provided me with the check -- a copy of the check

16  either yesterday or the day before, and I've spoken to the

17  U.S. Trustee about amending Schedule B.  It's not clear why

18  he's holding a check since the first I learned of it was in

19  Mr. Lorick's deposition, and --

20  Q    When was that, Mr. Lorick's deposition?

21  A    Within the last week.  I can't recall.

22  Q    Was it after the sale hearing on August 24th, 2017?

23  A    Yes.

24  Q    And the discovery of this asset was after the sale

25  hearing on August 24th?

1   A    Yes.  Within the last two -- I think it was last week.

2   Q    Did you amend Schedule B?

3   A    No, I asked -- I didn't ascertain what the actual issue

4   potential asset was until yesterday.

5   Q    And what did you ascertain yesterday -- what did you

6   discover yesterday?

7   A    I just explained.

8            MR. BARRY:  Objection, asked and answered.

9            THE WITNESS:  I just answered your question.

10           THE COURT:  Sustained.

11  BY MR. MCCORD:

12  Q    Just -- you just discovered yesterday about this asset?

13  A    What it --

14           MR. BARRY:  Objection.

15           THE WITNESS:  No, what it was.

16           MR. BARRY:  Asked and answered.

17           THE COURT:  Sustained.

18           THE WITNESS:  I didn't attend Mr. Lorick's

19  deposition, so I wasn't there.

20           THE COURT:  Okay.  You know, you really should

21  respond only to questions asked, if you would, please.

22           THE WITNESS:  Yes.  I will try, Your Honor.

23           THE COURT:  Is this being -- this will be marked

24  as Ghalchi 3?  Is that correct?

25           MR. BARRY:  Four, Your Honor.

1          THE COURT:  Ghalchi 4.  Okay.  Okay.  Thank you.

2          MR. MCCORD:  Yeah.

3      (Pause)

4  BY MR. MCCORD:

5  Q    I show you what's been marked as Ghalchi 4.  Do you --

6  can you identify it?

7  A    It looks like a copy of the check that I obtained from

8  Frank Wharton, the debtors' former counsel.

9  Q    And when did you obtain it?

10          MR. BARRY:  Objection, asked and answered.

11          THE WITNESS:  I'm sorry?

12  BY MR. MCCORD:

13  Q    No, you testified about it.

14          THE COURT:  Okay.  I'm going to -- I'm sustaining

15  the objection.

16          MR. MCCORD:  Your Honor, for the record she asked

17  -- she answered about the knowledge of this occurring, but

18  she didn't -- I don't the think she testified as to when she

19  received a copy of this check.  But if you're sustaining it

20  you're sustaining it.

21      (Pause)

22          THE COURT:  Mark it as Ghalchi 5, please.

23  BY MR. MCCORD:

24  Q    I show you Ghalchi 5.  Can you identify it?

25  A    It's a copy of the application to retain my firm filed

1    obligation he wanted to be repaid for, meaning

2    Mr. Choudhary, by the debtor?

3    A    I have had no indication that this was anything other

4    than someone applying for a loan.  This transaction was done

5    so that it was -- the debtors were selling 10 percent of the

6    building in Brooklyn to somebody else, and that potential

7    buyer paid for financing.  I did not see that as indication

8    that the buyer became a creditor of the estate.

9    Q    Okay.  Take a look at Exhibit 4, please.  Should be a

10    check.

11    A    It's one page?

12    Q    Yeah.

13        (Pause)

14    Q    What is it?

15    A    It is a check from Brownstone Agency, Inc. from 2014.

16    Q    And how much is it for?

17    A    153,356.

18    Q    And who is it payable to?

19    A    It is payable to multiple parties, Boysin Lorick, Wells

20    Fargo Bank, as trustee, Douglas Rosenburg (ph), Sovereign

21    Bank, Bercita (ph) Commercial Mortgage, LLC, as master

22    servicer, and the New York Adjustment Bureau, Inc.

23    Q    Have you -- are you familiar with the circumstances

24    surrounding the issuance of this check?

25    A    No.

Page 203

1    Q    As you sit here today, you're not familiar with it?

2    A    I first saw this check yesterday.  I am not familiar

3    with the circumstances that led to this check.

4    Q    Who provided it to you yesterday?

5    A    The former attorney for the debtors, Frank Wharton.

6    Q    And was he involved with the debtors in the Chapter 13?

7    A    I believe he was the attorney of record in the Chapter

8    13 case, yes.

9    Q    And was that Chapter 13 filed in 2016?

10   A    Yes, I believe so.

11   Q    Was it dismissed?

12   A    Yes.

13   Q    Do you know when it was dismissed?

14   A    I don't remember exact dates, no.

15   Q    Was it dismissed shortly before the Chapter 11 was

16   filed in December 15th, 2016?

17   A    I do not remember the dates.

18   Q    Do you know why the Chapter 13 was filed?

19   A    I believe it was due to a foreclosure sale that was

20   scheduled.

21   Q    Was it the same foreclosure sale that was scheduled

22   that you filed a -- that your firm filed the Chapter 11 for?

23   A    I believe so.

24   Q    Stay?

25   A    I believe it was the same legal proceedings, yes.

Page 204

1    Q    Did Mr. Wharton email you or your firm the -- both

2    sides of Exhibit 4 or just the front?

3    A    I am -- don't understand your question.

4    Q    You said you received that from Mr. Wharton yesterday,

5    correct?

6    A    Yes.

7    Q    Was it endorsed?

8    A    No, I do not remember receiving anything other than

9    this page.

10    Q    Do you know if that check was negotiated?

11    A    I do not know.

12    Q    Did you discuss it with Mr. Lorick?

13    A    I did not discuss it with Mr. Lorick.

14    Q    Is it in the schedules?

15    A    We -- I do not believe it's in the schedules.

16    Q    Did there come occasion where there was an auction for

17    the property?

18    A    Yes.

19    Q    Did you participate in that auction?

20    A    I did.

21    Q    And were you at the auction on August 22nd, 2017?

22    A    I was.

23    Q    How did you participate in the auction?

24    A    I brought the documentations to the auction, and I

25    ensured that I had signed terms of sales from old bidders

# **EXHIBIT D**

Relevant Portions of October 6, 2017 Hearing Transcript

Page 1

1   UNITED STATES BANKRUPTCY COURT

2   EASTERN DISTRICT OF NEW YORK

3   Case No. 1-16-45645-nhl

4   - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   BOYSIN RALPH LORICK and

8   CYNTHIA THERESA LORICK,

9

10          Debtor.

11   - - - - - - - - - - - - - - - - - - - - - - - - - x

12

13                          United States Bankruptcy Court

14                          271-C Cadman Plaza East

15                          Brooklyn, NY 11201

16

17                          October 6, 2017

18                          10:08 AM

19

20

21   B E F O R E:

22   HON. CARLA E. CRAIG

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  J. LECKY

1    HEARING re (Day 2) Evidentiary Hearing RE: [108] ORDERED,

2    scheduling a hearing on Ghalchis request for relief under

3    Federal Rule of Bankruptcy Procedure 9023 (RE: related

4    document(s)[96] Motion to Authorize/Direct filed by Creditor

5    Soleyman Ghalchi).

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

```
 1    A P P E A R A N C E S :

 2

 3    UNITED STATES DEPARTMENT OF JUSTICE

 4          Attorney for the U.S. Trustee

 5          U.S. Federal Office Building

 6          201 Varick Street, Suite 1006

 7          New York, NY 10014

 8

 9    BY:   NAZAR KHODOROVSKY

10

11    KILPATRICK TOWNSEND & STOCKTON LLP

12          Attorneys for Wells Fargo Bank, Creditor

13          1100 Peachtree Street, Suite 2800

14          Atlanta, GA 30309

15

16    BY:   COLIN M. BERNARDINO

17

18    ORTIZ & ORTIZ LLP

19          Attorneys for the Debtor

20          32-72 Steinway Street, Suite 402

21          Astoria, NY 11103

22

23    BY:   NORMA E. ORTIZ

24          MARTHA J. DE JESUS

25
```

Page 4

1    CERTILMAN BALIN ADLER & HYMAN

2         Attorneys for Soleyman Ghalchi, Creditor

3         90 Merrick Avenue

4         East Meadow, NY 11554

5

6    BY:   RICHARD J. MCCORD

7         CAROL GLICK

8

9    LAW OFFICE OF MARILYN MACRON, ESQ.

10        Attorney for Debtors

11        211 Beach 134th Street

12        Belle Harbor, NY 11694

13

14   BY:   MARILYN MACRON

15

16   LAW OFFICE OF STEPHEN L. BARRY

17        Attorney for Debtors

18        61-43 186th Street, Suite 525

19        Fresh Meadows, NY 11365

20

21   BY:   STEPHEN L. BARRY

22

23

24

25

```
 1    ALSO PRESENT:

 2    BOYSIN LORICK - Debtor

 3    CYNTHIA LORICK - Debtor

 4    SOLEYMAN GHALCHI - Witness

 5    MOHAMMAD CHOUDHARY - Witness

 6    JANE NADELSON - Witness

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    A    Yes.

2    Q    Go to the third page.  Do you see where it says

3    (indiscernible) Reorganization Expenses?

4    A    Yes.

5    Q    Legal Fees $2,500?

6    A    Right, yes.

7    Q    Who prepared this document?

8    A    I did.

9    Q    And you put this entry in there?

10    A    Yes, I did.

11    Q    Is it accurate?

12    A    No, it's not.

13    Q    Why is it not accurate?

14    A    Because at the time I was preparing it I was in Georgia

15    and Boysin was in New Jersey, and I questioned him, what was

16    the $2,500 item?  And he couldn't recall.  And I think he

17    brought it to my attention that the check number was a very

18    unique number.  It was not one of my check numbers.  And so I

19    told him, I said, "I have to balance the books.  Where do I put

20    it?" He said, "Okay, just put it in Legal Fees." What he didn't

21    realize is that that 2,500 was that $25,000 check that I told

22    you about.

23    Q    Testify to the Court.

24    A    Okay.  So, there was a $25,000 check that Boysin wrote.

25    TD Bank encoded it as $2,500.  Because it was rejected, I did

1  not come up with one of my checks.  So when I looked at my

2  register I couldn't identify the item.  So, to balance my

3  books, I put it under Legal Fees.  The following month, when I

4  did my overstatement, I saw that there was an adjustment of

5  22,500, which made up the 25,000.  So then Boysin realized what

6  it was.  He will have to explain that to you.

7  Q    What do you understand what the $25,000 was for?

8  A    It related to a broker fee where they were trying to

9  obtain the loan to refinance the building.  So, it should have

10  really gone under reorganizational...but because I didn't

11  realize the 2,500 related to the $25,000 check, I put it in as

12  Legal Fees.

13  Q    Where did the $25,000 come from?

14  A    Boysin will have to answer that.

15  Q    (indiscernible)

16  A    Boysin will have to answer that.  Mr. Lorick will have to

17  answer that.

18  Q    My question to you --

19  A    It came over the account.

20  Q    And where did the money -- how did the money get in the

21  account?

22  A    Like I explained to you before, when the whole bankruptcy

23  thing started, and this was before Ortiz & Ortiz were involved,

24  Boysin had tried to secure a loan to refinance the building,

25  and there was a check for 22,891.14, I believe it was, that he

1   had given to this company.  And I'm not sure what

2   (indiscernible) was from but...he eventually requested a

3   reimbursement.  So they refunded him a check for 22,891.14.

4   And like I told you, if you look on July 13th, there's a

5   deposit for 22,941.30, which would be that 22,914 plus another

6   smaller check.  So, out of those funds I think he reimbursed --

7   I'm not sure what that transaction was about.  He will have to

8   explain it to you.

9   Q    Was it a result of the payout from the fire, from the

10   insurance --

11   A    No, no.  No, it wasn't.

12   Q    Were you in New York this past August for the auction on

13   August 22nd?

14   A    No, I was in New Jersey.  Georgia, sorry.

15   Q    Were you here for the sale hearing on August 24th?

16   A    No.

17   Q    Did you participate in any way in either one of those

18   events?

19   A    No.

20   Q    Did you have any conversations with your attorneys or

21   anyone else with any of those events?

22   A    With Boysin but that's it.

23        MR. MCCORD:  All right, I don't have any further

24   questions.

25        CROSS-EXAMINATION OF MS. LOREY

1    Chapter 11 petition on December 29th, 2016?

2    A    Yes.

3    Q    Did you provide the information on this document in the

4    exhibit to Ms. Ortiz or Ms. De Jesus to file with the Court?

5    A    I would say so.

6    Q    Did they ask you to provide them with information

7    pertaining to all of your assets and liabilities?

8    A    Yes.

9    Q    And did you do that?

10   A    Best of my knowledge.

11   Q    Is -- are all your assets listed in there, and your

12   liabilities?

13   A    Yes.

14   Q    Okay.  I'm going to ask you to look at Page 9 of Schedule

15   B ((indiscernible).  Okay.  You see Number 35?  Any financials

16   you did not already list?

17   A    Yes.

18   Q    Did you list the $153,000, settlement proceeds from the

19   insurance company that you were paid as a result of the fire on

20   your property?

21   A    It's not a settlement.

22   Q    But did you list that money?

23   A    No, because it's not a settlement yet.

24   Q    So, is it your money or not your money?

25   A    It's not my money yet.

1    Q    It's payable to you.  Can I -- let me just show you.

2    A    It's still a ongoing case that's going on, and number two,

3    there's two sides to that.  I told my attorney when we got a

4    check that that would his -- part of his payment.

5    Q    And that attorney was Mr. Wharton?

6    A    Yes.

7    Q    And is that why he's holding the check?

8    A    Well, no, he's still fighting the insurance company.  It's

9    not a completed issue.

10    Q    Please look at Exhibit G-4.

11    A    Okay.

12    Q    You see Exhibit G-4?

13    A    Yes.

14    Q    Have you ever seen it before?

15    A    Yes.

16    Q    What is it?

17    A    It's a check, a copy of a check.

18    Q    And do you recognize the account that it's drawn on,

19    (indiscernible) Agency, Inc., New York, on behalf of Aspen

20    American Insurance Company?

21    A    Yes.

22    Q    Is that your insurance carrier?

23    A    Yes.

24    Q    And was that -- did it hold a policy, a fire policy for

25    the building located at 3126 Coney Island Avenue, Brooklyn, New

1    York?

2    A    Yes.

3    Q    Was there a fire?

4    A    Yes.

5    Q    And is this a payment towards that expense?

6    A    Yes.

7    Q    And it's payable to Boysin Lorick, Wells Fargo as trustee,

8    Douglas Rosenberg, Sovereign Bank, Arcadia Commercial Mortgage,

9    LLC, and New York Adjustment Bureau; correct?

10   A    Yes.

11   Q    Was that check ever negotiated?  Was it ever deposited,

12   cashed, cleared?

13   A    Not that know of.

14   Q    Why not?

15   A    Because he said he had issues with the insurance company.

16   Q    Do you believe that you're owed this money?

17   A    For the damages, yeah.

18   Q    You believe you're owed --

19   A    No, I think the claim was higher and it's an ongoing case

20   right now.

21   Q    And you're attorney that's handling this is Mr. Wharton?

22   A    Yes.

23   Q    Did you ever disclose this information to Ms. Ortiz or

24   anyone in her firm?

25   A    No, because since I was paying them, I don't think it was

Page 92

1    going to be part of my money, so, or anything of my --

2    Q    You just said that you think you're owed more --

3    A    At the time.

4    Q    -- than $153,000, correct?

5    A    Say that again?

6    Q    You just, a moment ago, testified you believe you're owed

7    more than 153,000.

8    A    This is what he's claiming.  He said there's more --

9    Q    Not him, you.

10   A    Well, the claim that I put in is more than 153.

11   Q    How much is the claim?

12   A    I don't recall this minute.

13   Q    But it's more than 153,000?

14   A    I'm pretty sure it is.

15   Q    And did you disclose this information to Ms. Ortiz or

16   anyone in her firm?

17   A    No, I didn't.

18   Q    Is it reflected anywhere in the bankruptcy documents --

19   A    No, it isn't.

20   Q    Excuse me?

21   A    No, it isn't.

22   Q    Ask you to look at Exhibit G-9.  Ask you to -- you

23   recognize that document?

24   A    Yes.

25   Q    What is it?

1    A    I think it's a monthly report.

2    Q    Is it for the period of July 1st through July 31st?

3    A    Yes.

4    Q    Third page, please.  It says, "Legal fees $2500."  You see

5    that?

6    A    Third page.  (Indiscernible.)  This would be third page,

7    okay.

8    Q    You see that?

9    A    Yes.

10    Q    What is -- it says, "Legal fees $2500."  Is that accurate?

11    A    Well, now, if I'm nitpicking it, it wasn't because it was

12    part of the fees we paid for updating the finance for the

13    building.

14    Q    What do you mean nitpicking?

15    A    Well, if you want perfect, maybe I wasn't too clear on how

16    I should get this put on the form, so I told my wife to put

17    legal fees.

18    Q    Is that the way you approached all the other -- putting

19    information in all the other documents, that you didn't have to

20    be clear, that it's nitpicking to be --

21         MR. BARRY:  Objection.

22    A    I --

23         THE COURT:  I'm going to overrule it.  Go ahead.

24    Q    You can answer the question.

25    A    I don't say, I mean, there's words there and you could

1    fill them in, but it was a fee was paid to someone, I don't

2    know if you want to call it legal.  In my opinion, it could be

3    a legal fee paying a broker.  I don't know what you call a

4    legal fee, if it's all real lawyers who get legal fees, or if

5    other people that charge you things, you pay them, and it's a

6    legal fee for findings money for you.  So, that's how I kind of

7    interpret it.

8    Q    You believe a broker is an attorney?

9         MR. BARRY:  Objection, Your Honor.

10   A    I don't think -- I'm just saying --

11        THE COURT:  I'm over -- okay.  Okay.  What did we

12   talk about before?  What happens when somebody says the word

13   objection?  Okay.  I'm overruling the objection.

14   Q    So, you think an attorney's a broker?  Do you think a

15   broker that you're referring to is also an attorney?

16   A    I didn't give that any thought apart from now.  All I know

17   is I did, to perform legal stuff here.

18   Q    The broker?

19   A    Yeah.

20   Q    Okay.  But you authorize -- did you know that to pay a

21   broker or a lawyer you had to have -- while you were in

22   bankruptcy, you had to pay the -- you had to get the Court's

23   approval?

24   A    No, I didn't.

25   Q    Ms. Ortiz never told you that, or anyone from her firm?

Page 95

1    A    No.

2    Q    And is this entry here accurate?

3    A    Well, in my mind it's accurate.

4    Q    Earlier this afternoon your wife testified that it was

5    $25,000, not $2500.  Was she wrong?

6    A    No, she was right.

7    Q    Well, you just said it's accurate at 2500, and now you

8    said it's accurate at 25,000.  Which is it?

9    A    You asked me if the 2500 is accurate and I said yes, it

10    was part of it.

11    Q    But then how can you tell me that her saying it's really

12    25,000 is accurate?

13    A    Well, we didn't get -- you didn't get to that part.

14    You're accusing me before you get to it.

15    Q    I'm not accusing you of anything.

16    A    Yes, you are.

17    Q    I'm asking you.

18    A    You just accused me of something that you shouldn't.

19         THE COURT:  All right.

20    A    You asked me about the 2500 --

21         THE COURT:  Okay.  Stop.  Stop, stop, stop.  This is

22    not an occasion for you to have a conversation or for you to

23    argue, either of you.  Either of you.  Okay, I'm -- take --

24    your role here is to ask questions, as you know.  Yours is to

25    answer them, okay?  That's it.  That's it.  If there's any

Page 96

1    issues or if you feel that there are -- if there are other

2    things that need to be said, your lawyer will bring them out on

3    cross-examination.  But in any event, you answer questions.

4    You do not argue with Mr. McCord, okay?

5               MR. LORICK:  I agree with that, but if --

6               THE COURT:  Okay.  No, no, no, no, no, no, no, no.

7    You also don't argue with me.

8               Ask your question.

9    Q    Please explain whether this is $25,000 or $2500.

10   A    That's $2500.

11   Q    Please explain what your wife meant when she said it

12   should be $25,000, that the bank made a mistake.

13              MR. BARRY:  Objection.

14              THE COURT:  Sustained.

15   Q    Did the bank make a mistake and should this be $25,000?

16   A    Yes, it should've been.

17   Q    So, how can it be accurate at 2500 if it's -- you just

18   told me it's a mistake?

19   A    I cannot argue with you if you say that's what it is.

20   Q    Sir, I'm not -- as the Judge said, I'm asking questions.

21   A    My answer is that I -- to phrase this properly creates an

22   argument so I can't do it.

23   Q    You can't -- you cannot explain how it's accurate, but

24   you're saying it's accurate at 2500 when you just said it's a

25   mistake and it should be 25,000.  You can't explain?

1    A    All right.  What happened here is that I gave Mr. Mohammad

2    the $25,000 check.

3    Q    You gave who?

4    A    Mr. Mohammed.  With all his expenses, this was part of my

5    --

6    Q    You gave Mr. Mohammad Choudhary $25,000?

7    A    Yes, a check.

8    Q    In July of 2017?

9    A    Sometime around that time.  And the $25,000 he deposited

10   into his account.  All right, the bank made a mistake.  Instead

11   of 25,000, they put 2500.

12   Q    Is Mr. Mohammad Choudhary the gentleman that -- the one

13   that you gave the 25,000 to the one we've been talking about

14   all along, the one that went to the auction?

15   A    Yes.

16   Q    A. Mohammad Choudhary?

17   A    Yes.

18   Q    Is he a broker?  Is he a broker?

19   A    Not that I know of.

20   Q    Is he an attorney?

21   A    No.

22   Q    So, earlier in your testimony, you said that you gave to,

23   and your wife did also, that you gave this money to a broker.

24   That was all inaccurate?  That was all false?

25   A    You're mixing up two things here.

1   Q   Please explain.

2   A   I give Mr. Mohammad -- he was incurring expenses while I

3   was -- you see this is what happens here because I'm not free

4   to do what I want, would like to do, but he was -- and I was

5   surprised that he incurred all these expenses without an

6   agreement just by word of mouth, because I know him and he

7   knows me very well and I think he trusts me, and when this

8   money came into my possession I give him back some of it.  This

9   was part of his payment.  Now, the money that came to me,

10   that's a different issue, the 22,000.  That came from --

11   Q   Wait.  Where did you get the 25,000 in July of 2017 to

12   give to Mr. Mohammad Choudhary if it's different than this

13   $25,000?  Where'd you get that money?

14   A   I'm trying to explain to you.

15   Q   Please do.

16   A   The 22,000 came from a broker back in 2015 that was trying

17   to refinance the building for me.  All right, something

18   happened and he had that money.  The bank already got that

19   mortgage for me.  And --

20   Q   What bank?

21   A   I don't recall the bank's -- the name of the bank, but it

22   was small branch.  And they had the money in their possession.

23   Q   How much?

24   A   It was a $30,000 check.  He kept the rest as his fees, and

25   he gave me back 22,891, or something like that.

Page 99

1    Q    So the bank issued a check for 22,500 to you and 7500 to

2    him?

3    A    I don't know what they did with the rest.  He just told me

4    the rest was his fees.

5    Q    And who told the bank to do this?  Who instruct -- what --

6    this was your money, correct?

7    A    Yes.

8    Q    Did you tell the bank to do this?

9    A    No.  He was the middle person, so he got a check from me.

10   Q    Yeah, but did you authorize him to get this check?  Did

11   you agree that he should get this check to pay towards his

12   expenses?

13   A    I still arguing over it, but right now I'm in the middle

14   of a bigger mess than that, so I'm leaving that on the side.  I

15   don't know.  He said it was his fees, and I didn't argue with

16   him.

17   Q    So, did you authorize the bank to give him this check for

18   $7500 in July of 2017?

19   A    No, no.  I give him a $30,000 check.

20   Q    All right.  Did you authorize the bank to give him a check

21   for $30,000 in July of 2017?

22   A    You're going the wrong direction; yeah.  I gave him a

23   check for $30,000.

24   Q    Where'd you get the check from?  Where'd you get the money

25   from?

1    A    Since 2015.

2    Q    Okay.

3    A    I don't think we're following each other here.  This money

4    was owed to me from him.

5    Q    From whom?

6    A    He gave me back -- he gave me the rest of it.

7         THE COURT:  I'm sorry.  Who's the him here?  Who's

8    him?

9    A    David (indiscernible).

10   Q    He's a broker?

11   A    Yes.

12        THE COURT:  Okay.

13   Q    He owed you $30,000.  David (indiscernible)?

14   A    Yes.

15   Q    Okay.  How did that $30,000 get from David (indiscernible)

16   to Mohammad Choudhary that was owed to you?

17   A    This have nothing to do -- you're getting it all mixed up

18   again.  I --

19   Q    Let's -- hold it.  In July of 2018 --

20        THE COURT:  2018?

21   Q    '17, did you -- in July of 2017, you stated a few moments

22   ago that you paid money to Mohammad Choudhary to go towards his

23   expenses, correct?

24   A    Yes.

25   Q    How much?

1    A    25,000.

2    Q    25,000.  In this report, exhibit that you're looking at

3    right now, Exhibit G-9, it says $2500 for legal fees, correct?

4    A    Yes.

5    Q    Your wife says it's -- the bank made a mistake and it

6    should really be $25,000, correct?

7    A    Yes.

8    Q    And then your wife also said that 22,500 was credited or

9    deducted from your account by the bank in August, correct?

10   A    No, that is a different bank.

11   Q    Is that money related to this exhibit --

12   A    Two different.

13   Q    -- different than the 30,000 you gave Mohammad Choudhary?

14         THE COURT:  Wait, wait, wait.  30,000?

15         MR. MCCORD:  He said --

16   Q    How much did you give Mohammad Choudhary in July, 25 or

17   30?

18   A    25.

19   Q    Okay.  Is the 25,000 that's reflected in this Operating

20   Report that's G -- Exhibit G-9, that 25,000 different than the

21   25,000 payment you made to Mohammad Choudhary in July of 2017?

22         MR. BARRY:  Objection.  The document doesn't reflect

23   25,000.  It has been testified to repeatedly that it says 2500

24   but should be 25,000 for reasons that have been described.

25         MR. MCCORD:  Exactly what I said.

1       MR. BARRY:  No, you said, 25,000 as reflected in this

2    report.

3       MR. MCCORD:  That's exactly what I said what he said.

4    But I agree with what he said.

5       THE COURT:  Okay.  Can you --

6       MR. BARRY:  But this doesn't reflect --

7       THE COURT:  Okay.  I'm going to overrule the

8    objection.

9    Q    Mr. Lorick, is it your testimony that you paid Mr.

10   Choudhary $25,000 in July of 2018 --

11      MR. BARRY:  Objection, asked and answered.

12   Q    -- of '17?

13      THE COURT:  Sustained.

14   Q    Well I'm trying to clear up -- did you get the money that

15   you paid to Mr. Choudhary from -- as a refund from the money

16   you paid to the broker (indiscernible) --

17      MR. BARRY:  Objection.

18   Q    -- two years ago?

19      MR. BARRY:  Objection, asked and answered.

20      THE COURT:  Overruled.

21      MR. MCCORD:  No, it's not --

22      THE COURT:  Overruled.

23   A    Yes, it was.  That's where the funds came from.

24   Q    Okay.  Did you tell Mr. (indiscernible) to pay Mr.

25   Choudhary the 25,000 in July directly?

1   A    No.

2   Q    He paid it to you and then you paid it to Mr. Choudhary?

3   A    Yes.

4   Q    What bank account did you use to pay Mr. Choudhary the

5   $25,000 --

6   A    TD Bank.

7   Q    -- in July of 2017?

8   A    TD Bank.

9   Q    Is that a Debtor in Possession account?

10  A    Yes.

11  Q    What bank account did you use to pay the bills in this G-

12  9, including this, at the time, the $2500 that the bank

13  deducted?  What bank account?

14  A    The debtors' account.

15  Q    I can't hear you.

16  A    The debtors' account.

17  Q    Is that the same account as the other TD Bank, or no?

18  A    Yes.

19  Q    So you had --

20       THE COURT:  Was that a yes?  Was that answer yes?

21  A    Yes.

22       THE COURT:  Okay.

23  Q    So what -- in July of 2017, you believe you had a balance

24  of $50,000 or more in that DIP account?

25  A    How much?

1   Q    50,000?

2   A    It could've.  I --

3   Q    Is the payment --

4   A    I --

5           THE COURT:  Wait, wait, wait.  You have to let him

6   answer.  He's --

7           MR. MCCORD:  He said it could've.  I'm sorry, if he

8   was finished.

9   Q    I'm sorry.  Proceed.

10  A    I really don't do my books.  My wife do all the financial,

11  so I don't know how much was in there, but in the past two

12  months, I -- my first time collecting Social Security, I they

13  give me a lump sum also that went in there, so there was extra

14  money.  So, I had it, so I think it was the right thing to give

15  Mr. Choudhary back some of it that I owed him -- that he was

16  putting out money without looking back to see where it coming

17  from or if I'm going to give him back, so I think I had to show

18  him some good faith.

19  Q    Did you tell your wife that you gave -- wrote a check to

20  Mr. Choudhary in the month of July, 2017 for $25,000?

21  A    Yes.

22  Q    Is it reflected anywhere in this Exhibit G-9 the month of

23  the Operating Report that we're looking at right now?

24  A    No, I don't think so.

25  Q    Why not?

1    A    Because it never got into the account.  It did a month

2    later.

3    Q    So, are you saying it'd be reflected in the August, 2017

4    report?

5    A    Yes.

6    Q    And has that been filed with the Court to date yet?

7    A    (Indiscernible)

8    Q    Yes?

9    A    As far as I -- we are concerned.  My wife and --

10    Q    And your wife provided a copy of that report to Ms. Ortiz

11    and to -- or her office?

12    A    Yes.

13    Q    And it reflects all this -- these expenditures?

14    A    Yes.

15            MR. MCCORD:  Let the record reflect it -- that report

16    hasn't been filed with the Court.

17            THE COURT:  Okay.

18    Q    Could you please explain what from after December 15th,

19    for the beginning of the year, say through June or July, what

20    activities you had with Mr. Choudhary regarding getting

21    refinancing or sale of the building at 3126 Coney Island

22    Avenue, Brooklyn?

23    A    I don't remember everything in detail, but it was ongoing

24    way of trying to refinance.  What happened yet, is that when I

25    first started out with the bankruptcy, I -- pretty sure I

# **<u>EXHIBIT E</u>**

Insurance Check Dated November 19, 2014



7031

BROWNSTONE AGENCY INC., NY ON BEHALF OF
ASPEN AMERICAN INSURANCE COMPANY

J.P.Morgan
JPMorgan Chase Bank, N.A.
New York, New York
1-2-210

7031

PAY    ONE HUNDRED FIFTY-THREE THOUSAND THREE HUNDRED FIFTY-SIX & 03/100 DLRS

11/19/14          $153,356.03
DATE              AMOUNT

TO THE
ORDER OF

BOYSIN LORICK, WELLS FARGO BANK,
N.A. AS TRUSTEE, DOUGLAS ROSENBERG,
SOVEREIGN BANK, BERKADIA COMMERCIAL
MORTGAGE LLC AS MASTER SERVICER
AND NEW YORK ADJUSTMENT BUREAU, INC

AUTHORIZED SIGNATURE

⑈ Security features. Details on back.

⑈"007031⑈" ⑈:021⑈0000 2⑈: 40316859⑈"

BROWNSTONE AGENCY INC. NY ON BEHALF OF
ASPEN AMERICAN INSURANCE COMPANY

Account Number:
Payment Number:
Amount Paid:           153356.03
Insured:       BOYSIN LORICK
Claimant:      BOYSIN LORICK
Date of Loss: 10/21/13
Type of Loss: FIRE
Location: 3126 CONEY ISLAND AVENUE   BROOKLYN NY 11235
Policy No: BNY0002129-002
Policy Term: 12/07/12-12/07/13
Claim No: GPSD18471301
Check-No: 00007031
Check Date: 11/19/14
Comment: UND ACV BLDG - KEEP OPEN
Your Reference:

7031

**EXHIBIT F**

Proposed Order

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
In re:

                                      Chapter 11

Boysin Ralph Lorick and
Cynthia Theresa Lorick,

                                      Case No. 16-45645-NHL

                  Debtors.
----------------------------------------------------------X

## ORDER APPOINTING CHAPTER 11 TRUSTEE

       Upon the motion (the "Motion") of Wells Fargo Bank, N.A., as Trustee for the registered

holders of Sovereign Commercial mortgage Securities Trust, 2007-C1, Commercial Pass-Through

Certificates, Series 2007-C1 for entry of an order, pursuant to section 1104 of the Bankruptcy

Code, appointing a chapter 11 trustee in this case, or, alternatively, converting this case to chapter

7; and it appearing that the Court has jurisdiction over the Motion pursuant to 28 U.S.C. § 157 and

1334; and it appearing that venue of the Debtor's Chapter 11 Case and the Motion in this District

is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that no other or further notice

need be provided; and the Court having found and determined that the relief sought in the Motion

is in the best interests of the Debtor, its estate, creditors and all parties in interest and that the legal

and factual basis set forth in the Motion establish just cause for relief granted herein; and after due

deliberation and sufficient cause appearing therefor,

IT IS HEREBY ORDERED THAT:

1.  The Motion is GRANTED as set forth herein.

2.  The United States Trustee is directed to appoint, subject to the Court's approval, a chapter

    11 trustee to serve in this case.

3.  Upon the chapter 11 trustee's appointment by this Court, the chapter 11 trustee is directed to take any and all necessary steps in furtherance of closing the Sale of the Property (as defined in the Motion).

4.  The Court shall retain jurisdiction with respect to all matters arising from and related to this Order.

# **EXHIBIT G**

Foreclosure Action Hearing Transcript

```
1  SUPREME COURT OF THE STATE OF NEW YORK
   COUNTY OF KINGS- CIVIL TERM-PART COMM 6
2  ------------------------------------x
   WELLS FARGO BANK,                   :
3                     Plaintiffs,:INDEX NO.
              -against-               :500469/2013
4  BOYSIN LORICK, et al.,             :
                    Defendants.:
5  ------------------------------------x
                 H E A R I N G
6                 360 Adams Street
                  Brooklyn, N.Y. 11201
7                 October 9, 2015


8
   B E F O R E:
9                  HONORABLE LAWRENCE KNIPEL,
                   Judge.
10

11 A P P E A R A N C E S:

12                 KILPATRICK TOWNSEND & STOCKTON LLP
                   1114 Avenue of the Americas
13                 New York, New York 10036
                   BY: THERESE M. REYES, Esq., of Counsel
14                 For the Plaintiff

15                 TENENBAUM BERGER & SHIVERS LLP
                   26 Court Street
16                 Brooklyn, New York 11242
                   BY:  MARTIN TENENBAUM, ESQ.
17                 For the Receiver, Douglas Rosenberg

18                 FRANK WHARTON, ESQ.
                   One Pierrepont Plaza, Floor 12
19                 300 Cadman Plaza West
                   Brooklyn, NY 11201
20                 For the Defendant, Boysin Lorick

21

22

23

24

25                              LISA L. DIMINO
                                SENIOR COURT REPORTER
                                                   ld
```

1          THE COURT: Good morning, counsels.  We have here

2     an order to show cause for contempt.  And is there a

3     cross-motion?

4          MR. TENENBAUM:  Yes, there is a cross-motion,

5     judge.

6          THE COURT: Notice of cross-motion by defendant.

7     Let's deal with the order to show cause, I guess we'll

8     deal with that first.

9          MR. TENENBAUM:  You also have our affirmation in

10    opposition?

11         THE COURT: Affirmation in reply.

12         MR. TENENBAUM:  Reply in opposition.

13         THE COURT: So, order to show cause.  Whose order

14    to show cause?

15         MR. TENENBAUM:  It's my order.  Your Honor, if I

16    may, Warren Tenenbaum, Tenenbaum, Berger and Shivers.  I

17    represent the receiver, Doug Rosenberg.  It's our motion

18    to punish for contempt for failing of the respondent, of

19    the defendants, to succeed to the receiver's rights under

20    the order, to attorn to them for the security deposits,

21    and also, for out and out breaches of the order, itself.

22         I'd like to argue in a little bit unorthodox

23    manner.  But, if I may, the cross-motion that was made

24    seeks relief saying that Douglas Rosenberg is not the

25    receiver, but that BPC is the receiver, which I find to be

                                                         ld

1     electrician, could not be paid.

2              MR. TENENBAUM:    Judge, he's testifying.

3              THE COURT:    All right.    I'll take his comments as

4     summation, not as testimony.    It's not testimony.    I can't

5     take it as evidence.    But, I'll take your argument to the

6     extent it bears upon summation.    Go ahead.

7              MR. WHARTON:    And is, as well, a part of the

8     papers in support, your Honor.    In addition to that, your

9     Honor, if my client did anything with respect to the

10    removal of the garbage and what he testified to, he did so

11    in a matter that I also described in my affirmation as an

12    exhibit, as the person who spent a lot of his own money to

13    rehabilitate this building, faced with the Sandy event,

14    faced with a fire and then is faced now with what he finds

15    repugnant to his property, the build-up of garbage, the

16    place not being taken care of.

17              And he did what he did as a caring and honest

18    owner and landlord, even though at some point shortly

19    following the receiver or the alleged receiver began to

20    function in the manner that the receiver was expected to

21    function.    Whatever Mr. Lorick did, he did because of

22    inactivity by this receiver with respect to those

23    functions.

24              Your Honor, let me close up by saying that we'll

25    turn over what there can be turned over, but I mentioned

                                                            ld

1    in this summation that there's nothing to turn over.

2    There are no security deposits.  Mr. Lorick spent that and

3    whatever other money from his own pocket to pay for the

4    fire repair, to pay for the --

5                    THE COURT:    He spent the security deposits?

6                    MR. WHARTON:    He spent the security deposits.

7                    THE COURT: Isn't that a crime?  You realize what

8    you're saying?

9                    MR. WHARTON:    Not in these circumstances.

10                   THE COURT: Do you realize what you're saying?

11                   MR. WHARTON:    There is a clear defense to this,

12   your Honor.  I do understand what I'm saying with respect

13   to that, the health and welfare of the tenants took

14   priority.  And in that circumstance --

15                   THE COURT: You think that entitles your client to

16   take the tenants' money and spend it?

17                   MR. WHARTON:    The tenants weren't paying rents

18   and the security deposit was utilized --

19                   THE COURT:    Okay.

20                   MR. WHARTON:    --to repair the building, as well.

21                   THE COURT:    Okay.

22                   MR. WHARTON:    There's another exhibit there, as

23   well, that shows the amount of money from those tenants

24   who weren't paying during that period.  So, my client

25   acted responsibly.  He acted in a matter that was