**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
---------------------------------------------------------X  Case No. 16-45645-NHL
IN RE:

      BOYSIN RALPH LORICK,
      CYNTHIA THERESA LORICK.

          Debtors
---------------------------------------------------------X

## Preliminary Statement

Wells Fargo's or its servicers counsel, Kilpatrick Townsend & Stockton (KTS)

application must be denied. It is exotic, opaque and no discernible information can be

adduced from its several entries—information is redacted and to aggravate is block

billing. Also, we cannot discern if the billing is right and reasonable in absence of

production of an agreement (retainer) that KTS might have signed with their client.

KTS was asked to produce the retainer and the copies of all invoices and bills etc.

sent to their client. They have not done it. The undersigned would request discovery

and the Court is requested to halt in their fees application in all aspects pending the

discovery of the real terms of engagement of KTS with Wells Fargo.  Something is

very extraordinary here regarding the nature of billing and special counsel coming

from Atlanta billing at very high rates, charging for flights, food and lodging. We

would request discovery in this case, as there is substantial reasons to find abuse.

Thus, based on lack of proper information from KTS and redacted billing the

response could not be prepared adequately regarding the monies sought. KTS wants

to us pay for something that they don't want us to know about. There is overreaching and tweaking of laws and facts to suit their needs.

### Background Summary

1.     On13[th] day of September,2005, Boysin Lorick and his wife Cynthia Lorick ("The Debtors" or "The Borrowers") mortgaged to Independence Community Bank, a New York banking corporation, their real property 3126 Coney Island Avenue, Brooklyn, New York 11235 ("The Property") to secure payment of an indebtedness in the sum of Two Million Twenty Five Thousand Six Hundred Three and 85/100 ($2,025,603.85) Dollars.  **Ex. A.** Mortgage. Also, a "Consolidation, Extension and Modification Agreement" was entered by the mortgagors with the mortgagee bank. **Ex. B.** The mortgage declares:

> If any action or proceeding be commenced ( except an action to foreclose this mortgage or to collect the debt secured thereby) to which action or proceeding the holder of this mortgage is made a party or in which it becomes necessary to defend or uphold the lien of this mortgage, all sums paid by the holder of this mortgage for the expense of any litigation to prosecute or defend the rights and lien created by this mortgage (including reasonable counsel fees) shall be paid by the mortgagor, together with interest thereon, at the rate or rates specified in the Note secured hereby and any such sums, with the interest thereon, shall be a lien on said premises attaching or accruing subsequent to the lien of this mortgage and shall be deemed to be secured by this mortgage and by the Note which it secures. In any action or proceeding to foreclose this mortgage and/or to recover or collect the debt secured thereby, the provisions of law respecting the recovery of costs, disbursements and allowances shall continue unaffected by this covenant.

Mortgage ¶ 16. See also, Note ¶ 16 Further,

> If Mortgagor fails to provide in a timely manner any Books and

> Records, mortgagee shall have the right to have mortgagor's Books and Records audited, at Mortgagor's expense, by independent certified public accountants selected by mortgagee in order to obtain such statements, schedules and reports, and all related costs and expenses of mortgagee including reasonable attorneys fees, shall become immediately due and payable and shall become secured hereby.

Ibid, 23 (ii).   Same for the Consolidated Note.  In addition, the

Consolidated Note declares the following:

> **If it becomes necessary to employ counsel to collect the obligation described herein or to protect or foreclose said mortgage, the mortgagor hereby agrees to pay all expenses and costs, including reasonable attorney's fees for the services of such counsel together with all other costs and disbursements in connection therein whether or not suit be brought and including those incurred in post-judgment collection efforts and in any bankruptcy proceeding (including any action for relief from the automatic stay of any bankruptcy proceeding).**

Note ¶ 35

With these skeletal provision for he fees and other rudimentary features, the

contractual relationship was established between Wells Fargo and the debtors.

However, with the change of servicing [ as usually happens with the secondary

market], new ambitious players comes to play different roles, where the aim is

maximize the profit [that comes only with the foreclosure/sale of the property, not

with linear periodic loan collection process].  The loan had a maturity in 2012,

> BY the payment of the sum of $12,424.50 on November 1, 2005 and like payments in the sum of $12,424.50 monthly thereafter on the first day of every month in each and every year to and including September 1, 2012 with the balance of principal remaining unpaid, together with accrued interest thereon to be paid on October 1, 2012.

Consolidated Agreement/Note, p. 2. But the debtors had carved out the provision of

the extension of the loan maturity by 5 years,

> 48. Provided mortgagor, during the term hereof, shall have (a) made all payments

3

*required hereunder within applicable grace periods, if any, and (b) not otherwise defaulted under any provision hereof, which default(s) shall not have been cured within applicable grace and cure periods, if any, then mortgagor is hereby given an option to extend the maturity date hereof for a period of five years, provided further that as conditions precedent to the exercise of such option mortgagor first (a) gives mortgagee written notice of mortgagor's election to exercise such option at least sixty days prior to the original maturity date, and (b) at the time such notice is given, mortgagor simultaneously pays to mortgagee a sum equal to one (1 % ) percent of the then unpaid principal balance of the loan as a non-refundable extension fee.* Upon the giving of such notice and the payment of such fee the loan shall be automatically extended for a five year period and the interest rate to be paid by the mortgagor on the unpaid principal balance during such extension period will be the greater of a) a rate which is Two (2.00%) Percent per annum in excess of the Five Year Fixed Advance Rate of the Federal Home Loan Bank of New York as announced or made available on or most recently prior to a date which is sixty days prior to the commencement of such extension, or b) Five and One Quarter (5.25%) Percent per annum. During such extended term the constant monthly payments set forth hereinabove shall be adjusted to reflect the change in the interest rate and shall include a One (1.00%) Percent per annum amortization factor. All such payments shall be made in monthly installments and be applied first to interest at the rate specified above and the balance in reduction of principal. In the event the Five Year Fixed Advance Rate of the Federal Home Loan Bank of New York ceases to be made available by the Federal Home Loan Bank, the mortgagee shall compute the interest rate by application of a comparable index.

Consolidated Note, P. 17.  The debtors were current on the date the loan was about become due. See Boysin's Affidavits. **Ex. C.**  Boysin Lorick sent a letter for extension of time to the related dept. He also spoke to one lady dealing with the loan servicing. He had the requisite amount of one (1%) percent money in the lenders escrow account. He was told it is all ok. See his affidavit filed earlier with the Court,

This building had a mortgage of $500,000 when I bought it. I financed it twice. Last time with Independent bank. So the total owed in 2005 was $2,250,000 and supposed to mature in 2012 with an option of 5 years renewal. The mortgage came down a lot. Because I was making payment. In 2012, it was 1. 9 million. I along with my wife lived up to our contractual obligations. During the time of renewal I was in touch with the bank. I had paid them all the monies. I requested the servicing company to renew the mortgage period for an additional 5 years. They said everything was OK. And under that impression I kept making payments. But that was the deception. They stated a foreclosure proceeding. A new servicing company called Water Stone Asset Management came into the picture. I got in touch Sumit Jain. He said that he does not care what I do, but he would foreclose. He said he wants the full payment. The full payment was 1.992 million. I stated looking for new mortgage and I had a commitment, but by then the story changed, the demanded more monies for the lawyers and the default interest. It came to an additional sum of $500,000. I asked the bank for the additional sum through a

4

> broker. I could not arrange for that additional money fast enough. The trickery of
> the bank prevailed. And in the state court they used again a set of papers work
> which I had never signed to obtain a judgment. My state court attorney, Mark
> Feelander, had taken my signature on three blank pages. He said he would need all
> this to prepare and fight the case. I do not understand. But a judgment was given
> against me. There was no trial. Nothing was asked of me or my wife. I only
> received a letter from the bank that my property is being auctioned.

See Dkt #224-1 Affidavit of Boysin Lorick. Now the counsel for the Fargo uses the

state court judgement and an alleged "Stipulation of Settlement and Order (the "So-

Ordered Stipulation") executed by Boysin Lorick ("B. Lorick"), his then-counsel

Mark S. Friedlander, Esq., and the Lender," see Dkt # 227. Mr. Bernardino points

out to "true and correct copy of which is attached as Exhibit A to the Reply in

Support of Application for Order Directing Distribution of Sale Proceeds to Wells

Fargo Bank, N.A. [ECF No. 207] (the "Reply"))" however, the same does not have

the signed copy. I obtained a signed copy from the state court docket. **Ex. D. This is**

**precisely one of the copy for which the signatures were obtained on a blank**

**page. Missing are the signatures of Cynthia Lorick.** Also dubiously are placed the

signatures of debtor Boysin Lorick (besides the fact that he did not sign the

agreement, he had signed on three blank pages). It is true that Fargo has a judgment

and Mr. Bernardino produces them, Dkt#227 and claims,

> 5. Paragraph 9 of the So-Ordered Stipulation provides the following:
> B. Lorick shall, and hereby covenant and agree to, protect, defend, indemnify,
> and hold Trustee and its affiliates, agents, employees and attorneys, harmless
> from and against all liabilities, obligations, claims, damages, penalties, causes
> of action, costs, and expenses (including, without limitation, reasonable
> attorneys' fees and expenses) arising or occurring out of: (i) any of the
> representations and warranties made by B. Lorick in this Stipulation being
> untrue in any material respect; and (ii) any and all claims of any kind and
> description made against Lender.

Supplemental Statement . . . . Sale Proceeds to Fargo, Dkt 227,¶ 5. Similarly he

echoes Consolidated Mortgage/Agreement, ¶¶ 32, 35. Also flaunted is the language

from this fraudulently obtained So Ordered Stipulation releasing the Lender its team

from any lawsuit etc.. Ibid, ¶ 9. Now having armed himself with the "language from the So-Ordered Stipulation, the Amended Foreclosure Judgment, and the Consolidated Mortgage," Mr. Bernardino claims "clear entitlement to attorneys' fees, costs, and interest to be paid by the Debtors as well as Debtors' acknowledgment that Debtors have no viable claims against the Lender." Id.¶10. Mr. Bernnardino claims "Lender's Attorneys Fees." But they are *unconscionable, unreasonable and inequitable* in all aspects.

**New York State Law Regarding Attorneys Fees in New York Does not Grant the Claimed fees.**

2.      It is clear that the legal fees are not a creature of statute. Rather, their award is a function of the terms of the mortgage and case law interpretations. In order to be entitled to attorney fees in a mortgage foreclosure action there must be an agreement obligating the mortgagors to pay the fees. Without this type of agreement, attorney fees may not be awarded by the court as part of the total amount due on the mortgage. *Sibley Mortg. Corp. v. Sobotka*, 155 Misc. 2d 616, 589 N.Y.S.2d 279 (Sup 1992). The mortgage does not allow, any collection fees, it allows only "[i]f any action or proceeding be commenced ( except an action to foreclose this mortgage or to collect the debt secured thereby) to which action or proceeding the holder of this mortgage is made a party or in which it becomes necessary to defend or uphold the lien of this mortgage all sums paid by the holder of this mortgage for the expense of any litigation to prosecute or defend the rights and lien created by this mortgage (including reasonable counsel fees) shall be paid by the mortgagor, together with interest thereon, at the rate or rates specified in the Note secured hereby and any such sums, with the interest thereon, shall be a lien on said premises attaching or accruing subsequent to the lien of this mortgage and shall be deemed to be secured by this mortgage and by the Note which it secures." See the **Mortgage.**   Further, the

Mortgage explains that, "[i]n any action or proceeding to foreclose this mortgage and/or to recover or collect the debt secured thereby, the provisions of law respecting the recovery of costs, disbursements and allowances shall continue unaffected by this covenant." Ibid. Here the entire contest or issues raised by any of the parties did not deal with the "lien of the mortgage." It is about collection. And the Consolidated Note has an allowance for a reasonable fees only related to collection, only "[i]f it becomes necessary to employ counsel to collect the obligation . . . the mortgagor hereby agrees to pay all expenses and costs, including reasonable attorney's fees for the services of such counsel . . . costs and disbursements . . . including those incurred in post-judgment collection efforts and in any bankruptcy proceeding (including any action for relief from the automatic stay of any bankruptcy proceeding). See the **Consolidated Note.** Thus, it is clear that unlisted or un-covenanted item is not compensable. The standard is strict proof. For instance, a provision in a mortgage instrument entitling the mortgagee to remedy the mortgagor's default and to add all payments for remedying the default, including reasonable attorney fees, did not entitle the mortgagee to attorney fees on the mortgagor's default. *Sibley Mortg. Corp. v. Sobotka*, 155 Misc. 2d 616, 589 N.Y.S.2d 279 (Sup 1992). Further, the mortgagees' attorneys would be subjected to sanctions for "frivolous conduct" of attempting to recover attorney fees against mortgagors following foreclosure. *Id.* This clause of the mortgage, lien protection, does not grant any rights to fees for the situation evolved in this case. As, in essence, the cited clause allows legal fees only to the extent it represents reasonable indemnity for protecting the mortgagee's lien from attack. Nonetheless, one court refused an award of attorney's fees incurred by mortgagee in securing its lien from bankruptcy proceedings. *Cohoes Sav. Bank v. Blair*, 119 Misc 2d 153, 462 NYS2d 572.

**The Note and Mortgage etc. Prepared by the Lender.**

4.    The mortgage agreement in this case had obviously been prepared by the lender and thus it needs to be interpreted against the lender and in favor of the debtors' contentions. The attorney fees provision must come across as clear. *Cohoes Sav. Bank v. Blair,* 119 Misc 2d 153, 462 NYS2d 572.

**No interest on Attorney Fees or It does not become a part of the judgment.**

5.    Fargo wants wants "attorney's fees totaling $773,240.40 through December 2017" and declares them as a part of the secured creditors claim.  However, the Note does not allow that summation. It becomes no part of the secured creditors claim, thus no interest etc. is leviable on it. Only if the contest was about the "protection of the lien" would it become a part of the lien.  The Mortgage language is explicit about it. And the Note language does not incorporate that language.  Thus, "in the absence of an express agreement for the payment of attorney's fees as a part of the mortgage lien, such fees may not be awarded by the court in a foreclosure proceeding as part of the amount due upon the mortgage. *Cohoes Sav. Bank v. Blair*, 119 Misc. 2d 153, 155, 462 N.Y.S.2d 572, 574 (Sup. Ct. 1983) (quoting Lincoln *First Bank, N.A. v. hayer,* 102 Misc.2d 451, 423 N.Y.S.2d 795; cf. *Federal Land Bank of Springfield, Mass. v. Ambrosano,* 89 A.D.2d 730, 731, 453 N.Y.S.2d 857 [affirming an award of attorney's fees where the mortgagor "pursuant to a provision in the bond and mortgage * * * agreed to pay all attorneys' fees in the event of foreclosure."] ) Therefore, the statement that "amount due to the Lender at the time of the partial payoff was $5,255,380.55" is false.  Even attorney's fees provided in the state court judgment were not to incur interest on them.

**Even the attorneys fees were not payable in the State Court Judgment**

6.    Fargo commenced a foreclosure proceeding in the state court and it was not for collection of the monies as per note, but a foreclosure. The mortgage clearly excludes

8

attorney's fees when it comes to foreclosure: *If any action or proceeding be commenced ( except an action to foreclose this mortgage or to collect the debt secured thereby) to which action or proceeding the holder of this mortgage is made a party or in which it becomes necessary to defend or uphold the lien of this mortgage, all sums paid by the holder of this mortgage for the expense of any litigation to prosecute or defend the rights and lien created by this mortgage (including reasonable counsel fees) shall be paid by the mortgagor . . . .* See the Mortgage.

Thus, there was no entitlement in the foreclosure proceeding for attorney fees,

> We agree with the Supreme Court, Suffolk County, that the plaintiff was not entitled to an award of attorneys' fees in the judgments of foreclosure. In this case, he mortgages provided, in pertinent part, for the award of attorneys' fees in actions other than to foreclose the mortgages. The promissory notes evidencing the underlying obligations provided, in relevant part, for attorneys' fees to be awarded "[i]f this note be not paid when due". "That provision in the note[s] is not the equivalent of an obligation to pay reasonable counsel fees in an action to foreclose a mortgage" (*see, Lipton v. Specter,* 96 A.D.2d 549, 465 N.Y.S.2d 59, *lv. denied,* 61 N.Y.2d 608, 475 N.Y.S.2d 1026, 464 N.E.2d 1004). Accordingly, the applications for attorneys' fees in these foreclosure proceedings were properly denied

*Vardy Holding Co. v. Metric Resales, Inc.,* 131 A.D.2d 564, 564, 516 N.Y.S.2d 490, 490 (1987). Yet they had their way

> The mortgage provided for the award of counsel fees in actions other than to foreclose the mortgage. The promissory note evidencing the underlying obligation provided for counsel fees to be awarded "in case any instalment under this Note is not paid when due". That provision in the note is not the equivalent of an obligation to pay reasonable counsel fees in an action to foreclose a mortgage (*Jamaica Sav. Bank v. Cohan,* 38 A.D.2d 841, 330 N.Y.S.2d 119). Thus, the award of counsel fees in the case at bar was improper.

*Lipton v. Specter,* 96 A.D.2d 549, 549, 465 N.Y.S.2d 59, 60 (1983). However, now it is time to pause,

> the matter before the Court is not a suit on the Note, but is rather a foreclosure of the security instrument, in which case the language of the Note is not equivalent to an obligation to pay the legal fees in the mortgage foreclosure action, and authority in the Note is not considered the same as authority in the Mortgage (*see Vardy Holding Company,* 131 A.D.2d 564; *Lipton,* 96 A.D.2d 549, lv. denied 61 N.Y.2d 608; *Eight Tobey Road Corp. v. Markesteyn,* 198 A.D.2d 865 [4th Dept.] ). An additional

9

sentence in the Mortgage specifically stating counsel fees are recoverable is needed.

*United States v. White,* 20 Misc. 3d 1136(A), 867 N.Y.S.2d 379 (Sup. Ct. 2008).

There is no sentence for attorney fees in the mortgage. The Note here talks about

reasonable fees for collection. What is the collection and what does it entail and how

much is "reasonable attorneys fees are the issues. Answer to these do no provide any

basis for Bernardino fees.

**Fargo, Bernardino cannot claim any Attorney Fees for Litigation related to**

**Choudhary, Ghalchi or Sale of the Coney Island Property**

7.      Further Fargo seeks all kind of indemnities and has a inflated sense of what it

could be, but it is not so. For instances, it claims monies for being sued in the district

court by Mohammad Choudhary. The debtors have absolutely nothing to do with that

litigation. The debtor filed a notice of appearance to protect is interest. Protecting

ones interest does not mean that the debtor would have to be liable for causes of

action that the a third party may have against Fargo and Bernardino.

As the New York Court of Appeals observed in the case of *Hooper Associates, Ltd. v.*

*AGS Computers, Inc.,*

> [t]he words in a contract are to be construed to achieve the apparent purpose of the
> parties. Although the words might seem to admit a larger sense, yet [sic] they should
> be restrained to the particular occasion and to the object which the parties had in
> view. This is particularly true with indemnity contracts. When a party is under no
> legal duty to indemnify, a contract assuming that obligation must be strictly
> construed to avoid reading into it a duty which the parties did not intend to be
> assumed. The promise should not be found unless it can be clearly implied from the
> language and purpose of the  entire agreement and the surrounding facts and
> circumstances. Inasmuch as a promise by one party to a contract to indemnify the
> other for attorney's fees incurred in litigation between them is contrary to the well-
> understood rule that parties are responsible for their own attorney's fees, the courts
> should not infer a party's intention to waive the benefit of the rule unless the
> intention to do so is *unmistakably clear.*

*Hooper Assoc. Ltd. v. AGS Computers, Inc.,* 74 N.Y.2d 487, 491–92, 549 N.Y.S.2d

365, 367, 548 N.E.2d 903 (1989) (internal citations omitted) (emphasis added). The

claimed fees must be denied, it has absolutely nothing to do with the debtors.

Bernardino makes an all encompassing statement in his application: "As noted elsewhere herein, it has been the Debtors that have caused these fees to be incurred, whether by contesting foreclosure, collaterally attacking the sale, or litigating with Mr. Ghalchi." Dkt #227,P.8, ¶ 17.n.5. The debtors are not liable for any of these related expenses. Further, he claims, that "litigation arises directly out of the Debtors' sale of the Property and the Lender's defense of its interests in the Property. The Debtors are required to indemnify the Lender for such amounts and such amounts are recoverable under the Consolidated Mortgage. Ibid at p.9. It is overstretching the language or the covenants of the Mortgage and or the Note. It has nothing to do with the protection of the lien. It has nothing to do with collection vis-à-vis a third party. The Note does not say that the debtors shall pay for anything that the debtor is not responsible. Bernardino is responsible for this mess and outrageous conduct wherein the highest bidder was lost. The debtor suffered owning to his bias and prejudiced dealings. **Ex. D**. Lawsuit District Court. The lawsuit is against KTS and their client Wells Fargo for violation of civil rights. Mr. Bernardino cannot cloth it in terms of a contract indemnification by the debtors. Leasing Service Corp. v. First Tennessee Bank Nat. Ass'n, 826 F.2d 434, 16 Bankr. Ct. Dec. (CRR) 628, Bankr. L. Rep. (CCH) P 71925, 4 U.C.C. Rep. Serv. 2d 621 (6th Cir. 1987)(conversion action against bank was grounded in tort and did not arise under contractual terms of agreement);

It is unfortunate that he wants to saddle the debtor for his conduct. The audacity is opprobrious, especially now in his application for payment, he exhorts that "[i]Indeed, large portions of the fees were incurred during litigation with Mr. Ghalchi, including depositions of the Debtors' attorneys and a two-day evidentiary hearing at which the Debtors were represented by four attorneys. Had the Debtors worked with Mr. Ghalchi, the parties could have avoided this litigation. Yet the Debtors refused to accommodate Mr. Ghalchi and were actively attempting to set aside the Court's sale order. It was left to the Lender to defend the sale." Bernardino

11

misstates the facts and makes them self-serving. It is him who triggered this crisis. See Affidavit of Boysin. Twice Mohammad attempted to buy the building, he stood in between. Ghalchi did not want to buy at the price he bid. He wanted to get out. But Bernardino did not want that. Thus, Ghalchi lawsuits and pending appeal was not trigged by debtor, it was done by Ghalchi, he did not want to buy something that which he believed was pushed in value. It was strange that Ghalchi did not want to buy, the debtor did not want to sell, yet the sale was pushed through. Irrespective, Ghalchi issues were not with the debtor, but Mohammad Choudhary—why should the debtor be saddled with this payment? Mr. Bernardino brushed aside the highest bidder and created a crisis. That crisis arose from Bernardino putting his foot down against Mohammad Choudhary and not by anything debtor did. Thus, the additional expense of sale litigation and or vigorously litigating for that purpose should not be borne by Debtors. The debtor is responsible only for reasonable fees for reasonable efforts that Fargo took for collecting. All fees related to the sale litigation and pending appeal  must be borne by Wells Fargo or KTS.

Mr. Bernardino wanted work, additional work, more payments, but that ambitions is not tied to any rational knots here.  In the Ghalchi episode, he sat uninvited, when all he could do was just watch.  How did the debtor create any impediment, rather the former counsel for the debtor was working in sync with Mr. Bernardino. Mr. Bernardino wanted sale, he got sale.  How can he complain now? He wanted to sell to Ghalchi. It was his decision to deny Mohammad. Now he cannot blame the debtors, and nor can he bill the debtors for this either under the contract or under 11 U.S.C. § 506(b).

### State Court grant of legal fees

8.    All fees incurred prior to the signing of the judgement with allotment of legal

fees cannot be questioned here.  The fees allocated there were $85,000. The

Judgment was signed on June 3, 2016.

## Billing

9.    Fargo claims that ""Section 506(b) provides that an oversecured claim shall be

allowed "interest on such claim, and any reasonable fees, costs or charges provided

for under the agreement or State statute under which the claim arose." 11 U.S.C. §

506(b). There is no dispute that the Lender is oversecured."" Dkt#207 ¶ 13.

Basically it claims payments under the Note, Mortgage and Section 506 of the Code.

Now being in the bankruptcy forum, it seeks refuge in section 506 if the Note and

Mortgage does not help or vice-versa.  But "any defense to a claim that is available

outside of the bankruptcy context is also available in bankruptcy." *Travelers Casualty*

*& Surety Co. of America v. Pacific Gas & Electric Co.,* 549 U.S. 443, 450 (2007).

Under both analysis, state or the federal fees demanded must be reasonable.  "The

fourth prong of ¶ 506(b) also permits only reasonable fees and expenses to be added

to an over-secured claim. This limiting principle mitigates some of the inequity

inherent in the breadth of the agreement's unilateral fee-shifting provision." *In re*

*Latshaw Drilling, LLC.,* 481 B.R. 765, 798 (Bankr. N.D. Okla. 2012). Thus, Fargo

and its team "may be reimbursed only to the extent that fees and expenses were

reasonably incurred (*i.e.,* for a proper purpose and with appropriate restraint) and are

reasonable in amount under the circumstances." Id.  "Section 506(b) does not provide

an oversecured creditor with a "blank check" to act without regard to the

reasonableness of strategies or positions taken, of time spent, or of the number of

lawyers engaged. [A] rule of reason must be observed, in order to avoid such clauses becoming a tool for wasteful diversion of an estate at the hands of secured creditors who, knowing that the estate must foot the bills, fail to exercise restraint." Id (inner citation omitted). Lastly, the "[c]ourts are not authorized to be generous with the money of others, and it is as much the duty of courts to see that excessive fees and expenses are not awarded as it is to see that an adequate amount is awarded." *Am. Civil Liberties Union of Ga. v. Barnes,* 168 F.3d 423, 428 (11th Cir.1999)

### This case was not complex

10.    Fargo dictated the terms of this case unfortunately from the get go. They had the steering of the case, though the debtors had an attorney. Mr. Bernardino, an out of state counsel (billed the debtors, $19 dollars to obtain certificate of good standing) ran the show. The docket speaks for itself. Any issues that emanated from this case emanated from the doings of Mr. Bernardino. The property was listed for sale. The sale took place. Bernardino came to watch the sale or participate or move parts of the process. His presence was not necessary and least expected was his engineering of the sale.

11.    Any billing pertaining to Bernardino presence in the auction should be deleted. His presence was not necessary and his reviews were equally not necessary, when the debtors counsel was already examining and filing for the sale the property under the supervision of the court and the trustee. His billing incorporates not only attending the sale/auction but also, sharing information about the same thing with other attorneys with equally expensive billing rates. Not one drop, it rained well, the barrage of times, hailing into invoices. Because Loricks were solvent and property had equity, Fargo should have reasonably believed that its claim, once adjudicated, would be paid in full. The only legitimately disputed issue in the case was NONE. Yet a team of KTS went on a spree.

**The number of lawyers assigned to work on this case resulted in substantial duplication of efforts, and no billing judgment was applied.**

12.    As seen from the bills, and time keeper names, 6 individuals emerges to accomplish the same task under different headings, each consulting the other and briefing each other.

| | | |
|---|---|---|
| CMB | Colin M. Bernardino | 700.00 |
| KB | Keith Brandofino | 710.00 |
| MR | Max Rinaldi | 380.00 |
| TMR | Therese M. Reyes | 375.00 |
| JT | Joanna Turner | 280.00 |
| SG | Shavone Green | 265.00 |

The most interesting part of this group is that the do not claim distinct expertise but are basically performing the same genre of work. The distinction is found only in terms of billing rates. The attorneys are based in Atlanta and New York. This proliferation of lawyers resulted in a substantial duplication of efforts, as multiple lawyers billed for reading, reviewing, and revising the same pleadings and documents, sometimes multiple times. KTS time records reflect that interoffice conferences (in person, or by phone or email) between and among the professionals billing in this case represent a sizable portion of the total hours billed. There is no evidence that KTS exercised billing judgment to eliminate or minimize the expense of these duplicated efforts. See for instance a simple calculation of the pay off statement/figure. Also, see below the billing during month of August, 2017. *Praseuth v. Rubbermaid, Inc.,* 406 F.3d 1245, 1258 (10th Cir.2005) ("time for tasks that were unnecessary, irrelevant and duplicative" should be excluded).

But, "[b]illing judgment consists of winnowing the hours actually expended down to the hours reasonably expended. Hours that an attorney would not properly bill to his or her client cannot reasonably be billed to the adverse party, making certain time presumptively unreasonable." *Case v. Unified School Dist. No. 233,* 157

F.3d 1243, 1250 (10th Cir.1998), *citing Ramos v. Lamm,* 713 F.2d 546, 553–54 (10th Cir.1983). *See also Hensley v. Eckerhart,* 461 U.S. 424, 434, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (counsel seeking fees from opposing party should make a "good faith effort to exclude from a fee request hour that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obliged to exclude such hours from his fee submission."). Thus, time *actually* expended in completing a particular task is not necessarily time *reasonably* expended. *Ramos v. Lamm,* 713 F.2d 546, 553–54 (10th Cir.1983). A simple example of the month of August, 2017 billing show the abuse or call it virtues of billing. See also, that many of these entries have no pointers, other than a opaque redaction. And yet they are billing for the same.

**AUCTION RELATED EXPENSE**

See:

**08/22/20 17 CMB**

| | | |
|---|---|---|
| Attend auction; travel to and from auction; conference call with D. McCloskey, K. Brandofino, and T. Reyes regarding - telephone call from J. Church regarding- correspondence to and from N. Khodorovsky and N. Ortiz regarding auction results and Choudary's proof of funds; analysis of - review debtor's report of auction. | 5.40 | 3,780.00 |

Bernardino lawyer to lawyer communications about the same issue. One attorney reviewing work of the other attorney.

**08/02/2017 CMB**

| | | |
|---|---|---|
| Review corres ondence from D. McCloskey regarding telephone call to K. Brandofino regarding review correspondence from K. Brandofino regarding - prepare correspondence to N. Ortiz regarding sale status; review sale order | 1.40 | 980.00 |

**08/08/2017 CMB**

| | | |
|---|---|---|
| Telephone call from K. Brandofino regarding correspondence to and from N. Ortiz regarding auction status and bids; | 1.30 | 910.00 |

correspondence from and to K. Brandofino regarding
- prepare correspondence to D. McCloskey and
K. Brandofino regarding

**08/21/2017**
CMB Correspondence from and to K. Brandofino, D.      4.10            2,870.00
McCloske , and J. Church regarding telephone calls to and
 from K.Brandofino regarding correspondence to and from J. Craig's chambers
regarding emergency hearing; pa,ticipate in telephonic
hearing regarding debtors' request to postpone hearing;
prepare for auction.

**08/21/2017**
KB Prepare for auction. Review - filed      4.30            3,053.00
by debtors. Consideration of
Consideration of response. Multiple correspondence
with client regarding - Telephone conference
with Judge Craig for argument on emergency motion.

**08/22/20 17 CMB**
 Attend auction; travel to and from auction; conference      5.40            3,780.00
call with D. McCloskey, K. Brandofino, and T. Reyes
regarding - telephone call from J. Church regarding- correspondence to and from N.
Khodorovsky and N. Ortiz regarding auction results and
Choudary's proof of funds; analysis of - review debtor's report of auction.


**Pay off calculations**

**Several minds joined to calculate simple calculations, time expanded.**

08/14/2017 **SL** Calculated new payoff figures for updated letter.     1.20        378.00
08/14/2017 **TMR** Receipt of correspondence regarding proposed offers 0.30        112.50
            for sale next week;
08/15/2017 TMR - correspondence with client regarding     0.50        187.50
revisions to payoff letter;

08/16/2017 **TMR** Tele hone conference with client regarding -
revision to payoff letter;                       0.90                 337.50

08/17/2017 **TMR** Correspondence with client regarding revisions 0.90        337.50
to the payoff calculations and payoff letter

**08/18/2017 CMB**
Telephone call from and correspondence from J.      2.10            1,470.00
Church regarding correspondence
from and to K. Brandofino and D. McCloske
regarding conference call with J. Church and K. Brandofino
regarding - conference call with T. Reyes and K.
Brandofino regarding review payoff calculations; correspondence to and from N.

Ortiz regarding bids and payoff.

| | | |
|---|---|---|
| 08/18/2017<br>TMR Correspondence from client regarding -<br>revisions to payoff letter; consideration of<br>correspondence from Receiver regarding report on<br>testing of environmental mitigation; correspondence<br>with client regarding review correspondence with Debtor's counsel regarding<br>payoff, bids and term sheet; | 2.80 | 1,050.00 |
| 08/22/2017 TMR<br> Review Plaintiffs Motion to Adjourn Sale; appearance<br>in Bankruptcy Court for Sale Auction; multiple<br>correspondence regarding bidding · conference call<br>with client regarding. | 4.90 | 1,837.50 |
| 08/22/2017 KB<br>Prepare for and attendance at bankruptcy auction.<br>Consideration of **Multiple correspondence with client<br>regarding ....** | 4.90 | 3,479.00 |
| 08/23/2017 DHS<br>prepare memorandum to Mr. Brandofino<br>regarding - | 4.60 | 2,1 85.00 |
| **08/23/2017 CMB**<br>Research prepare<br>correspondence to N. Ortiz regarding auction results;<br>conference with K. Brandofino regarding -<br>conference call with K. Brandofino and D. McCloskey<br>regarding - review proposed sale<br>order; correspondence to from N. Ortiz regarding<br>proposed sale order; prepare sale objection. | 6.80 | 4,760.00 |
| **08/23/2017 TMR**<br>Conference call with Mr. McKlosky regarding -<br>consideration of same;<br>coordination of documents needed for hearing on<br>auction; review research regarding<br>conference call with client regarding<br>correspondence consideration | 1.60 | 600.00 |
| **08/24/2017 CMB**<br> for sale hearing and prepare -<br>coordinate service of limited objection; travel<br>to and from sale hearing; conferences with buyer's and<br>Choudary's counsel; conference calls with J. Church | 6.30 | 4,4 I 0.00 |

18

and K. Brandofino regarding telephone call to E. Aryeh regarding
sale and correspondence from E. Areyeh regarding sale
hearing; attend sale hearing; telephone call to J.Church regarding prepare correspondence to J.
Church and D. Mccloskey regarding
08/24/2017 SA Prepared Auction Confirmation Hearing Binder. 0.80 232.00
08/24/2017 SA Court run. Hand del ivered documents to Judge's 1.30 377.00
chambers.

08/24/2017 TMR
Review of limited objection to auction sale;        4.50                1,687.50
Correspondence from client regarding
appearance for hearing on auction and sale;
draft correspondence to the Court regarding limited
objection and cou1tesy copy; attention to delivery of
courtesy copy to the Court; correspondence to Debtor's
counsel regarding courtesy copy to Court correspondence regarding

08/28/2017 CMB
 Review revised sale order; prepare correspondence to     1.60        1,120.00
M. de Jesus regarding inclusion of additional sale
order language.

08/30/2017 CMB
Review revised sale order; correspondence from and to     2.60        1,820.00
M. de Jesus, N. Khodorovsky, and E. Aryeh regarding
proposed sale order and purchaser's objections to
same; telephone call to J. Church regarding -…..prepare memorandum of to J Church
regarding research  research regarding, review correspondence from D. McCoslkey regarding

   Some Mr. McCoslkey is the protagonist who seems to the hub of all reportage.

And interestingly all correspondence and or talks with Mr. McCloskey is regarding

[dark color]. We cannot understand these entries,

02/05/2016 KB

02/08/2016 KB

02/1 6/2016 KB

02/22/2016 KB

04/07/2016 KB

04/25/2016 KB

05/12/20 16 **KB**

07/06/2016 KB

07/18/2016 KB

07/19/2016 KB

08/04/2016 KB

09/0 1/2016 KB

09/07/2016 KB

09/12/2016 KB

I 0/11/2016 KB

12/07/2016 KB

12/16/2016 **KB**

0 1/05/2017 KB

02/08/2017 CMB

02/17/2017 CMB

02/22/2017 CMB

02/27/2017 CMB

02/28/2017 CMB

03/01/2017 CMB

03/02/2017 CMB

04/03/2017 KB

04/1 0/20 17 CMB

04/10/2017 **KB**

04/ 18/20 17 CMB

04/24/2017 CMB

04/25/20 I 7 KB

05/09/2017 CMB

05/10/2017 CMB

05/10/2017 CMB

05/18/2017 CMB

06/13/2017 CMB

06/13/2017 CMB

06/20/2017 CMB

06/23/2017 CMB

06/27/2017 CMB

07/06/2017 CMB

07/17/20 I 7 CMB

07/24/2017 **CMB**

07/27/2017 CMB

08/0 I/2017 CMB

08/01/2017 KB

08/02/2017 CMB

08/03/2017 CMB

08/08/2017 CMB

08/09/2017 CMB

08/09/2017 **KB**

08/13/2017 **CMB**

08/17/2017 CMB

08/18/2017 CMB

08/21/2017 CMB

08/22/20 17 CMB

08/23/2017 CMB

08/23/2017 TMR

08/24/2017 CMB

08/31 /2017 KB

09/04/2017 CMB

09/06/2017 CMB

09/12/2017 CMB

09/12/2017 **KB**

09/13/2017 **CMB**

09/15/2017 **CMB**

09/19/2017 CMB

09/20/2017 **CMB**

09/21/2017 CMB

09/22/2017 **CMB**

09/22/2017 **KB**

09/25/2017 CMB

09/26/2017 **KB**

09/30/2017 CMB

10/02/2017 **CMB**

10/02/2017 **KB**

10/05/2017 CMB

10/06/2017 CMB

10/07/2017 CMB

10/09/2017 CMB

10/09/2017 KB

I 0/19/2017 CMB

10/24/2017 **CMB**

10/25/2017 CMB

10/26/2017 CMB

10/26/2017 KB

11/02/2017 CMB

11/03/2017 CMB

11/04/2017 **CMB regarding counsel**

11/06/2017 CMB regarding district court

11/07/2017 CMB regarding closing

11/10/2017 CMB correspondence to McCloskey.

11/17/2017 CMB correspondence to McCloskey and Church

11/20/2017 CMB conference call with McCloskey regarding Dahiya retention

11/21/2017 CMB closing correspondence with Church and McCloskey

11/28/2017 CMB closing and receiver correspondence with McCloskey

11/29/2017 **CMB** Conference call with J. Wilkicki, J. Church, and D McCloskey

12/07/2017 KB Telephone conference with Mssrs. Church, McClosky

12/13/2017 CMB Review correspondence from **D.** McCloskey regarding receiver and taxes
12/21/2017 **CMB** conference call with D. McCloskey, J. Church, and K. Brandofino regarding hearing and partial payoff

The foregoing are some of the very notorious entries and they are being billed at more than 700 dollars an hour. The entries are correspondence to "D. McCloskey regarding.......[other than those mentioned]" However nimbus they might be for the biller, the reference is barren. It has been redacted. We do not know the purpose of these communications. It looks like, despite the mysterious communications reported to him regarding [mysterious stuff], he seems to have a concrete designation with entity Waterstone. He is an Asset Manager. His full name is Denny McCloskey. Is that the client of the KTS? What attorney-client privilege is being protected here, when my client is being made to pay for the mysterious reportage. Is it some special communique of section 506(b), the "reasonable attorney fees"? KTS like a diligent lawyer seems to be reporting to him, incurring huge expense for the debtors. However, the aforesaid reportage happens to be not only McCloskey, but also one Mr. J. Church. Several lawyers reporting to not one client, a client's team. It not acceptable. There is duplication of both reporting and those receiving the information. Dissemination of the client is fine but not at such a cost to the debtor.

Several of these expenses incurred, telephonic calls are discussions with K. Brandofino, both billing at 700 dollars an hour. All intra-KTS strategic planning discussion etc. are mere duplication of work. It is a comical that one side we have a solo lawyer, former and the present and other side a team. It is not fair or reasonable to expect the debtors to bear, through the fee-shifting mechanism contained in the

Note ( allowing expenses on collection) excessive fees resulting from excessive time spent by more than two lawyers billing at excessive rates, when the same services could have been provided efficiently and cost-effectively by the one experienced lawyer retained as local counsel. What was the point of brining an out of state lawyer—paying for his hotel, travel expenses and then creating a necessity of the local lawyers equally expensive to tell him as to what is happening with the case with emails telephone calls etc.—basically charging their hours to deplete every equity from the estate. *United Phosphorus, Ltd. v. Midland Fumigant, Inc.,* 205 F.3d 1219, 1234 (10th Cir.2000). *See also Praseuth,* 406 F.3d at 1259("While a party is free to select counsel from any locality, absent a clear showing that the matter could not have been reasonably handled by counsel from the locality, rates above the prevailing local hourly rates should not be applied.")

KTS' rates far exceed rates customarily charged in the Eastern District of New York for creditor representation in bankruptcy cases and for representation in litigation.

**Dark Patch entries**

13.    The entire invoices, the time entries are mysteriously redacted. One cannot evaluate its worth. As observed in the different courts, it looks and evaluates, the oversecured creditors' fee requests by assessing various factors in order to shed light on whether the creditor acted fairly, prudently, and efficiently, and whether the fees

incurred were reasonable in amount. These courts considered, among others the following, whether,

i.   the legal services and expenses were authorized by the loan agreement;

ii.   the services were necessary to promote the client's interest;

iii.   the charges were permitted under applicable law, including the Bankruptcy Code;

iv.   the services were compatible with bankruptcy policy;

v.   the time spent was appropriate in light of the complexity of the task;

vi.   the hourly rates were appropriate under applicable standards;

vii.   tasks were assigned to attorneys that were able to render the services efficiently and competently;

viii.   billing judgment was exercised to adjust the fee to eliminate unnecessary or duplicative services or expenses; and

ix.   the bankruptcy court's observation of the nature of the case and the manner of its administration reflects that the fees sought should be further adjusted.

**See,** *,In re Wonder Corp. of America,* 72 B.R. 580 (Bankr.D.Conn.1987) (*"Wonder I "*),*aff'd sub nom Chase Manhattan Bank, N.A. v. Wonder Corp. of America (In re Wonder Corp. of America),* 82 B.R. 186 (D.Conn.1988) (*"Wonder II "*); *In re Wonder Corp. of America,* 96 B.R. 423 (Bankr.D.Conn.1989) (*"Wonder III "*).

All dark patch entries in the invoices must denied. These are not compensable items. The movant has failed to substantiate these charges.

## Environmental Concerns and its Bills

14.    Wells Fargo hired very expensive lawyers for a transaction or project that the debtor was already making payment through the appointment of the Receiver.  The property was under the control of a Receiver. The receiver did not hire Akin Gump Strauss Hauer & Feld, LLP (Akin). The receiver has been paid. He was hired by the Court, pursuant to the Supreme Court direction and was authorized to hire professionals. He did not hire Akin.  This is a duplicative billing. All Akin related invoices needs to be scrapped.  **Ex. E**. of Fargo Application.

|       |                          |
|-------|--------------------------|
| i.    | 09/12/14  $2,634.00      |
| ii.   | 02/17/15 $1,125.50       |
| iii.  | 03/16/15 $3,327.00       |
| iv. . | 04/20/15  $444.50        |
| v.    | 06/24/15  $635.00        |
| vi.   | 08/11/15  $500.00        |
| vii.  | 09/18/15 $604.50         |
| viii. | 10/13/15 $684.50         |
| ix.   | 11/25/15 $661.00         |
| x.    | 01/28/16 $1,543.00       |
| xi.   | 02/11/16 $3,814.50       |
| xii.  | 03/18/16 $6,499.50       |
| xiii. | 04/21/16 $85.50          |
| xiv.  | 05/12/16 $628.00         |
| xv.   | 06/17/16 $542.00         |
| xvi.  | 06/17/16 $542.00         |
| xvii. | 06/17/16 $542.00         |
| xviii.| 07/26/16  $1,098.50      |
| xix.  | 08/19/16 08/19/16 $1,342.50 |
| xx.   | 09/21/16 $2,370.50       |
| xxi.  | 10/25/16 $2,026.00       |
| xxii. | 11/21/16  $1,484.00      |
| xxiii.| 11/29/16 $1769.00        |
| xxiv. | 01/11/17 $6,670.00       |
| xxv.  | 02/16/17 $5,164.00       |
| xxvi. | 03/14/17 $2,216.00       |
| xxvii.| 03/14/17 $2216.00        |
| xxviii.| 04/25/17 $1,350.00      |
| xxix. | 05/24/17 $2,202.00       |

## The demanded Fees are disproportionate to the risk and present classic case of overreach

15.    In, *In re PCH Assoc.,* 122 B.R. 181, 203 (Bankr.S.D.N.Y.1990), the court summarized, In evaluating the reasonableness of fees sought under § 506(b),

> [t]he size of a creditor's equity cushion is an underlying factor in the reasonableness determination .... [citation omitted]. If the equity cushion is large enough that there is no appreciable risk that a creditor will not be paid, courts will tend to view large fee claims as being exorbitant because there is no purpose in engaging in legal maneuvers.

Therefore, although "creditors are entitled to engage counsel and pay for constant, comprehensive, and aggressive representation, ... where services are not reasonably necessary or action is taken because of an attorney's excessive caution or overzealous advocacy, courts have the right and duty, in the exercise of discretion, to disallow fees under § 506(b)." *In re Wonder Corp. of America,* 72 B.R. 580, 591 (Bankr.D.Conn.1987) (*"Wonder I"*).

Here the property was listed for sale. And even before listing for sale, it had been valued at more than 5.1 million. Thus, there was hardly any question on that the hefty equity cushion that protected Fargo's secured claim from erosion was never seriously called into question. Fees incurred in participation and directing and misadventurously denting in the process of the sale were clearly not warranted. It was clear from the get go that the Fargo's interest in the Coney Island property was sufficient to satisfy the claim. Therefore, the triggering Mohammad's challenge, pushing Ghalchi was not reasonable. No money must be paid for KTS involvement or participation in the sale or bidding process and or related litigation. Its entries should scrapped.

KTS must be compelled to club the billing according to the nature of the acts, rather than by dates. It has made it very difficult for the undersigned and for the Court too, it shall be onerous to deal with it.

### Retainer is Missing

16.    Something is not right here.  Bernardino has been asked many a times to send a copy of the retainer, the terms of the engagement. Wells Fargo has hired a very-very expensive team of lawyers. It is not reasonable. And reasonable are not the rates. Basic understanding between Fargo and KTS is to be seen.  Without the said retainer, one very vital step to evaluate fees is missing.  The rate of being billed here very vivid and it is very high.  Special competence is being flown from Atlanta—why? Did New York not have attorneys?  They are asking a mammoth sized fees, ironically calling it a reasonable fees. What evidence has Bernardino produced to show reasonableness. Nothing. He had been requested several times to produce the retainer executed between him and his client, the Wells Fargo or it sub servicer. And they in turn produce, how Bernardino has billed them. Clearly, as the Fifth Circuit observed,

> Whether the bankruptcy court abused its discretion in finding that Wells Fargo failed to prove any reasonable attorneys' fees is a closer question. There was evidence that attorneys for Wells Fargo had provided some services, and there was evidence that Wells Fargo had in fact paid its attorneys the amounts it sought to recover. However, on balance, we conclude that the bankruptcy court was within its discretion in finding that there was no documentation of the time that was spent and no testimony as to what was a reasonable fee. Based on this record, we cannot say that the bankruptcy court erred in finding under § 506(b) that the amount of attorneys' fees Wells Fargo sought was not substantiated and therefore was not shown to be reasonable.

*In re 804 Cong.*, L.L.C., 756 F.3d 368, 377 (5th Cir. 2014) (inner citation omitted).

We have been relentless for production of what he has been billing his client. This

will show a chasm. "Hours that are not properly billed to one's *client* also are not

properly billed to one's *adversary* pursuant to statutory authority." *Hensley v.*

*Eckerhart,* 461 U.S. 424, 434, 103 S. Ct. 1933, 1940, 76 L. Ed. 2d 40 (1983) (quoting

*Copeland v. Marshall,* 205 U.S .App. D.C. 390, 401, 641 F.2d 880, 891 (1980) (en

banc) (emphasis in original)). We must know what fees agreement there is between

the creditor and their attorney.  As so cogently put,

> The underlying fee agreement between the creditor and
> its attorney is relevant to this test in two respects. First, ordinarily,
> as in this case, the agreement between the creditor and the debtor
> provides that the creditor shall be reimbursed only for fees it
> incurs. Where a fee agreement exists between the creditor and
> its attorney, the agreement is crucially relevant to determining
> what fees are incurred. Thus the fee agreement is relevant to the
> third of the four issues: whether the underlying agreement provides
> for payment of the fees requested.
>
> Second, the fee agreement is relevant to the determination
> of how much is reasonable. Whether the requested amount *290 is
> reasonable is a question of federal law on which the courts
> typically employ some version of the lodestar analysis. Under this
> analysis, a "lodestar" is determined by multiplying the number of
> hours reasonably expended by a reasonable hourly rate, and this
> amount is then adjusted upward or downward according to various
> considerations enumerated in *Johnson v. Georgia Highway
> Express, Inc.,* 488 F.2d 714, 717–719 (5th Cir.1974). *Hensley v.
> Eckerhart,* 461 U.S. 424, 433–434, 103 S.Ct. 1933, 1939–1940, 76
> L.Ed.2d 40 (1983). The rate agreed upon between the creditor and
> its attorney is directly relevant to the most basic element in this
> analysis: the reasonable hourly rate. Although it is not dispositive,
> an attorney's actual billing rate is the starting point, especially
> where, as the product of arm's length bargaining, it reflects the
> market value of the attorney's services.

*In re 1095 Commonwealth Ave. Corp.,* 204 B.R. 284, 289–90 (Bankr. D. Mass.

1997), aff'd as modified sub nom. *In re 1095 Commonwealth Corp.,* 236 B.R. 530 (D.

Mass. 1999). The actual negotiated rate displaces the standard rate and becomes the

presumptive reasonable rate. The negotiated rate is also important among the considerations enumerated in *Johnson v. Georgia Highway Express, Inc.* In that case, the court stated: "The fee quoted to the client or the percentage of the recovery agreed to is helpful in determining the attorney's fee expectations." *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d at 718. Later, the court added that "[i]n no event should the litigant be awarded a fee greater than he is contractually bound to pay, if indeed the attorneys have contracted as to amount." Id. The Note language reflects the same principle—"If it becomes *necessary to employ counsel* to *collect the obligation* described herein or to protect or foreclose said mortgage, the *mortgagor hereby agrees to pay all expenses and costs, including reasonable attorney's fees for the services of such counsel together with all other costs and disbursements in connection therein* whether or not suit be brought and including those incurred in post-judgment collection efforts and in any bankruptcy proceeding (including any action for relief from the automatic stay of any bankruptcy proceeding). So, what is the retainer? We do not know. The rate that is applied here misses the first step of being reasonable. A "reasonable" attorney's fee "means a fee that would have been deemed reasonable if billed to affluent plaintiffs by their own attorneys." *Missouri v. Jenkins,* 491 U.S. 274, 286 (1989) (quoting *City of Riverside v. Rivera,* 477 U.S. 561, 591 (1986) (Rehnquist, J., dissenting)); see also *In Time Products, Ltd. v. Toy Biz, Inc.,* 38 F.3d 660, 667 (2d Cir. 1994) ("A district court's award of attorneys' fees pursuant to a contractual fee-shifting provision must be reasonably related to the fee arrangement that the prevailing party would have made with counsel absent a fee-shifting agreement."). *Rozell v. Courtney Ross-Holst,* 576 F. Supp. 2d 527, 544 (S.D.N.Y. 2008) (rates that attorneys actually charge their clients is "obviously strong evidence of what the market will bear").

## The Loot Billing cannot pass Reasonableness Test

17.    As a prelude to fixing any fees, it is necessary to "determine whether the creditor reasonably believed the services were necessary to protect its interest in the debtor's property." *In re PCH Assocs.,* 122 B.R. 181, 204 (Bankr.S.D.N.Y.1990); *see also In re Vest Assocs.,* 217 B.R. 696, 700–701 (Bankr.S.D.N.Y.1998). It has not shown that.

As is clear from the Note, that only when it becomes

> necessary to employ counsel to collect the obligation described herein or to protect or foreclose said mortgage, the mortgagor hereby agrees to pay all expenses and costs, including reasonable attorney's fees for the services of such counsel together with all other costs and disbursements in connection therein whether or not suit be brought and including those incurred in post-judgment collection efforts and in any bankruptcy proceeding (including any action for relief from the automatic stay of any bankruptcy proceeding).

See Note. Thus, the permissive provision for fees is that Wells Fargo here "may recover only such fees "as were reasonably necessary to enforce the debtor's obligations and to collect the amount remaining due pursuant to those obligations." *In re Cont'l Vending Mach. Corp.,, 543 F.2d 986 (2ⁿᵈ Cir. 1976).* However, "this does not provide a secured creditor a "blank check" to accrue fees and expenses, and it only provides for reimbursement of reasonably necessary fees in connection with a chapter 11 proceeding." *In re Glazier Grp., Inc.,* No. 10-16099 ALG, 2013 WL 1856305, at *3 (Bankr. S.D.N.Y. May 2, 2013) (*In re Scarlet Hotels, LLC,* 392 B.R. 698, 702 (B.A.P. 6th Cir.2008)). The servicer employed a counsel, there must be some agreement, as it might have become "necessary to employ counsel to collect the obligation." Also, when Wells Fargo as here so over secured, "[t]he size of a creditor's equity cushion is an underlying factor in the reasonableness determination." *In re Glazier Grp.,Inc* (quoting *In re Amherst Orthopedic Assocs., P. C.,* 355 B.R. 420, 422 (Bankr.W.D.N.Y.2006). And "when there is only minimal risk, "circumstances will generally require that counsel respond only to issues of material

31

concern...." *Id.* at 424.Here there is lot of redundant work and billing generated from the beginning.   There was absolutely no need to interject in the sale process and attempt to get a result which backfired dramatically.  Mr. Bernardino overstepped. He stepped into the shoes of the debtors' counsel by commandeering the Debtor-in-Possession executions of the bidding, the sale and then triggering an avalanche of litigation.

### Hotel Stay Expenses

18.    Why would the debtor pay for the hotel expenses? It is highly unreasonable. New York is swarming with lawyers, yet Fargo or Water Stone had to forge for Atlanta.  These expenses were not necessary and were not even foreseeable by the debtors when they executed the mortgage and the note.  Some of the examples of billing are:

08/16/2016

Hotel Expense of Colin Bernardino on 08/15/2016 - 08/16/2016 to New York, NY regarding Attend Lorick Hearing in New York. 227.27

01/10/2017

Hotel Expense of Colin Bernardino on 01/09/2017 - 01/10/2017 to New York, NY regarding Attend Hearing in New York for Waterstone/Coney Island 255.96

02/23/2017
Hotel Expense of Colin Bernardino on 02/22/2017 - 02/23/2017 to New York, NY regarding Attend Lorick Hearing in New York
151.53

04/20/2017

Hotel Expense of Colin Bernardino on 04/19/2017 - 04/20/2017 to New York, NY regarding Attend hearing in New York on April 20,2017
398.24

06/27/2017
Hotel Expense of Nancy Day on 06/26/2017 - 06/27/2017 to NEw York, NY regarding Attend Lorick Hearing in New York. 319.07

08/24/2017

Hotel Expense of Colin Bernardino on 08/22/2017 - 08/24/2017 to New York, NY regarding Attend Hearing in New York. 511.92

01/10/2017
Hotel Expense of Colin Bernardino on 01/09/2017 - 01/10/2017 to New York, NY regarding Attend Hearing in New York for Waterstone/Coney Island 255.96

02/23/2017
Hotel Expense of Colin Bernardino on 02/22/2017 - 02/23/2017 to New York, NY regarding Attend Lorick Hearing in New York     151.53

04/20/2017
Hotel Expense of Colin Bernardino on 04/19/2017 - 04/20/2017 to New York, NY regarding Attend hearing in New York on April 20,2017  398.24

06/27/2017
Hotel Expense of Nancy Day on 06/26/2017 - 06/27/2017 to NEw York, NY regarding Attend Lorick Hearing in New York.   319.07

08/24/2017
Hotel Expense of Colin Bernardino on 08/22/2017 - 08/24/2017 to New York, NY regarding Attend Hearing in New York. 511.92

10/05/2017
Hotel Expense of Colin Bernardino on 10/04/2017 - 10/06/2017 to New York, NY regarding Attend Lorick Hearing in New York 347.76

10/06/2017
Hotel Expense of Colin Bernardino on 10/05/2017 - 10/05/2017 to New York, NY regarding Attend Lorick Hearing in New York
370.70

10/26/2017
Hotel Expense of Colin Bernardino on 10/25/2017 - 10/26/2017 to New York, NY regarding Attend Lorick Hearing in New York.  496.92

11/02/2017
Hotel Expense of Colin Bemardino on 11/01/2017 - 11/02/2017 to New York, NY regarding Attend Lorick Hearing in New York. 543.67

I 1/07/2017
Hotel Expense of Colin Bernardino on 11/06/2017 - 11/07/2017 to New York, NY regarding Attend Lorick hearing in New York. 347.76

11/17/2017

Hotel Expense of Colin Bernardino on 11/16/2017 - 11/17/2017 to New
York, NY regarding Attend Lorick hearing in New York
245.63
12/13/2017
Hotel Expense of Colin Bernardino on 12/12/2017 •· 12/13/2017 to New
York, NY regarding Attend Lorick hearing in New York. 587.57
12/21/2017

Hotel Expense of Colin Bernardino on 12/20/2017 - 12/21/2017 to New
York, NY regarding Attend Lorick Hearing in New York.
254.81

02/08/2018 Hotel Expense of Colin Bernardino on 02/07/2018 - 02/08/2018 to New
York, Y regarding Attend Lorick Hearing in New York. 254.81

Out-of-town Travel (Hotel)
$5,313.62  as per the invoice.

## Travel and Hotel Expenses of Bernardino must be denied

19.    KTS has a local counsel that could have attended all the matters pending in this

district. Importing a lawyer from Atlanta and billing at 700 dollars an hour is not

acceptable. Clearly Atlanta lawyers billing rate is lower than Manhattan based. Thus

charging the estate for these lawyers time while traveling unnecessarily is not

reasonable. "While the Court recognizes plaintiff's right to retain counsel of her own

choice, she has failed to explain the need for out-of-state counsel when presumably, a

local attorney with similar trial experience could be located." *Simmons v. New York

City Transit Auth.,* No. CV-02-1575, 2008 WL 630060, at *7 (E.D.N.Y. Mar. 5,

2008), vacated, 575 F.3d 170 (2d Cir. 2009). See also, *Sizemore v. Electronic Pre-

Press Systems, Inc.,* CV-90-5042, 1993 WL 535175, at *3(S.D.N.Y.1993) (denying

attorneys' travel time because defendants chose to be represented by attorneys located

in Rochester rather than New York City). Berarnardino travel expenses must be

deleted. Costs are ordinarily recoverable if they are "incidental and necessary to the

litigation." *Tips Exports, Inc., v. Music Mahal, Inc.,* No. 01-CV-5412, 2007 W<u>L</u>

952036, at * 11 (E.D.N.Y.2007). Costs relating to filing fees, process servers, postage, travel, and photocopying are routinely made. *See id. However, as* "Attorney Marshall's roundtrip airfare and airport cabfare in the amount of $266 and $60, respectively. Marshall's travel expenses are denied for the same reason as his request for travel fees," *Simmons v. New York City Transit Auth.,* No. CV-02-1575, 2008 WL 630060, at *7 (E.D.N.Y. Mar. 5, 2008), similarly Bernardino travel expenses must be stricken from any payments. See also, *Cartier Int'l B.V. v. Gorski,* 2003 WL 25739624, at *3, 5 (D.Conn. Apr.30, 2003) (denying an award of travel expenses because plaintiff chose out-of-town counsel); *Zampino v. Supermarkets General Corp.,* 1994 WL 470338, at *3 (E.D.Pa. Aug.31, 1994)(denying an award of travel expenses on the ground that a defendant "should not be forced to pay the exorbitant costs associated with Plaintiff's choice of distant counsel"). All this travelling was not necessary, local lawyers or even KTS local lawyers were fully capable of assuming the tasks assumed by Bernardino.

### Food

20.    There are lot of meals. As if meals payments have been covenanted to the foreclosing attorney. It would be a mess to imagine all foreclosing attorneys start billing for their food. No one is going to buying real estate. *In re Cummins Utility, L.P.,* 279 B.R. 195, 204 (Bankr.N.D.Tex.2002) ("Section 506(b) is not intended as a carte blanche for secured creditors to dun the estate."). A client or a not a client, food would still be necessary for Bernardino. Something that he would do, naturally and compellingly, with or without presence of Loricks—then why should that old man be burdened with feeding. Eating, Mr. Bernardino would still do, this expense must be stricken from the bills.

**Reach of Section 506 is prudence and is anchored in restrain**

21.    One purpose of Section 506(b)

> is to ensure that estate assets are not squandered by over-
> secured creditors, who, believing that the debtor will be required to foot
> the bills, fail to exercise restraint in the attorneys' fees and expenses they
> incur, perhaps exhibiting excessive caution, overzealous advocacy and
> hyperactive legal efforts.

*In re Gwyn,* 150 B.R. 150 at 155, (Bankr.M.D.N.C.1993).   Thus, pursuant
to Bankruptcy Code 506(b), a secured creditor is allowed only
reasonable attorneys fees and expenses in enforcing its rights. In making a fee
determination, the Court must consider not only the fee agreement but the overall
fairness and reasonableness of the fee under all of the circumstances. Reasonable fees
are those necessary to the collection and protection of a creditor's claim and include
fees for those actions which a similarly situated creditor might have taken. The fees
must be cost justified by the economics of the situation and necessary to preserve the
creditor's interest in light of the legal issues involved. A secured creditor is not
entitled to compensation for its attorneys fees for every action it takes by claiming
that its rights have been effected. *In re Huhn,* 145 B.R. 872, 876 (W.D.Mich.1992).
See also  *In re Digital Prod. Corp.,* 215 B.R. 478, 482 (Bankr. S.D. Fla. 1997).  [T]he
reasonableness of counsel's activities in representing a secured creditor may depend
on the extent to which the creditor's secured position is jeopardized. Where a creditor
is oversecured, the size of a creditor's equity cushion is an underlying factor in the
reasonableness determination. When there is only minimal risk, circumstances will
generally require that counsel respond only to issues of material concern. Mr.
Bernardino did not have participate and steer the sale process of the bankruptcy case.
He is micromanaging and throwing his weight around. "A secured creditor is not
entitled to compensation for its attorneys' fees for every action it takes by claiming

36

that its rights have been affected." *In re Dig. Prods. Corp.*, 215 B.R. at 482 (Bankr.
S.D. Fla. 1997), *citing In re Huhn*, 145 B.R. 872, 876 (W.D. Mich. 1992). There was
no threat to their lien. There was no threat to the secured status. There were no other
competing claims. They were the only one with a judgment lien fully secured.
Clearly, time billed for services not related to protecting the claimant's secured
position is not allowed. *In re Country Squire Assocs. of Carle Place, L.P.*, 1998
Bankr. LEXIS 1909, at *42. "[T]he services employed [have] to be necessary to
protect [creditor's interest] in the debtor's property." *In re Salisbury*, 58 B.R. 635, 640
(Bankr. D. Conn. 1985).

As suggested in the heading, this case and its billing under the guise of 506
was a more a loot. "[A] rule of reason must be observed, in order to avoid such
clauses becoming a tool for wasteful diversion of an estate at the hands
of secured creditors who, knowing that the estate must foot the bills, fail to exercise
restraint." *Wonder,* 82 B.R. at 189 (D.Conn.1988), *quoting In re Continental Vending
Machine Corp.,* 543 F.2d 986 (2d Cir.1976). The Supreme Court in *United States v.
Ron Pair Enterprises* 489 U.S. 235 1989) held that under § 506(b), "recovery of
postpetition interest is unqualified," however, "[r]ecovery of fees, costs, and charges
... is allowed only if they are reasonable and provided for in the agreement under
which the claim arose. The Supreme Court  here held that the word "reasonable" in §
506(b) does not modify "interest" but does modify "fees, costs, or charges provided
for under the agreement." Id at 241. Agreed state law grants a contractual claim,
however, "the language of 506(b) [does not] indicate that just because a given fee
arrangement is enforceable under state law, it should be exempt from the
reasonableness standard. *In re 804 Cong., L.L.C.,* 756 F.3d 368, 376 (5th Cir. 2014)
(quoting *Welzel v. Advocate Realty Invs., LLC (In re Welzel),* 275 F.3d 1308, 1314
(11th Cir.2001)). Indeed, Wells Fargo or is collection or service agents have gone
too far in their fees assertion, but not too far to escape this court scrutiny,

> The Ninth Circuit held that " § 506(b) preempts the state law governing the availability of attorney's fees as part of a secured claim, and ... the bankruptcy court correctly engaged in an independent reasonableness inquiry." *Joseph F. Sanson Investment Co. v. 268 Ltd. (In re 268 Ltd.)* 33 789 F.2d 674 (9th Cir.1986). The debtor had argued "that if the contractual fee provision would be enforceable under Nevada law, then the amount provided is reasonable per se under § 506(b)." The court rejected that argument, explaining that "[r]easonableness and enforceability are not, however, coterminous." The court upheld the bankruptcy court's finding that $20,000 was a reasonable fee, rather than $197,500, which was five percent of the outstanding balance at the time the property was sold.

*In re 804 Cong., L.L.C.,* 756 F.3d 368, 376–77 (5th Cir. 2014) (citation omitted).

Thus, "If a contractual fee is not reasonable, it will not be given effect for the purposes of § 506(b)."

### Nondisclosure and Misrepresentation is another reason for denial of this fees application

22.     Bernardino misrepresented the nature of the fee agreement between itself and Wells Fargo, despite an affirmative obligation to do so, failed to disclose the real agreement he had with his client. It indirectly states that it has been retained at the hours they are billing their client. We do not have both—neither the retainer or the receipt of this billings by Wells Fargo.

### Hourly rates are not acceptable

23.     Hourly rates must reflect the "prevailing market rates in the relevant community." *Blum v. Stenson,* 465 U.S. 886, 895 (1984). Unless the subject of the litigation is "so unusual or requires such special skills" that only an out-of-state lawyer possesses, "the fee rates of the local area should be applied even when the lawyers seeking fees are from another area." *Ramos v. Lamm,* 713 F.2d 546 (10th Cir. 1983). Here, Mr. Bernardino is partner in Atlanta—what was the necessity of having

him flown here to prosecute this action? What was so "unusual or require[ed] such special skills"?

### Claim against Stone Management

24.    "[A]ny defense to a claim that is available outside of the bankruptcy context is also available in bankruptcy." *Travelers Casualty & Surety Co. of America v. Pacific Gas & Electric Co.,* 549 U.S. 443, 450 (2007).  The debtors have serious claim against this law firm and creditor. They misled the debtor. His loan term was not extended. He exercised his right, the creditor breached it.  The claim is clearly establishes the right of setoff. It is a different issue that the debtors have not yet initiated in their action.

### CONCLUSION

25. Based on a lack of transparency, lack of a production of a retainer agreement and billing agreement and owing to the highly redacted bills, blocking billing, this application must be denied in its entirety. To be entitled to estate monies, complete disclosure is warranted. Wherefore, the different applications for Wells Fargo and KTS law under the contract or section 506  does not merit any consideration.

Dated: New York NY
May 17, 2018

/s/
Karamvir Dahiya